1  Ben F. Pierce Gore (SBN 128515)
2  PRATT & ASSOCIATES
   1901 S. Bascom Avenue, Suite 350
3  Campbell, CA 95008
   Telephone: (408) 429-6506
4  Fax: (408) 369-0752
   pgore@prattattorneys.com
5
   (Co-counsel listed on signature page)
6
   *Attorneys for Plaintiffs*
7

8

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                   SAN FRANCISCO DIVISION

12

13  LEVI JONES, CHRISTINE STURGES,        Case No. 12-CV-1633 CRB
    and EDD OZARD, individually and on
14  behalf of all others similarly situated,   **CLASS ACTION AND
                                               REPRESENTATIVE ACTION**
15                   Plaintiffs,
                                               **AMENDED COMPLAINT FOR
16  v.                                         DAMAGES, EQUITABLE AND
                                               INJUNCTIVE RELIEF**
17  CONAGRA FOODS, INC.,
                                               **JURY TRIAL DEMANDED**
18                   Defendant.

19

20        Plaintiffs Levi Jones, Christine Sturges and Edd Ozard, through their undersigned

21  attorneys, bring this lawsuit against ConAgra Foods, Inc. (hereinafter "ConAgra" or "Defendant")

22  as to their own acts upon personal knowledge, and as to all other matters upon information and

23  belief. In order to remedy the harm arising from Defendant's illegal conduct, which has resulted

24  in unjust profits, Plaintiffs bring this action on behalf of a class of California consumers who,

25  within the last four years purchased a PAM cooking spray product, or a Hunt's canned tomato

26  product, or a Swiss Miss cocoa product (referred to herein as "Misbranded Food Products").

27

28

1

**INTRODUCTION**

2

     1.     Every day, millions of Americans purchase and consume packaged foods.

3

Identical federal and California laws require truthful, accurate information on the labels of

4

packaged foods. This case is about a company that flouts those laws and sells misbranded food to

5

unsuspecting consumers. The law, however, is clear: misbranded food cannot legally be

6

manufactured, held, advertised, distributed, or sold. Misbranded food is worthless as a matter of

7

law, and purchasers of misbranded food are entitled to a refund of their purchase price.

8

     2.     If a manufacturer is going to make a claim on a food label, the label must meet

9

certain legal requirements that help consumers make informed choices and ensure that they are

10

not misled. Defendant has made, and continues to make, false and deceptive claims in violation

11

of federal and California laws that govern the types of representations that can be made on food

12

labels. These laws recognize that reasonable consumers are likely to choose products claiming to

13

have a health or nutritional benefit over otherwise similar food products that do not claim such

14

benefits.

15

     3.     Under California law, which is identical to federal law, a number of Defendant's

16

food labeling practices are unlawful because they are deceptive and misleading to consumers.

17

These include:

18

19

     A.     Representing food products to be "100% natural" when they contain significant
quantities of undisclosed petrochemicals such as Petroleum gas (liquefied), Propane,

20

Propane 2-methyl (isobutane) and Butane that have comprised 24% or more of the food
products' ingredients;

21

22

     B.     Representing food products to be "100% natural" when they contain significant
quantities of undisclosed chemical preservatives, synthetic chemicals, added artificial

23

color and other artificial ingredients;

24

     C.     Representing food products to be "Organic" or "Certified Organic" or "USDA
Organic" when they contain disqualifying amounts of "synthetic" chemicals and

25

"[n]onagricultural (nonorganic) substances" that preclude the use of those terms as a

26

matter of law;

27

     D.     Failing to use the common or usual name of ingredients required by law or to list
ingredients in descending order by weight as required by law thus concealing the

28

presence of undisclosed chemicals and petrochemicals such as Petroleum gas (liquefied),

Propane, Propane 2-methyl (isobutane) and Butane that comprise 24% or more of the product and conveying the false impression that chemicals and other nonorganic ingredients comprise smaller percentages of the products than they actually do;

E.     Representing food products to be "free of artificial ingredients and preservatives" when they in fact contain artificial ingredients and preservatives;

F.     Failing to disclose the presence of chemical preservatives and artificial added colors in the ingredient lists of food products as required by law;

G.     Making unlawful nutrient content claims on the labels of food products that fail to meet the minimum nutritional requirements that are legally required for the nutrient content claims that are being made;

H.     Making unlawful antioxidant claims on the labels of food products that fail to meet the minimum nutritional requirements that are legally required for the antioxidant claims that are being made;

I.     Representing foods to be fresh or have a "fresh taste" when those products have undergone manufacturing processes and contain undisclosed chemical preservatives that preclude any representations about freshness as a matter of law;

J.     Making unlawful and unapproved health claims about their products that are prohibited by law; and

K.     Making unlawful claims that suggest to consumers that their products can prevent the risk  or treat the effects of certain diseases like cancer, osteoporosis, asthma, cardiovascular disease, diabetes, psoriasis, erythema, premature skin aging, sun damage, dementia, Alzheimer's disease, Parkinson's disease, and mild cognitive impairment.

4.     These practices are not only illegal but they mislead consumers and deprive them of the information they require to make informed purchasing decisions. Thus, for example a mother who reads labels because she wants to purchase all natural foods and does not wish to feed her child foods containing a lighter fluid like butane would be misled and deceived if she, like Plaintiffs, purchased Defendant's 100% Natural PAM Original cooking spray which actually contained at least 24% Petroleum gas (liquefied), Propane, Propane 2-methyl (isobutane) and Butane but failed to list those petrochemicals in the ingredient list by their common or usual name or by any name that would have disclosed their presence to a consumer. ConAgra omitted this relevant information from the labels of its food products and the only way a consumer could obtain it would be to either subject their food purchases to laboratory analysis or track down the official Material Safety Data Sheets the Defendant prepared for its products where it detailed their

1    true compositions and the health risks attributable to exposure to those products through

2    ingestion, inhalation, and contact. The identical California and federal labeling laws were

3    designed so that consumers could get the information they want and need by reading the labels of

4    the foods they purchased. These laws recognized that consumers should not have to conduct

5    laboratory analyses or track down Material Safety Data Sheets to ensure they were not purchasing

6    foods that contained undisclosed ingredients like lighter fluid (butane) they wished to avoid in

7    their food.

8        5.      Similarly, these laws placed numerous requirements on food companies that were

9    designed to ensure that the claims about their products that they made to consumers were truthful,

10   accurate and backed by acceptable forms of scientific proof. When companies like ConAgra

11   make unlawful nutrient content, or antioxidant or health claims that have been prohibited by

12   regulation consumers like Plaintiffs are misled.

13       6.      Identical federal and California laws regulate the content of labels on packaged

14   food.  The requirements of the federal Food, Drug & Cosmetic Act ("FDCA") were adopted by

15   the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law").

16   California Health & Safety Code § 109875, *et seq.*  Under both the Sherman Law and FDCA

17   section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if

18   it does not contain certain information on its label or in its labeling.  California Health & Safety

19   Code § 110660; 21 U.S.C. § 343(a). Under the FDCA, the term "false" has its usual meaning of

20   "untruthful," while the term "misleading" is a term of art.  Misbranding reaches not only false

21   claims, but also those claims that might be technically true, but still misleading.  If any single

22   representation in the labeling is misleading, the entire food is misbranded, and no other statement

23   in the labeling can cure a misleading statement.  "Misleading" is judged in reference to "the

24   ignorant, the unthinking and the credulous who, when making a purchase, do not stop to analyze."

25   *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951).  Under the FDCA, it is

26   not necessary to prove that anyone was actually misled.

27       7.      ConAgra, through its website, claims that it is "one of North America's leading

28   food companies" and claims to have consumer brands in 97% of America's households.

1   ConAgra's major brands include but are not limited to Alexia®, Chef Boyardee®,

2   Fleischmann's®, Healthy Choice®, Hunt's®, Manwich®, Marie Callender's®, Orville

3   Redenbacher's®, PAM®, Parkay®, Peter Pan®, Ro*Tel®, Slim Jim®, Snack Pack®, Swiss

4   Miss®, Wesson®, and others.

5          8.     Through its Hunt's brand, ConAgra packages and sells canned tomatoes, including

6   Diced Tomatoes, Crushed Tomatoes, Stewed Tomatoes, Whole Tomatoes, Tomato Paste, Tomato

7   Puree, and Tomato Sauce, including variations of each.  The canned tomato industry sometimes

8   refers to these as the "seven segments."  ConAgra sells cooking sprays through its PAM brand

9   and cocoa through its Swiss Miss brand.

10          9.     As consumer preferences have begun to favor healthier options, ConAgra has

11   embarked on a health and wellness strategy that seeks to emphasize how its products are good for

12   a consumer and to reposition its products as a healthy option. In furtherance of its health and

13   wellness strategy, ConAgra utilizes unlawful, false and misleading nutrient content and health

14   claims to promote and market its Misbranded Food Products. ConAgra has also sought to appeal

15   to consumer preferences for natural and functional foods by including unlawful, false and

16   misleading "100% natural" claims, "Organic" claims, antioxidant claims, nutrient content claims,

17   no preservatives claims, ingredient claims, and fresh claims on its Misbranded Food Product

18   labels and product related materials. ConAgra has also engaged in a host of unlawful labeling

19   practices designed to conceal those aspects of its foods that are not in line with consumer

20   preferences. Thus, for example, ConAgra concealed the fact that certain varieties of its PAM

21   cooking spray purchased by Plaintiffs contained at least 24% Petroleum gas (liquefied), Propane,

22   Propane 2-methyl (isobutane) and Butane by failing to list those ingredients by their common or

23   useful name in the ingredient list.

24         10.     ConAgra's reason for making such claims and engaging in deceptive and unlawful

25   labeling practices is driven by its pecuniary interests. As stated by ConAgra in the Risk Factors

26   section of  the most recent annual report it filed with the S.E.C.:

27                     Consumer preferences evolve over time and the success of our food products

28                     depends on our ability to identify the tastes and dietary habits of consumers and
                  to offer products that appeal to their preferences, including concerns of

consumers regarding health and wellness, obesity, product attributes, and ingredients. Introduction of new products and product extensions requires significant development and marketing investment. If our products fail to meet consumer preference, or we fail to introduce new and improved products on a timely basis, then the return on that investment will be less than anticipated and our strategy to grow sales and profits with investments in marketing and innovation will be less successful. Similarly, demand for our products could be affected by consumer concerns regarding the health effects of ingredients such as sodium, trans fats, sugar, processed wheat, or other product ingredients or attributes.

11.     In other ConAgra reports, ConAgra has identified the following risk to the company:

Health care issues facing the United States and health-conscious consumer expectations have put increasing pressure on the food industry to constantly evaluate the nutritional profiles of its products. If our products fail to keep up with health trends and consumer expectations, our business performance may be negatively impacted.

ConAgra indicated that to address this risk it needed to:

…stay aligned with consumer preferences and improve the nutritional value of our products to establish a competitive advantage in the marketplace.

12.     In furtherance of its health and wellness strategy ConAgra has utilized a number of specific unlawful, improper, unauthorized, misleading and false antioxidant, nutrient content, fresh, "Organic" and "100% natural" claims on its products' labels and labeling. These include:

A.     "100% natural" claims on the labels of its Hunt's canned tomato products and its PAM cooking spray products that contain ingredients that are not natural such as Petroleum gas (liquefied), Propane, Propane 2-methyl (isobutane) and Butane and whose claims of naturalness have been the subject of prior regulatory action;

B.     "Organic" claims on the labels of certain varieties of PAM cooking spray that contain synthetic and nonorganic ingredients at disqualifying levels;

C.     "Free of artificial ingredients & preservatives" claims on the labels of its Hunt's canned tomato products that contain artificial ingredients and chemical preservatives;

D.     Antioxidant claims on the labels of its Hunt's canned tomato products and Swiss Miss cocoa products which fail to meet the minimum regulatory requirements for such antioxidant claims; and

*Amended Class Action Complaint*

E. Claims that ConAgra's Hunt's canned tomato products are "potassium-rich" and "provide more than twice the potassium than other common potassium sources" like bananas, potatoes, nonfat milk and orange juice when such claims are false and are prohibited by federal and California law.

13.     ConAgra recognizes that health and nutrition claims drive food sales, and actively promotes the purported health and nutritional benefits of its Misbranded Food Products, notwithstanding the fact that such promotion violates federal and California law.

14.     For example, according to ConAgra "canned tomatoes users are nutrient-driven." "These buyers are discriminating—often age 40 and older, with the maturity to understand that what they eat affects their wellness. They want to feed their families nutritionally sound meals, and as busy as they are, they willingly spend more time cooking than most. They value the short ingredients statements on Hunt's products, and they categorize canned tomatoes as a 'less-processed' food that deserves to be on their table."

15.     ConAgra also recognized that consumers were looking for natural options stating "Moms nowadays are looking for better-for-you products for their families. They want simple recipes, natural ingredients and quality at a fair price."

16.     ConAgra was aware, however, that because consumers only spend 5 to 10 seconds before making a decision to purchase, the "traditional brand blocking approach to this category [of sales] doesn't serve today's focused, time-pressed, health-seeking consumers." For such consumers, label claims and other forms of advertising and marketing could help drive sales, particularly if placed prominently on the front of product packaging. Such consumers, however, would not have the time to examine claims or labels in detail.

17.     For example, ConAgra has made a number of specific claims about its canned tomato products including:

A.     Tomatoes are a health promoting food;

B.     Antioxidant properties lend tomatoes toward lowering risk for a number of chronic diseases and improving health status overall;

C.     Hunt's® Tomatoes are available in many varieties, including No Salt Added options, which makes it easy to incorporate the

health benefits of tomatoes into your daily meals;

        D.           Tomatoes are nutrient dense;

        E.           Tomatoes are a package of phyto/bioactive nutrients associated with health;

        F.           Tomatoes deliver on multiple consumer demands;

        G.           Tomatoes offer Taste, Convenience, Calories, Cost, Health.

    18.      ConAgra specifically promotes the antioxidant properties and antioxidant health benefits of its tomato-based canned products. ConAgra maintains the website http://www.conagrafoodsscienceinstitute.com, which contains the following statements:

        A.      A natural source of antioxidants, Hunt's® tomatoes are prepared and packed using a FlashSteam® process to remove the peel;

        B.      Hunt's tomatoes provide:
                • Highly bioavailable lycopene

        C.      Antioxidant properties lend tomatoes toward lowering risk for a number of chronic diseases and improving health status overall.

    19.      ConAgra also has issued press releases and other marketing materials touting the healthy nature of its canned tomato products, including that tomatoes "may have a measurable impact on heart disease prevention" and contribute to "a significant decrease in blood pressure." http://media.conagrafoods.com/phoenix.zhtml?c=202310&p=irol-newsArticle&ID=1494219&highlight.

    20.      In promoting the purported benefits of its Misbranded Food Products, including Hunt's canned tomato products, ConAgra claims it has adopted responsible marketing and advertising policies.  ConAgra claims to understand the importance of communicating responsibly about its products.

    21.      Nevertheless, ConAgra has made, and continues to make, unlawful, false and deceptive claims on its Misbranded Food Products in violation of identical federal and California laws that govern the types of representations that can be made on food labels. In particular, in

making its unlawful antioxidant claims on its Misbranded Food Products, Defendant has violated nutrient content labeling regulations and misbranding laws mandated by identical federal and California laws. In making its "100% Natural," "Organic" and other claims, Defendant has violated a number of other food labeling and misbranding laws mandated by identical federal and California laws including those prohibiting false or misleading label claims.

22.     Defendant has made, and continues to make, unlawful claims on the food labels of its Misbranded Food Products that are prohibited by identical federal and California laws and which render these products misbranded.   Under federal and California law, Defendant's Misbranded Food Products, including Hunt's canned tomato products, PAM cooking spray, and Swiss Miss cocoa, cannot legally be manufactured, advertised, distributed, held or sold. Defendant's false and misleading labeling practices stem from its global marketing strategy. Thus, for example, the Defendant unlawfully placed its false "100% Natural" claim on a wide range of products described below.

## PARTIES

23.     Plaintiff Levi Jones is a resident of Santa Rosa, California who purchased Defendant's Misbranded Food Products in California during the four (4) years prior to the filing of this Complaint (the "Class Period").

24.     Plaintiff Christine Sturges is a resident of Campbell, California who purchased Defendant's Misbranded Food Products in California during the four (4) years prior to the filing of this Complaint (the "Class Period").

25.     Plaintiff Edd Ozard is a resident of Alamo, California who purchased Defendant's Misbranded Food Products in California during the four (4) years prior to the filing of this Complaint (the "Class Period").

26.     Defendant ConAgra is a Delaware corporation with its principal place of business at One ConAgra Drive in Omaha, Nebraska 68102.

27.     Defendant is a leading producer of retail food products, including the products described herein.

28.     Defendant sells its Misbranded Food Products to consumers through grocery and other retail stores throughout California.

**JURISDICTION AND VENUE**

29.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which:  (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendant; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

30.     The Court has jurisdiction over the federal claim alleged herein pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States.

31.     The Court has jurisdiction over the California claims alleged herein pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy under Article III of the United States Constitution.

32.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

33.     The Court has personal jurisdiction over Defendant because a substantial portion of the wrongdoing alleged in this Complaint occurred in California, Defendant is authorized to do business in California, has sufficient minimum contacts with California, and otherwise intentionally avails itself of the markets in California through the promotion, marketing and sale of merchandise, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

34.     Because a substantial part of the events or omissions giving rise to these claims occurred in this District and because the Court has personal jurisdiction over Defendant, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

**FACTUAL ALLEGATIONS**

A.   <u>Identical California And Federal Laws Regulate Food Labeling</u>

35.     Food manufacturers are required to comply with federal and state laws and regulations that govern the labeling of food products.  First and foremost among these is the FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

36.     Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state."  California Health & Safety Code § 110100.

37.     In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations.  For example, food products are misbranded under California Health & Safety Code § 110660 if their labeling is false and misleading in one or more particulars; they are misbranded under California Health & Safety Code § 110665 if their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and regulations adopted thereto; they are misbranded under California Health & Safety Code § 110670 if their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and regulations adopted thereto; they are misbranded under California Health & Safety Code § 110705 if words, statements and other information required by the Sherman Law to appear on their labeling are either missing or not sufficiently conspicuous; they are misbranded under California Health & Safety Code § 110725 if they fail to bear labels clearly stating the common or usual name of each ingredient they contain; they are misbranded under California Health & Safety Code § 110735 if they are represented as having special dietary uses but fail to bear labeling that adequately informs consumers of their value for that use; and they are misbranded under California Health & Safety Code § 110740 if they contain artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on their labeling.

**B.**     **FDA Enforcement History**

38.     In recent years the FDA has become increasingly concerned that food manufacturers were disregarding food labeling regulations. To address this concern, the FDA elected to take steps to inform the food industry of its concerns and to place the industry on notice that food labeling compliance was an area of enforcement priority.

39.     In October 2009, the FDA issued a Guidance For Industry: Letter regarding Point Of Purchase Food Labeling ("2009 FOP Guidance"), to address its concerns about front of package labels. The 2009 FOP Guidance advised the food industry:

> FDA's research has found that with FOP labeling, people are less likely to check the Nutrition Facts label on the information panel of foods (usually, the back or side of the package). It is thus essential that both the criteria and symbols used in front-of-package and shelf-labeling systems be nutritionally sound, well-designed to help consumers make informed and healthy food choices, and not be false or misleading. The agency is currently analyzing FOP labels that appear to be misleading. The agency is also looking for symbols that either expressly or by implication are nutrient content claims. We are assessing the criteria established by food manufacturers for such symbols and comparing them to our regulatory criteria.

> It is important to note that nutrition-related FOP and shelf labeling, while currently voluntary, is subject to the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. Therefore, FOP and shelf labeling that is used in a manner that is false or misleading misbrands the products it accompanies. Similarly, a food that bears FOP or shelf labeling with a nutrient content claim that does not comply with the regulatory criteria for the claim as defined in Title 21 Code of Federal Regulations (CFR) 101.13 and Subpart D of Part 101 is misbranded. We will consider enforcement actions against clear violations of these established labeling requirements. . .

> … Accurate food labeling information can assist consumers in making healthy nutritional choices. FDA intends to monitor and evaluate the various FOP labeling systems and their effect on consumers' food choices and perceptions. FDA recommends that manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA laws and regulations. FDA will proceed with enforcement action against products that bear FOP labeling that are explicit or implied nutrient content claims and that are not consistent with current nutrient content claim requirements. FDA will also proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading.

40.     The 2009 FOP Guidance recommended that "manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA law and regulations" and specifically advised the food industry that it would "proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading."

41.     Despite the issuance of the 2009 FOP Guidance, Defendant did not remove the unlawful and misleading food labeling claims from its Misbranded Food Products.

42.     On March 3, 2010, the FDA issued an "Open Letter to Industry from [FDA Commissioner] Dr. Hamburg" ("Open Letter"). The Open Letter reiterated the FDA's concern regarding false and misleading labeling by food manufacturers. In pertinent part the letter stated:

> In the early 1990s, the Food and Drug Administration (FDA) and the food industry worked together to create a uniform national system of nutrition labeling, which includes the now-iconic Nutrition Facts panel on most food packages. Our citizens appreciate that effort, and many use this nutrition information to make food choices. Today, ready access to reliable information about the calorie and nutrient content of food is even more important, given the prevalence of obesity and diet-related diseases in the United States. This need is highlighted by the announcement recently by the First Lady of a coordinated national campaign to reduce the incidence of obesity among our citizens, particularly our children.
>
> With that in mind, I have made improving the scientific accuracy and usefulness of food labeling one of my priorities as Commissioner of Food and Drugs. The latest focus in this area, of course, is on information provided on the principal display panel of food packages and commonly referred to as "front-of-pack" labeling. The use of front-of-pack nutrition symbols and other claims has grown tremendously in recent years, and it is clear to me as a working mother that such information can be helpful to busy shoppers who are often pressed for time in making their food selections. …
>
> As we move forward in those areas, I must note, however, that there is one area in which more progress is needed. As you will recall, we recently expressed concern, in a "Dear Industry" letter, about the number and variety of label claims that may not help consumers distinguish healthy food choices from less healthy ones and, indeed, may be false or misleading.
>
> At that time, we urged food manufacturers to examine their product labels in the context of the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. As a result, some manufacturers have revised their

1
2

labels to bring them into line with the goals of the Nutrition Labeling and Education Act of 1990. Unfortunately, however, we continue to see products marketed with labeling that violates established labeling standards.

3
4
5
6
7

To address these concerns, FDA is notifying a number of manufacturers that their labels are in violation of the law and subject to legal proceedings to remove misbranded products from the marketplace. While the warning letters that convey our regulatory intentions do not attempt to cover all products with violative labels, they do cover a range of concerns about how false or misleading labels can undermine the intention of Congress to provide consumers with labeling information that enables consumers to make informed and healthy food choices ….

8
9
10
11
12

These examples and others that are cited in our warning letters are not indicative of the labeling practices of the food industry as a whole. In my conversations with industry leaders, I sense a strong desire within the industry for a level playing field and a commitment to producing safe, healthy products. That reinforces my belief that FDA should provide as clear and consistent guidance as possible about food labeling claims and nutrition information in general, and specifically about how the growing use of front-of-pack calorie and nutrient information can best help consumers construct healthy diets.

13
14
15
16

I will close with the hope that these warning letters will give food manufacturers further clarification about what is expected of them as they review their current labeling. I am confident that our past cooperative efforts on nutrition information and claims in food labeling will continue as we jointly develop a practical, science-based front-of-pack regime that we can all use to help consumers choose healthier foods and healthier diets.

17
18
19

43.    Notwithstanding the Open Letter, Defendant continued to utilize unlawful food labeling claims despite the express guidance of the FDA in the Open Letter.

20
21
22

44.    In addition to its guidance to industry, the FDA has sent warning letters to industry, including the Defendant and many of Defendant's peer food manufacturers for the same types of unlawful nutrient content claims described above.

23
24
25
26
27
28

45.    In these letters dealing with unlawful nutrient content claims the FDA indicated that as a result of the same type of claims utilized by the Defendant, products were in "violation of the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR 101)" and were "misbranded within the meaning of section 403(r)(1)(A) because the product label bears a nutrient content claim but does not meet the requirements to make the claim." Similarly, letters such as the one received by the Defendant

1   for unlawful "all natural" claims similar to those at issue here indicated that the products at issue

2   were "misbranded under section 403(a)(1) of the Act" because their labels were "false and

3   misleading."

4       46.     The warning letters were hardly isolated as the FDA has issued over 10 other

5   warning letters to other companies for the same type of food labeling claims at issue in this case.

6       47.     The FDA stated that the agency not only expected companies that received

7   warning letters to correct their labeling practices but also anticipated that other firms would

8   examine their food labels to ensure that they are in full compliance with food labeling

9   requirements and make changes where necessary. ConAgra did not change the labels on its

10  Misbranded Food Products in response to the warning letters sent to other companies nor did it

11  change its labels on its Misbranded Food Products when it ultimately received a warning letter

12  from the FDA.

13      48.     Defendant also has ignored the FDA's Guidance for Industry, A Food Labeling

14  Guide which details the FDA's guidance on how to make food labeling claims. Defendant

15  continues to utilize unlawful claims on the labels of its Misbranded Food Products.  Despite all

16  warnings, Defendant's Misbranded Food Products continue to run afoul of FDA guidance as well

17  as federal and California law.

18      49.     Despite the FDA's numerous warnings to industry, Defendant has continued to sell

19  products bearing unlawful food labeling claims without meeting the requirements to make them.

20      50.     Despite the fact that it has repeatedly been sued for its unlawful labeling practices,

21  Defendant continues to engage in them. Thus this action is at least the third action against the

22  Defendant that challenges its "100% natural" or "all natural" labeling practices and the second

23  one since the Defendants received an FDA warning letter for those practices and yet with the

24  exception of changing the labeling of isolated products as the result of FDA enforcement or as

25  part of a litigation settlement, Defendant continues to engage in the unlawful practices.

26      51.     Plaintiffs did not know, and had no reason to know, that Defendant's Misbranded

27  Food Products were misbranded and bore food labeling claims despite failing to meet the

28  requirements to make those food labeling claims. Similarly, Plaintiffs did not know, and had no

reason to know, that Defendant's Misbranded Food Products were misbranded because their labeling was false and misleading.

**C.    Defendant's Food Products Are Misbranded**

**1.    Defendant Makes Unlawful "100% NATURAL" Claims**

52.    The term "natural" adds a premium to food products and makes them appear fresher, minimally processed, and safer. Seeking to profit from consumers' desire for natural food products and recognizing that the labeling of products as "all natural" or "100% natural" implicitly conveys to consumers that the products carry health benefits important to consumers, ConAgra has falsely represented its Hunt's canned tomato products and PAM Cooking spray products as all natural when that is not true. On the principal display panel of its product labels, ConAgra claims that such products are "100% Natural" despite the fact that they contain a host of artificial and synthetic ingredients which have undergone substantial processing and which include various petrochemicals such as Petroleum gas (liquefied), Propane, Propane 2-methyl (isobutane) and even the lighter fluid Butane as well as various artificial chemical preservatives and coloring agents  and other chemicals that have been classified by regulators as being synthetic and  artificial  and which have been held to preclude the labeling of the very types of products at issue here as being "natural."

53.    Consumers such as Plaintiffs expect that products labeled "100% natural" will be just that and that to be natural a food should contain no artificial or synthetic ingredients and that both it and its ingredients should  have had no more processing than something which could be made in a household kitchen. Consumers reasonably expect that products carrying a "100% natural" claim must not contain any artificial flavoring, color ingredients, chemical preservatives, or artificial or synthetic ingredients, and be only minimally processed by a process that does not fundamentally alter the raw product. Consumers certainly expect food labeled "100% natural" to free of the petrochemicals such as Petroleum gas (liquefied), Propane, Propane 2-methyl (isobutane) and Butane that were present in Defendant's purportedly "100% natural" products at

levels of at least 24% according to the Material Safety Data Sheets prepared by the Defendant for these products.

**A.     ConAgra Falsely Labels Its PAM Cooking Spray Products As "100% Natural"**

54.     Until very recently, Defendant included the phrase "100% NATURAL" on the principal display panel and other parts of the product labels of its PAM cooking sprays which contained unnatural propellant. It still does so on its website and on the labels of its purportedly "Organic" and "Certified Organic" PAM cooking sprays which contain unnatural, synthetic ingredients.

55.     For example, 100% Natural PAM Original cooking spray lists "PROPELLANT" as an ingredient, with no mention of the chemical composition of PROPELLANT:



56.     ConAgra's August 3, 2010 Material Safety Data Sheet (MSDS) for 100% Natural PAM Original cooking spray (Exhibit D) reveals the chemical composition of 100% Natural PAM Original cooking spray's propellant, and the percentage, by weight, of the "Hazardous Components" in 100% Natural PAM Original cooking spray:

Petroleum gas (liquefied)          10% to 18%

Propane                                      > 7%

| | | |
|---|---|---|
| Propane, 2-methyl- | | > 7% |
| Butane | | < 1% |

Exhibit D, p.3. In stark contrast to its MSDS, nowhere does the label or Nutrition Facts panel of 100% Natural PAM Original cooking spray disclose that it contains a substantial percentage, by weight, of Petroleum gas (liquefied), Propane, Propane 2-methyl (isobutane) and Butane. Nowhere does PAM cooking spray packaging mention the health hazards associated with PAM's undisclosed "PROPELLANT" ingredients.

57. Defendant has made and continues make the same illegal "100% Natural" claims on their websites and advertising in violation of federal and California law.

58. A reasonable consumer would expect that when Defendant labels its products as "100% NATURAL," the product's ingredients are "natural" as commonly understood and would not be contrary to the policy of any governmental regulator. A reasonable consumer would expect that when Defendant labels its products as "100% NATURAL," the product ingredients are "natural" under the common use of that word. A reasonable consumer would expect that "100% NATURAL" products do not contain synthetic, artificial, or excessively processed ingredients. A reasonable consumer would expect that "100% NATURAL" products do not contain a substantial percentage of Petroleum gas (liquefied), Propane, Propane 2-methyl (isobutane) and Butane.

59. Consumers are thus misled into purchasing and paying a premium for Defendant's products with unnatural ingredients that are not "100% NATURAL" as falsely represented on their labeling.

60. Defendant's claims in this respect are false and misleading and the products in this respect are misbranded under federal and California law. Misbranded products cannot be legally sold or held and are legally worthless.

61. Plaintiffs purchased PAM cooking spray including the 100% Natural PAM original and 100% Natural Certified Organic Olive Oil varieties in reliance on Defendant's false representations that the products were "100% Natural." Had Plaintiffs known this representation was false they would not have bought the products or paid a premium for them.

62.     Had Plaintiffs been aware that the 100% Natural PAM cooking spray products they purchased contained any amount (let alone the actual high levels) of Petroleum gas (liquefied), Propane, Propane 2-methyl (isobutane), Butane or any chemical listed pursuant to California's Proposition 65 because it was known to the state to cause cancer or reproductive toxicity, they would not have purchased the products or knowingly used them as food. Similarly, had Plaintiffs been aware that the 100% Natural PAM Certified Organic  cooking spray products they purchased contained disqualifying amounts of "synthetic" chemicals and "[n]onagricultural (nonorganic) substances that precluded the products from being classified, represented or labeled as "Organic" or "Certified Organic," they would not have purchased the products. Plaintiffs had other alternatives that lacked such ingredients and Plaintiff also had cheaper alternatives.

**B.     ConAgra Falsely Labels Its Canned Tomato Products As "100% Natural"**

63.     Defendant has unlawfully labeled a number of its products as being "100% NATURAL" when they actually contain artificial ingredients and/or chemical preservatives. These include Defendant's canned tomato products.

64.     Defendant includes the phrase "100% NATURAL" at the top of the principal display panel on the product labels of its Hunt's brand canned tomato products, despite the fact that Defendant's canned tomato products contain the ingredients citric acid and/or calcium chloride objected to by the FDA.

65.     The back panel of ConAgra's product labels for its Hunt's canned tomato products lists citric acid as an ingredient, and sometimes also list calcium chloride.  The product label for Hunt's Diced Tomatoes lists both citric acid and calcium chloride but not in a way that would cause a consumer to doubt the "100% natural" claim as Defendant unlawfully fails to indicate these ingredients are being used as chemical preservatives or firming agents.

66.     According to standardized requirements for canned tomatoes (21 C.F.R. § 155.190) citric acid may only be used for acidification purposes while calcium chloride may only be used as a firming agent. These uses are both artificial and a form of chemical preservation thus

1    rendering the "100% NATURAL" label statement false and misleading which results in the

2    Hunt's canned tomato products being misbranded under California law.

3         67.    Upon information and belief, some of ConAgra's competitors in the canned

4    tomato product market also include citric acid and/or calcium chloride as ingredients, but those

5    competitors do not make a "100% natural" claim on the product labels.

6         68.    Upon information and belief, some of ConAgra's competitors in the canned or

7    packaged tomato product market do not include citric acid or calcium chloride in their tomato

8    products.

9         69.    ConAgra itself produces non-canned tomato products like ketchup that do not

10   contain citric acid or calcium chloride.

11        70.    The FDA has sent warning letters relating to the use of a "Natural" label when a

12   product contains citric acid and/or calcium chloride.

13        71.    The FDA has determined – specifically with respect to canned tomato products –

14   that "the addition of calcium chloride and citric acid to these products preclude use of the term

15   'natural' to describe this product."

16        72.    In the August 29, 2001, FDA "Hirzel warning letter" (attached hereto as Exhibit

17   A) the FDA specifically found that "labels for canned tomato products manufactured by" Hirzel

18   were "in violation of Section 403 of the Federal Food Drug, and Cosmetic Act (the Act) and Title

19   21, Code of Federal Regulations (CFR), Part 101- Food Labeling."   Among other reasons, the

20   Hirzel warning letter stated in pertinent part:

21                      [The product] labels bear the term "All NATURAL," but
                        according to the ingredient statements, calcium chloride and citric
22                      acid are added to the products.   We have not established a
                        regulatory definition for the term "natural," however; we discussed
23                      its use in the [preamble] to the food labeling final regulations (58
                        Federal Register 2407, January 6, 1993).   FDA's policy regarding
24                      the use "natural," means that nothing artificial or synthetic has
                        been included in, or has been added to, a food that would not
25                      normally be expected to be in the food.   Therefore, the addition of
                        calcium chloride and citric acid to these products preclude use of
26                      the term "natural" to describe this product.
27

28        http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2001/ucm178343.htm

*Amended Class Action Complaint*

73.     Defendant knew or should have known of the Hirzel warning letter. Because Defendant's products contain the same ingredients prohibited by the FDA in other tomato products, the use of the claim "100% NATURAL" on Defendant's tomato product labels is false and misleading, and therefore these products are misbranded under section 403(a)(1) of the Act.

74.     On August 16, 2001, the FDA sent a warning letter to Oak Tree Farm Dairy, Inc. ("Oak Tree warning letter" attached hereto as Exhibit B).  The letter "found serious violations" of the Federal Food, Drug, and Cosmetic Act and Title 21, Code of Federal Regulations, Part 101 – Food Labeling (21 CFR 101), and stated in pertinent part:

> The term "all natural" on the "OAKTREE ALL NATURAL LEMONADE" label is inappropriate because the product contains potassium sorbate.  Although FDA has not established a regulatory definition for "natural," we discussed its use in the preamble to the food labeling final regulations (58 Federal Register 2407, January 6, 1993, copy enclosed).  FDA's policy regarding the use of "natural," means nothing artificial or synthetic has been included in, or has been added to, a food that would not normally be expected to be in the food.  The same comment applies to use of the terms "100 % NATURAL" and "ALL NATURAL" on the "OAKTREE REAL BREWED ICED TEA" label because it contains citric acid.

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2001/ucm178712.htm

75.     Defendant knew or should have known of the Oak Tree warning letter.

76.     On November 16, 2011, the FDA sent a warning letter to ConAgra's own subsidiary, Alexia Foods, Inc., informing Alexia of its failure to comply with the requirements of the FDCA and its regulations ("Alexia Warning Letter," attached hereto as Exhibit C). The Alexia Warning Letter stated, in pertinent part:

> The U.S. Food and Drug Administration (FDA) has reviewed the labels for your Alexia brand Roasted Red Potatoes & Baby Portabella Mushrooms products.  Based on our review, we have concluded that these products are in violation of the Federal Food, Drug, and Cosmetic Act (the Act).  You can find copies of the Act and the FDA regulations through links in FDA's home page at http://www.fda.gov.

1
2
3
4
5
6
7

Your Alexia brand Roasted Red Potatoes & Baby Portabella Mushrooms product is misbranded within the meaning of section 403(a)(1) of the Act [21 U.S.C. 343(a)(1)], which states that a food shall be deemed to be misbranded if its labeling is false or misleading in any particular. The phrase "All Natural" appears at the top of the principal display panel on the label. FDA considers use of the term "natural" on a food label to be truthful and non-misleading when "nothing artificial or synthetic…has been included in, or has been added to, a food that would not normally be expected to be in the food." [58 FR 2302, 2407, January 6, 1993].

8
9
10
11

Your Alexia brand Roasted Red Potatoes & Baby Portabella Mushrooms product contains disodium dihydrogen pyrophosphate, which is a synthetic chemical preservative. Because your products contain this synthetic ingredient, the use of the claim "All Natural" on this product label is false and misleading, and therefore your product is misbranded under section 403(a)(1) of the Act.

12
13
14

We note that your Alexia brand products market a number of food products with the "All Natural" statement on the label. We recommend that you review all of your product labels to be consistent with our policy to avoid additional misbranding of your food products.

15
16
17
18
19

This letter is not intended to be an all-inclusive review of your products and their labeling. It is your responsibility to ensure that all of your products and labeling comply with the Act and its implementing regulations. You should take prompt action to correct the violations cited in this letter. Failure to do so may result in enforcement action without further notice. Such action may include, but is not limited to, seizure or injunction.

20

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm281118.htm

21      77.     Defendant knew or should have known of the Alexia warning letter.

22      78.     In its rule-making and warning letters to manufacturers, as described herein, the

23  FDA has repeatedly stated its policy to restrict the use of the term "natural" in connection with

24  added color, synthetic substances, and flavors as provided in 21 C.F.R. § 101.22.

25      79.     The FDA has also repeatedly affirmed its policy regarding the use of the term

26  "natural" as meaning that nothing artificial or synthetic has been included in, or has been added

27  to, a food that would not normally be expected to be in the food.

28

80.    The FDA considers use of the term "natural" on a food label to be truthful and non-misleading when "nothing artificial or synthetic…has been included in, or has been added to, a food that would not normally be expected to be in the food." *See* 58 FR 2302, 2407, January 6, 1993.

81.    Any coloring or preservative can preclude the use of the term "natural" even if the coloring or preservative is derived from natural sources.  The FDA distinguishes between natural and artificial flavors in 21 C.F.R. § 101.22.

82.    The FDA has sent out numerous warning letters concerning this issue.  *See, e.g.*, Exhibit A (August 29, 2001 FDA warning letter to Hirzel Canning Company relating to citric acid or calcium chloride in tomato products); Exhibit B (August 16, 2001 FDA warning letter to Oak Tree Farm Dairy relating to citric acid); and Exhibit C (November 16, 2011 FDA warning letter to Alexia relating to synthetic chemical preservatives).  Defendant is aware of these FDA warning letters.

83.    The National Advertising Division of the Council of Better Business Bureaus has determined that ConAgra Foods should discontinue the claim certain of its tomato related claims because in connection with the term "100% Natural" they might falsely leave consumers with the impression that Hunt's tomato products were prepared from fresh unprocessed ingredients.

84.    Defendant's claims in this respect are false and misleading and the products in this respect are misbranded under federal and California law.  Misbranded products cannot be legally sold or held and are legally worthless.

85.    Plaintiffs purchased Hunt's canned tomato products in reliance on Defendant's false representations that the products were "100% Natural." Had Plaintiffs known this representation was false they would not have bought the products or paid a premium for them. Plaintiffs had other alternatives that lacked such ingredients and Plaintiff also had cheaper alternatives.

### 2.    **Defendant Makes Unlawful "Organic" and "Certified Organic" Claims**

86.    Defendant has violated California law by selling varieties of PAM cooking spray such as the 100% Natural PAM Certified Organic Olive Oil cooking spray purchased by Plaintiffs

that contained label representations that the products were "Organic" and "Certified Organic" and which bore the USDA Organic Seal when those products were precluded from doing so because of the disqualifying levels of one or more "synthetic" chemicals and "[n]onagricultural (nonorganic) substances" contained in those products.

87.     California has adopted a comprehensive scheme to regulate organic products. As part of this effort California regulates the use of terms such as "Organic" and "Certified Organic." In regulating organic products and the use of terms such as "Organic" and "Certified Organic" California has adopted regulations and laws identical to the federal National Organic Program ("NOP') established pursuant to the Organic Foods Production Act of 1990. Pursuant to California Health & Safety Code § 110820:

> Except as otherwise provided in this article, no product shall be sold as organic pursuant to this article unless it is produced according to regulations promulgated by the NOP, and consists entirely of products manufactured only from raw or processed agricultural products except as follows:(a) Water, air, and salt may be added to the product.(b) Ingredients other than raw or processed agricultural products may be added to the product if these ingredients include nonagricultural substances or nonorganically produced agricultural products produced in a manner consistent with, or which are on the national list adopted by the United States Secretary of Agriculture pursuant to Section 6517 of the NOP and do not represent more than 5 percent of the weight of the total finished product, excluding salt and water.

88.     Pursuant to California Health & Safety Code § 110830:

> No product handled, processed, sold, advertised, represented, or offered for sale in this state, shall be sold as organic unless it also is prominently labeled and invoiced with similar terminology as set forth by regulations promulgated by the NOP.

89.     Moreover, California has expressly adopted the federal organic labeling standards and regulations as its own pursuant to California Health & Safety Code § 110956 which states "[a]ll organic product regulations and any amendments to those regulations adopted pursuant to the NOP, that are in effect on the date this bill is enacted or that are adopted after that date shall be the organic product regulations of this state.

90.     Pursuant to these regulations, products with at least 95 percent organic content by weight or fluid volume, excluding water and salt, may use the term "organic." 7 C.F.R. § 205.301(b). In addition, products labeled "organic" may also display the USDA Organic seal on

the Principal Display Panel of the product label. 7 C.F.R. § 205.303(a)(4). The remaining five percent of the product must consist of organically produced agricultural products, unless these are not commercially available in organic form. In cases where minor ingredients are not commercially available in organic form, then non-organically produced ingredients maybe used, provided they are approved for use on the National List. 7 C.F.R. § 205.301(b). The ingredients declaration must identify all organic ingredients with the word "organic" or an asterisk or other reference mark that refers to a statement indicating the ingredient is organically produced.

91.    The labels of Defendant's "100% Natural PAM Organic and Certified Organic cooking sprays contained label representations that the products were "Organic" and "Certified Organic" and bore the USDA Organic Seal when those products were precluded from doing so because of the disqualifying levels of one or more "synthetic" chemicals and "[n]onagricultural (nonorganic) substances contained in those products. In particular, the products contained disqualifying levels of carbon dioxide which is listed as both a "synthetic" chemical and a type of "[n]onagricultural (nonorganic) substance" pursuant to 7 C.F.R. § 205.605(b).  It also appears that the products contained disqualifying levels of nonorganic lecithin. While the label specifies that the olive oil and grain alcohol were both organic, the lecithin was not so identified which would be in accordance with legal requirements only if it were nonorganic since all organic items must be identified.

92.    Despite the 5% ceiling for synthetic and nonorganic ingredients these products contained significantly higher levels of these restricted ingredients. For example, according to an official December, 2011 Material Safety Data Sheet for the 100% Natural Certified Organic Olive Oil cooking spray purchased by Plaintiffs, the carbon dioxide content of the product was as high as 10% and the lecithin content was as high as 8%. Thus, either ingredient was capable of independently precluding the use of the seal or any other form of organic labeling and certainly was capable of doing so in combination with the other.

93.    Moreover, organic forms of lecithin appear to be commercially available and thus it would be unlawful to use a nonorganic version in a product that was to be labeled "Organic" or

bear the USDA Organic Seal even if the amount of the nonorganic ingredient comprised less than 5% of the final product.

94.     A reasonable consumer would expect that when a manufacturer labels and represents a product as "Organic" or "Certified Organic" or places the USDA Organic Seal on a product that the product meets the minimum legal requirements to bear the labeling claims and the seal and that the representations are true. A reasonable consumer would expect that when Defendant claims its product is "Organic" or "Certified Organic" that its ingredients whether disclosed or undisclosed and whether listed under their common and usual or not would not preclude the product from qualifying as "Organic" or "Certified Organic" as a matter of law.

95.     Plaintiffs did not know, and had no reason to know, that Defendant's PAM Products were misbranded because they bore organic labeling claims and seals they were not legally permitted to make because the products failed to meet the minimum requirements under identical California and federal law for those claims and seals.

96.     Consumers are thus misled into purchasing Defendant's purportedly "Organic" products which were not in fact organic as a matter of law.

97.     Had Plaintiffs been aware that the 100% Natural PAM Certified Organic cooking spray products were not in fact organic as a matter of law, they would not have purchased the products.

98.     Similarly, had Plaintiffs been aware that the "synthetic" chemicals and "[n]onagricultural (nonorganic) substances were such a significant component of the 100% Natural Certified Organic cooking spray products, they would not have purchased the products.

99.     Plaintiffs were thus misled by Defendant's unlawful labeling practices and actions into purchasing products they would not have otherwise purchased had they known the truth about those products. Plaintiffs had other alternatives that lacked such ingredients and Plaintiff also had cheaper alternatives.

100.    Defendant's claims in this respect are false and misleading and the products are in this respect misbranded under identical federal and California laws, Misbranded products cannot

1    be legally sold and are legally worthless. Plaintiffs and members of the Class who purchased

2    these products paid an unwarranted premium for these products.

3

4    **3.    Defendant Violates California Law By Failing To Label Its Product**
     **Ingredients By Their Common Names Thus Concealing The Fact That Its**
5    **Purportedly "100% Natural" And "Organic" Food Products Contain High**
     **Levels Of Synthetic Chemicals And Petrochemicals That Preclude Their**
6    **Being Labeled As "100% Natural" Or "Organic"**

7    101.    In violation of identical California and federal law, Defendant concealed the fact

8    that its PAM cooking spray products contained significant amounts of undisclosed petrochemicals

9    such as Petroleum gas (liquefied), Propane, Propane 2-methyl (isobutane) and Butane as well as

10   other undisclosed chemicals.

11   102.    The Defendant did this by failing to disclose these ingredients in the ingredient

12   statements for PAM cooking spray products despite the fact that, as confirmed by an official

13   August 3, 2010 Material Safety Data Sheet prepared by the Defendant for its 100% Natural PAM

14   cooking spray products, the products contained up to 18% Petroleum gas (liquefied), more than

15   7% Propane, more than 7% Propane 2-methyl (isobutane) and up to 1% Butane as well as other

16   undisclosed chemical ingredients that could comprise up to 10% of the products.

17   103.    Earlier Material Safety Data Sheets prepared by the Defendant for PAM cooking

18   spray reveal the presence of significant quantities of nitrous oxide a chemical placed on

19   California's Proposition 65 list, a list of chemicals known to the state to cause cancer or

20   reproductive toxicity which trigger a duty to provide clear and reasonable warnings to inform

21   citizens about exposures to such chemicals.

22   104.    Under California law "[a]ny food fabricated from two or more ingredients is

23   misbranded unless it bears a label clearly stating the common or usual name of each ingredient"

24   (California Health & Safety Code § 110725). California's law is identical to federal law on this

25   point.

26   105.    Moreover, California has expressly adopted the federal regulations as it own. Thus

27   California has adopted the requirements of 21 C.F.R. § 101.4 which mandate that the ingredient

28   names listed on product labels be the common or usual name of those ingredients.

106. In its guidance for industry and warning letters to manufacturers, the FDA has repeatedly stated its policy of restricting the ingredient names listed on product labels to their common or usual name, as provided in 21 C.F.R. § 101.4(a)(1).

107. An ingredient's common or usual name is the name established by common usage or regulation, as provided in 21 C.F.R. § 102.5(d) which has been adopted by the State of California.

108. The common or usual name must accurately describe the basic nature of the food or its characterizing properties or ingredients, as provided in 21 C.F.R. § 102.5(a).

109. The purpose of these laws and regulations is to ensure that consumers are provided with accurate information about products and their ingredients so they can make informed purchasing decisions. Consumers can avoid chemicals and ingredients they wish to avoid in particular products and can select products that contain the ingredients consumers desire.

110. Absent such disclosures and labeling practices, consumers cannot, except by luck or happenstance, avoid chemicals like the ones listed on the Material Safety Data Sheets that the Defendant describes as posing both chronic and acute risks to health and life. For example, current Material Safety Data Sheets for ConAgra products containing nitrous oxide indicate that "[r]epeated overexposure to nitrous oxide has been linked to adverse reproductive effects" and note that at high concentrations it has been linked to "spontaneous abortions in humans." Similarly, the Material Safety Data Sheets for PAM cooking spray products containing propane and butane indicate that "[t]his product contains propane and butane which are known to cause central nervous system depression and cardiovascular symptoms" and further warn that an overdose can result in a host of complications including seizure and death from cardiac arrhythmias. Even the Material Safety Data Sheets for PAM cooking spray products containing carbon dioxide state that under certain circumstances inhalation of the product could result in death and that ingestion of the product could result in irritation.

111. Ignoring California law and its incorporated federal regulations and guidance, Defendant mislabeled its Misbranded Food Products so that consumers were deprived of accurate information and, in fact, Plaintiffs and the members of the class were misled by Defendant's

1    concealment of chemicals and petrochemicals they wished to avoid 1) in their food, 2) in products

2    labeled "100% natural" and 3) in products labeled "Organic" or "Certified Organic."

3        112.    For example, the back panel of Defendant's 100% Natural PAM Original cooking

4    spray lists "PROPELLANT" as an ingredient despite the fact that propellant is not the common or

5    usual name of any of the various petrochemicals that this product actually contained. According

6    to an official August 3, 2010 Material Safety Data Sheet prepared by the Defendant for this

7    product, 100% Natural PAM Original cooking spray actually contained up to 18% Petroleum gas

8    (liquefied), more than 7% Propane, more than 7% Propane 2-methyl (isobutane) and up to 1%

9    Butane.

10        113.    In listing "PROPELLANT" as an ingredient, and failing to list the actual

11    ingredients (Petroleum gas (liquefied), Propane, Propane 2-methyl (isobutane) and Butane) by

12    their common and usual names, Defendant not only misled Plaintiffs and the Class by concealing

13    the presence of these petrochemicals in products labeled "100% Natural," Defendant also violated

14    California Health & Safety Code § 110725 and the federal regulations (21 C.F.R. §§ 101.4 and

15    102.5) that have been adopted as law by the State of California.  Specifically, Defendant has

16    failed to disclose the presence of the Petroleum gas (liquefied), Propane, Propane 2-methyl

17    (isobutane) and Butane by their common or usual names, as required by California Health &

18    Safety Code § 110725 and 21 C.F.R. §§ 101.4 and 102.5.

19        114.    Similarly, the back panel of Defendant's 100% Natural Certified Organic PAM

20    Olive Oil cooking spray lists "PROPELLANT" as an ingredient despite the fact that propellant is

21    not the common or usual name of the chemical (carbon dioxide) that this product contained.

22    According to an official December, 2011 Material Safety Data Sheet prepared by the Defendant

23    for this product (Exhibit E), 100% Natural Certified Organic PAM Olive Oil cooking spray

24    actually contained up to 10% carbon dioxide which is classified under identical California and

25    federal law as a "synthetic" chemical and a type of "[n]onagricultural (nonorganic) substance[]

26    not allowed as an ingredient in processed products labeled as 'Organic'" except at far lower (5%

27    or less) levels than the up to 10% level listed on the December, 2011 Material Safety Data Sheet

28    prepared by the Defendant for this product.

115.   In listing "PROPELLANT" as an ingredient, and failing to list the actual ingredients (carbon dioxide) by its common and usual name, Defendant not only misled Plaintiffs and the Class by concealing the presence of this "synthetic" and  "[n]onagricultural (nonorganic) substance[]" in products labeled "100% Natural,"  and "Certified Organic," Defendant also violated California Health & Safety Code § 110725 and the federal regulations (21 C.F.R. §§ 101.4 and 102.5) that have been adopted as law by the State of California. Specifically, Defendant has failed to disclose the presence of the carbon dioxide or to list it as an ingredient by its common or usual name, as required by California Health & Safety Code § 110725 and 21 C.F.R. §§ 101.4 and 102.5.

116.   In addition to mislabeling the labels of its PAM products, Defendant has also failed to disclose or identify the chemicals and petrochemicals identified above by their common names on its websites and advertising in violation of identical California and federal law.

117.   A reasonable consumer would expect that when a manufacturer lists the ingredients on its products, the product's ingredients are given their common or usual name as required by law.  A reasonable consumer would also expect that when a manufacturer lists the ingredients on its products it would use the same names required on its Material Safety Data Sheets. A reasonable consumer would expect that when a manufacturer claims its product is 100% natural that its ingredients, whether disclosed or undisclosed, and, whether listed under their common and usual or not, would be all natural and not synthetic or artificial or unnatural. A reasonable consumer would certainly not expect a food product that was labeled 100% natural to contain undisclosed petrochemicals or synthetic chemicals. A reasonable consumer would expect that when a manufacturer claims its product is "Organic" or "Certified Organic" that its ingredients, whether disclosed or undisclosed, and, whether listed under their common and usual or not, would not preclude the product from qualifying as organic or certified organic as a matter of law.

118.   Plaintiffs did not know, and had no reason to know, that Defendant's PAM Products were misbranded because they failed to list undisclosed chemicals and petrochemicals as ingredients or to name those ingredients by the ingredients' common or usual name, despite

identical California and federal regulations requiring that that the chemicals and petrochemicals be listed as ingredients by their common and usual names.

119.   Consumers are thus misled into purchasing Defendant's products with false and misleading ingredient names, which do not describe the basic nature of the food or its characterizing properties or ingredients, as provided in California Health & Safety Code § 110725 and 21 C.F.R. §§ 101.4 and 102.5(a) both of which have been adopted as law by California..

120.   Had Plaintiffs been aware that the 100% Natural PAM cooking spray products they purchased contained any amount (let alone the actual high levels) of Petroleum gas (liquefied), Propane, Propane 2-methyl (isobutane), Butane or any chemical listed pursuant to California's Proposition 65 because it was known to the state to cause cancer or reproductive toxicity, they would not have purchased the products or knowingly used them as food. Similarly, had Plaintiffs been aware that the 100% Natural PAM Certified Organic cooking spray products they purchased contained disqualifying amounts of "synthetic" chemicals and "[n]onagricultural (nonorganic) substances that precluded the products from being classified, represented or labeled as "Organic" or "Certified Organic," they would not have purchased the products.  Plaintiffs had other alternatives that lacked such ingredients and Plaintiff also had cheaper alternatives.

121.   Defendant's claims in this respect are false and misleading and the products are in this respect misbranded under identical federal and California law, including California Health & Safety Code § 110725.  Misbranded products cannot be legally sold and are legally worthless. Plaintiffs and members of the Class who purchased these products paid an unwarranted premium for these products.

4.   **Defendant Violates California Law By Failing To List Its Product Ingredients In Descending Order Of Predominance By Weight.**

122.   Under identical California and federal law, ingredients must be listed in descending order of predominance by weight. 21 C.F.R. § 101.4 (adopted by California).

123.   Such laws are designed to ensure consumers can determine if ingredients that are important to them are either significant components of particular products or not and how those ingredients compare relative to other ingredients.

124. Defendant violates these regulations on its PAM cooking spray products by listing as its last ingredient "Propellant" a component of the product which constitutes a significant percentage of the product that is far greater than other ingredients listed before this ingredient.

125. For example, as confirmed by an official August 3, 2010 Material Safety Data Sheet prepared by the Defendant for its 100% Natural PAM Original cooking spray products, the products contained up to 18% Petroleum gas (liquefied), more than 7% Propane, more than 7% Propane 2-methyl (isobutane) and up to 1% Butane as propellant. Thus, even a single component of this propellant mix such as the Petroleum gas (liquefied) would represent a larger amount by weight than some of the ingredients that precede it in the ingredient list as the Material Safety Data Sheet indicate that the soy lecithin was no more than 8% of the product and could have been as low as 2%. Similarly, the other ingredients that were listed after the lecithin but ahead of the propellant such as the preservative, rosemary extract, would also appear to be a smaller component than the propellant mix as a whole or even some of its components like Petroleum gas (liquefied). Another example would be the fact that Propellant was listed last in the ingredient list on the label of Defendant's 100% Natural PAM Certified Organic Olive Oil despite the fact that an official December, 2011 Material Safety Data Sheet for this product reveals that the carbon dioxide that comprised the propellant comprised up to 10% of the product and thus should have been listed ahead of other ingredients such as lecithin that were present at lower percentages.

126. The failure to list ingredients in descending order of predominance by weight misbrands products under identical California and federal laws. It also misleads consumers such as Plaintiffs who relied on the labels into the erroneous belief that ingredients such as the synthetic chemicals and petrochemicals that comprised the propellant mix were a small component of the product less than even preservatives and anti-foaming agents, which is false.

127. Had Plaintiffs been aware that the Petroleum gas (liquefied), Propane, Propane 2-methyl (isobutane), Butane and other chemicals comprising the propellant mix were such a significant component of the 100% Natural PAM cooking spray products, they would not have purchased the products. Similarly, had Plaintiffs been aware that the "synthetic" chemicals and "[n]onagricultural (nonorganic) substance[] were such a significant component of the 100%

Natural Certified Organic cooking spray products, they would not have purchased the products. Plaintiffs had other alternatives that lacked such ingredients and Plaintiff also had cheaper alternatives.

128.   Defendant's label claims in this respect are false and misleading and the products are in this respect misbranded under identical federal and California laws, Misbranded products cannot be legally sold and are legally worthless. Plaintiffs and members of the Class who purchased these products paid an unwarranted premium for these products.

**5.    Defendant Violates California Law By Making Unlawful And False Claims That Its Misbranded Food Products Are "Free Of Artificial Ingredients & Preservatives" And By Failing To Disclose On Its Misbranded Food Products' Labels The Presence Of Preservatives In Those Products As Required By California Law**

129.   Despite the fact that its Misbranded Food Products contained chemical preservatives and artificial ingredients, the Defendant falsely stated on the labels of its Misbranded Food Products that they were "free of artificial ingredients & preservatives." This statement was demonstrably false and misled consumers such as Plaintiffs who relied on the statements.

130.   For example, Defendant's Hunt's tomato products, such as the diced tomatoes and tomato paste purchased by Plaintiffs, bore such a false labeling statement. In fact, these products contained a number of chemical preservatives and artificial ingredients such as citric acid and calcium chloride which, as discussed below, fall squarely within the definition of chemical preservatives incorporated into California and federal law.

131.   According to the standardized requirements for canned tomatoes (21 C.F.R. § 155.190) citric acid may only be used for acidification purposes while calcium chloride may only be used as a firming agent. Given that these uses are both artificial and a form of preservation, the label statement "free of artificial ingredients & preservatives" is both false and misleading and renders the Hunt's canned tomato products misbranded.

132.   Moreover, even if the Defendant had not included a false representation that its Misbranded Food Products were  "free of artificial ingredients & preservatives" on its product

1   labels, these products would have still been misbranded as a matter of law because of

2   Defendant's failure to disclose the presence of such ingredients as mandated by identical

3   California and federal law.

4        133.    "Under California law "food is misbranded if it bears or contains any artificial

5   flavoring, artificial coloring, or chemical preservative, unless its labeling states that fact

6   (California Health & Safety Code § 110740). California's law is identical to federal law on this

7   point.

8        134.    Pursuant to 21 C.F.R. § 101.22 which has been adopted by California, "[a]

9   statement of artificial flavoring, artificial coloring, or chemical preservative shall be placed on the

10  food or on its container or wrapper, or on any two or all three of these, as may be necessary to

11  render such statement likely to be read by the ordinary person under customary conditions of

12  purchase and use of such food." 21 C.F.R. § 101.22 defines a chemical preservative as" any

13  chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not

14  include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to

15  food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or

16  herbicidal properties."

17       135.    Defendant's Misbranded Food Products were misbranded because they contained

18  chemical preservatives but failed to disclose that fact.

19       136.    For example, while Defendant's Hunt's brand "100% natural" canned tomato

20  products, such as the diced tomatoes and tomato paste purchased by Plaintiffs, contain citric acid

21  which is used in those products as an acidulant which is a type of chemical preservative designed

22  to retard spoilage in canned vegetables, their labels fail to disclose the fact that the citric acid is

23  being used as a preservative in those products by including a parenthetical such as (preservative)

24  or (to retard spoilage) after the term citric acid in the ingredient statement. Because Defendant

25  unlawfully fails to indicate these ingredients are being used as chemical preservatives or firming

26  agents a reasonable consumer would have no reason to doubt the preservative free claim as these

27  ingredients could have been used for some other purpose such as flavoring in the case of citric

28  acid but for the limitation on doing so contained in the standard of identity for tomatoes.

137.   Similarly, while a number of  Defendant's Hunt's Brand "100%  natural" canned tomato products, such as the diced tomatoes purchased by Plaintiffs,  contain calcium chloride which is used in those products as an firming agent which is a type of chemical preservative designed to prevent canned vegetables from becoming soft and mushy, their labels fail to disclose the fact that the calcium chloride is being used as a preservative in those products by including a parenthetical such as (firming agent) after the term calcium chloride in the ingredient statement.

138.   Similarly, the version of 100% Natural PAM Original cooking spray purchased by Plaintiffs contained the preservative "rosemary extract" without disclosing that this ingredient was functioning as a preservative, although very recently ConAgra has apparently recognized that its failure to do so was unlawful and started to add the parenthetical (preservative) after this ingredient in the ingredient list. Other examples exist as some varieties of PAM such as the butter flavor contained the artificial coloring annatto without disclosing the fact that it was being use as artificial color, although it appears ConAgra has recently rectified this fact by adding a parenthetical indicating its use as a color.

139.   A reasonable consumer would expect that when the Defendant made a representation on its products' labels that such products were "free of artificial ingredients & preservatives" that such a representation was true, A reasonable consumer would also expect that when Defendant lists its products' ingredients that it would make all disclosures required by law such as the disclosure of chemical preservatives and coloring mandated by identical California and federal law.

140.   Plaintiffs saw Defendant's label representations that its products were "free of artificial ingredients & preservatives" and relied on them in the reasonable expectation that such a representation was true,  Plaintiffs based their purchasing decisions in part on the belief that these products did not contain chemical preservatives or artificial ingredients.

141.   Plaintiffs did not know, and had no reason to know, that Defendant's Misbranded Food Products contained undisclosed chemical preservatives and other artificial ingredients because 1) the Defendant falsely represented on its label that the products were "free of artificial

ingredients & preservatives" and 2) failed to disclose those chemical preservatives and artificial ingredients as required by California and federal law.

142.   Consumers are thus misled into purchasing Defendant's products with false and misleading labeling statements and ingredient descriptions, which do not describe the basic nature of the ingredients, as  required by California Health & Safety Code § 110740 and  21 C.F.R. §§ 101.22 which has been adopted as law by California..

143.   Had Plaintiffs been aware that the Misbranded Food Products they purchased contained chemical preservatives and artificial ingredients they would not have purchased the products. Plaintiffs had other alternatives that lacked such ingredients and Plaintiff also had cheaper alternatives.

144.   Because of their false label representations and omissions about chemical preservatives and artificial ingredients Defendant's Misbranded Food Products are in this respect misbranded under identical federal and California law, including California Health & Safety Code § 110740.  Misbranded products cannot be legally sold and are legally worthless. Plaintiffs and members of the Class who purchased these products paid an unwarranted premium for these products.

**6.    Defendant Makes Unlawful Nutrient Content Claims**

145.   Pursuant to Section 403 of the FDCA, a claim that characterizes the level of a nutrient in a food is a "nutrient content claim" that must be made in accordance with the regulations that authorize the use of such claims.  21 U.S.C. § 343(r)(1)(A).  California expressly adopted the requirements of 21 U.S.C. § 343(r) in Section 110670 of the Sherman Law.

146.   Nutrient content claims are claims about specific nutrients contained in a product. They are typically made on food packaging in a font large enough to be read by the average consumer.  Because consumers rely upon these claims when making purchasing decisions, the regulations govern what claims can be made in order to prevent misleading claims.

147.   Section 403(r)(1)(A) of the FDCA governs the use of expressed and implied nutrient content claims on labels of food products that are intended for sale for human consumption.  *See* 21 C.F.R. § 101.13.

148.    21 C.F.R. § 101.13 provides the general requirements for nutrient content claims, which California has expressly adopted.  California Health & Safety Code § 110100.

149.    An "expressed nutrient content claim" is defined as any direct statement about the level (or range) of a nutrient in the food (*e.g.*, "low sodium" or "contains 100 calories").  *See* 21 C.F.R. § 101.13(b)(1).

150.    An "implied nutrient content claim" is defined as any claim that: (i) describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (*e.g.*, "high in oat bran"); or (ii) suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (*e.g.*, "healthy, contains 3 grams (g) of fat").  21 C.F.R. § 101.13(b)(2)(i-ii).

151.    These regulations authorize use of a limited number of defined nutrient content claims. In addition to authorizing the use of only a limited set of defined nutrient content terms on food labels, these regulations authorize the use of only certain synonyms for these defined terms. If a nutrient content claim or its synonym is not included in the food labeling regulations it cannot be used on a label. Only those claims, or their synonyms, that are specifically defined in the regulations may be used. All other claims are prohibited. 21 CFR 101.13(b).

152.    Only approved nutrient content claims will be permitted on the food label, and all other nutrient content claims will misbrand a food. It is thus clear which types of claims are prohibited and which types are permitted. Manufacturers are on notice that the use of an unapproved nutrient content claim is prohibited conduct. 58 FR 2302. In addition, 21 USC 343(r)(2), whose requirements have been adopted by California, prohibits using unauthorized undefined terms and declares foods that do so to be misbranded.

153.    In order to appeal to consumer preferences, Defendant has repeatedly made unlawful nutrient content claims about Lycopene and unnamed antioxidants that fail to utilize one of the limited defined terms. These nutrient content claims are unlawful because they fail to comply with the nutrient content claim provisions in violation of 21 C.F.R. §§ 101.13 and 101.54, which are incorporated in California's Sherman Law. To the extent that the terms used to describe

1    Lycopene and unnamed antioxidants are deemed to be a synonym for a defined term like

2    "contain" the claim would still be unlawful because, as these nutrients do not have established

3    daily values, they cannot serve as the basis for a term that has a minimum daily value threshold as

4    the defined terms at issue here do.

5            154.    Similarly, the regulations specify absolute and comparative levels at which foods

6    qualify to make these claims for particular nutrients (*e.g.*, .low fat, . . . more vitamin C) and list

7    synonyms that may be used in lieu of the defined terms. Certain implied nutrient content claims

8    (*e.g.*, .healthy.) also are defined. The daily values (DVs) for nutrients that the FDA has

9    established for nutrition labeling purposes have application for nutrient content claims, as well.

10   Claims are defined under current regulations for use with nutrients having established DVs;

11   moreover, relative claims are defined in terms of a difference in the percent DV of a nutrient

12   provided by one food as compared to another. *See. e.g.* 21 C.F.R. §§ 101.13 and 101.54.

13           155.    Defendant has repeatedly made unlawful nutrient content claims about Lycopene

14   and potassium that fail to utilize one of the limited defined terms appropriately. These nutrient

15   content claims are unlawful because they fail to comply with the nutrient content claim provisions

16   in violation of 21 C.F.R. §§ 101.13 and 101.54, which have been incorporated in California's

17   Sherman Law.  They are false because the terms have defined minimum nutritional thresholds so

18   that, for example, a claim that a product "contains" a nutrient is a claim that the produc has at

19   least 10 of the daily value of that nutrient. By using defined terms improperly, Defendant was, in

20   effect, falsely asserting that the products met the minimum nutritional thresholds for the claims in

21   question which its products failed to qualify for. By using undefined terms, Defendant was, in

22   effect, falsely asserting that its products met at least the lowest minimum threshold for any

23   nutrient content claim which would have been 10% of the daily value of the nutrient at issue.

24   Such a threshold represents the lowest level that a nutrient can be present in a food before it

25   becomes deceptive and misleading to highlight its presence in a nutrient content claim.

26           156.    For example, the labels of Hunt's tomato products purchased by Plaintiffs have

27   utilized two separate unlawful Lycopene nutrient content claims. The first was a claim that the

28   particular tomato product was a "natural source" of the antioxidant Lycopene. An example being

1    "OUR PROMISE Our Tomatoes Are Always … A natural source of Antioxidants –Vitamin C &

2    Lycopene." The second was a claim that the antioxidant Lycopene was found naturally in

3    tomatoes. An example being "OUR PROMISE Our Tomatoes Are Always …The Antioxidants

4    Vitamin C and Lycopene are found naturally in tomatoes." Both types of label claims are claims

5    are improper nutrient content claims.

6        157.    This has been made clear by prior FDA enforcement actions targeting similar or

7    identical claims. For example on March 24, 2011, the FDA sent Jonathan Sprouts, Inc. a warning

8    letter where it specifically targeted a "source" type claim like the one used on Defendant's tomato

9    products. In that letter the FDA stated:

10           Your Organic Clover Sprouts product label bears the claim "Phytoestrogen Source[.]"
             Your webpage entitled "Sprouts, The Miracle Food! - Rich in Vitamins, Minerals and
11           Phytochemicals" bears the claim "Alfalfa sprouts are one of our finest food sources of . . .
             saponin." These claims are nutrient content claims subject to section 403(r)(1)(A) of the
12           Act because they characterize the level of nutrients of a type required to be in nutrition
             labeling (phytoestrogen and saponin) in your products by use of the term "source." Under
13           section 403(r)(2)(A) of the Act, nutrient content claims may be made only if the
             characterization of the level made in the claim uses terms which are defined by regulation.
14           However, FDA has not defined the characterization "source" by regulation. Therefore,
15           this characterization may not be used in nutrient content claims.

16

17       158.    It is thus clear that a "source" claim like the one utilized on the labels of Hunt's

18   tomato products such as those purchased by Plaintiffs are unlawful because the "FDA has not

19   defined the characterization 'source' by regulation" and thus such a "characterization may not be

20   used in nutrient content claims." Similarly, a claim that the nutrient Lycopene is "found" in

21   tomatoes is improper because it is either an undefined characterization that a nutrient is found in a

22   food at some undefined level or because it is a synonym for a defined term like "contains" as

23   there is no difference in meaning between the statement "tomatoes contain Lycopene" and the

24   statement "Lycopene is found in tomatoes." Both characterize the fact the tomatoes contain

25   Lycopene at some undefined level.  These claims are false because they falsely imply that the

26   levels of nutrients in the food are capable of satisfying the minimum nutritional threshold

27   established by regulation

28       159.    The Defendant made similar unlawful nutrient content claims on the labels of its

Swiss Miss cocoa products claiming that unnamed antioxidants were found in cocoa. It also claimed that Swiss Miss cocoa was a "natural source" of unnamed antioxidants.

160.    Claims that ConAgra's Hunt's canned tomato products are "potassium-rich" are unlawful and false because Hunt's canned tomato products do not meet the minimum nutrient level threshold to make such a claim which is 20 percent or more of the RDI (Reference Daily Intake or Recommended Daily Intake) or the DRV (Daily Reference Value) of potassium per reference amount customarily consumed. Similarly, claims that ConAgra's Hunt's canned tomato products "provide" or "contain" Lycopene are unlawful and false because Lycopene does not have an RDI and therefore Hunt's canned tomato products do not meet the minimum nutrient level threshold to make such a claim which is 10 percent or more of the RDI or the DRV per reference amount customarily consumed. Claims that ConAgra's Hunt's canned tomato products "have more than twice the potassium than other common potassium sources" like bananas, potatoes, nonfat milk and orange juice fail to meet the criteria for such a claim as well. 21 C.F.R. §§ 101.13 and 101.54.

161.    In addition, claims that ConAgra's Hunt's canned tomato products have "more" than twice the potassium than other common potassium sources" like potatoes, nonfat milk and orange juice are literally false and misleading and another reason the Hunt's tomato products are misbranded.

162.    Claims that ConAgra products contain or are made with an ingredient that is known to contain a particular nutrient, or is prepared in a way that affects the content of a particular nutrient in the food, can only be made if it is a "good source" of the nutrient that is associated with the ingredient or type of preparation.  Thus, statements on canned tomato product labels that the tomatoes are a "source" of Lycopene or that Lycopene is found in tomatoes trigger a "good source" (10 percent or more of the RDI or the DRV per reference amount customarily consumed) which Lycopene and tomatoes cannot demonstrate. Similarly, statements on Swiss Miss cocoa product labels that cocoa is a "source" of unnamed antioxidants or that unnamed antioxidants are found in cocoa trigger a "good source" (10 percent or more of the RDI or the

DRV per reference amount customarily consumed) which the cocoa and unnamed antioxidants cannot demonstrate. 21 C.F.R. § 101.65(c)(3).

163.    The nutrient content claims regulations discussed above are intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in food products.

164.    Plaintiffs relied on these nutrient content claims when making their purchase decisions and were misled because they erroneously believed the implicit misrepresentation that the tomato and cocoa products they were purchasing met the minimum nutritional threshold to make such claims. Plaintiffs would not have purchased these products had they known that the tomatoes and cocoa did not in fact satisfy such minimum nutritional requirements with regard to Lycopene, potassium and unnamed antioxidants.  Plaintiffs had other alternatives that lacked such ingredients and Plaintiff also had cheaper alternatives.

165.    For these reasons, Defendant's nutrient content claims at issue in this Complaint are false and misleading and in violation of 21 C.F.R. § 101.13 and California law, and the products at issue are misbranded as a matter of law. Defendant has violated these referenced regulations. Therefore, Defendant's Misbranded Food Products are misbranded as a matter of federal and California law and cannot be sold or held because they are legally worthless.

**7.    Defendant Makes Unlawful Antioxidant Claims**

166.    On its product labels, ConAgra touts that its canned tomato products contain antioxidants such as Lycopene.  For example, the product label for Hunt's "Diced Tomatoes" currently states:



167.    Until recently the label stated: "OUR PROMISE Our Tomatoes Are Always … A natural source of Antioxidants –Vitamin C & Lycopene" or some very similar claim that the tomatoes were a "source" of Lycopene.

168.    The product label for Swiss Miss Classics Milk Chocolate states that "Natural Antioxidants Are Found In Cocoa"



169.    The Defendant also made claims that its Swiss Miss cocoa was a "source" of unnamed antioxidants.

170.     Identical federal and California regulations regulate antioxidant claims as a particular type of nutrient content claim.  Specifically, 21 C.F.R. § 101.54(g) contains special requirements for nutrient claims that use the term "antioxidant":

(1)  the name of the antioxidant must be disclosed;

(2)  there must be an established RDI for that antioxidant, and if not, no "antioxidant" claim can be made about it;

(3)   the label claim must include the specific name of the nutrient that is an antioxidant and cannot simply say "antioxidants" (*e.g.*, "high in antioxidant vitamins C and E"), *see* 21 C.F.R. § 101.54(g)(4);

(4)   the nutrient that is the subject of the antioxidant claim must also have recognized antioxidant activity, *i.e.*, there must be scientific evidence that after it is eaten and absorbed from the gastrointestinal tract, the substance participates in physiological, biochemical or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions, *see* 21 C.F.R.  § 101.54(g)(2);

(5)  the antioxidant nutrient must meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims, respectively.  For example, to use a "High" claim, the food would have to contain 20% or more of the Daily Reference Value ("DRV") or RDI per serving.  For a "Good Source" claim, the food would have to contain between 10-19% of the DRV or RDI per serving, *see* 21 C.F.R. § 101.54(g)(3); and

(6)  the antioxidant nutrient claim must also comply with general nutrient content claim requirements such as those contained in 21 C.F.R. § 101.13(h) that prescribe the circumstances in which a nutrient content claim can be made on the label of products high in fat, saturated fat, cholesterol or sodium.

171.     Defendant's package labels for all canned tomato products currently represent that the antioxidant Lycopene is contained in the tomatoes and has until recently represented that the canned tomato products were a "source" of Lycopene.  The antioxidant labeling for Defendant's canned tomato products violates federal and California law.

172.    The antioxidant claims on the packages of these products violate federal and California law:  (1) because there are no RDIs for Lycopene, the antioxidant being touted, and (2) because Defendant lacks adequate scientific evidence that the claimed antioxidant nutrients participate in physiological, biochemical, or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions after they are eaten and absorbed from the gastrointestinal tract.

173.    The FDA has issued at least one warning letter relating to the use of a claim of a Lycopene claim for tomato products indicating that because "[t]here is no established reference value for Lycopene" a nutrient claim for Lycopene is unlawful. As such Lycopene cannot serve as the basis for the type of antioxidant claim made on the Hunt's canned tomato products.

174.    Similarly, ConAgra's antioxidant claims on its Swiss Miss cocoa products are also unlawful and render the products misbranded because the labels simply represent that an unnamed antioxidant is contained in the cocoa:

(1)  the name of the antioxidant is not disclosed;

(2)  there is no established RDI for that antioxidant;

(3)  the label claim does not include the specific name of the nutrient that is an antioxidant;

(4)  the nutrient that is the subject of the antioxidant claim does not have recognized antioxidant activity, *i.e.*, there must be scientific evidence that after it is eaten and absorbed from the gastrointestinal tract, the substance participates in physiological, biochemical or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions; and

(5)  the antioxidant nutrient does not meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims, respectively.

175.    In addition to the August 29, 2001 FDA letter sent to the Hirzel Canning Company described below ("Hirzel warning letter" attached hereto as Exhibit A), the FDA has issued at

least 6 other warning letters addressing similar unlawful antioxidant nutrient content claims. Defendant knew or should have known of these FDA warning letters.

176.    Ignoring the legal requirements to make antioxidant claims about  Lycopene and other antioxidants like the unnamed ones purportedly found in Swiss Miss cocoa as well as prior enforcement activity and relevant warning letters, the Defendant made multiple unlawful antioxidant claims about its tomato and cocoa products.

177.    For example, the labels of Hunt's tomato products purchased by Plaintiffs have utilized two separate unlawful Lycopene antioxidant nutrient content claims. The first was a claim that the particular tomato product was a "natural source" of the antioxidant Lycopene. An example being "OUR PROMISE Our Tomatoes Are Always … A natural source of Antioxidants –Vitamin C & Lycopene." The second was a claim that the antioxidant Lycopene was found naturally in tomatoes. An example being "OUR PROMISE Our Tomatoes Are Always …The Antioxidants Vitamin C and Lycopene are found naturally in tomatoes. Both types of label claims are improper nutrient content claims.

178.    This has been made clear by prior FDA enforcement actions targeting similar or identical claims. For example on March 24, 2011, the FDA sent Jonathan Sprouts, Inc. a warning letter where it specifically targeted a "source" type claim like the one used on Defendant's tomato products. In that letter the FDA stated:

> Your Organic Clover Sprouts product label bears the claim "Phytoestrogen Source[.]" Your webpage entitled "Sprouts, The Miracle Food! - Rich in Vitamins, Minerals and Phytochemicals" bears the claim "Alfalfa sprouts are one of our finest food sources of . . . saponin." These claims are nutrient content claims subject to section 403(r)(1)(A) of the Act because they characterize the level of nutrients of a type required to be in nutrition labeling (phytoestrogen and saponin) in your products by use of the term "source." Under section 403(r)(2)(A) of the Act, nutrient content claims may be made only if the characterization of the level made in the claim uses terms which are defined by regulation. However, FDA has not defined the characterization "source" by regulation. Therefore, this characterization may not be used in nutrient content claims.

179.    It is thus clear that a "source" claim like the one utilized on the labels of Hunt's tomato products such as those purchased by Plaintiffs are unlawful because the "FDA has not defined the characterization 'source' by regulation" and thus such a "characterization may not be

used in nutrient content claims." Similarly, a claim that the nutrient Lycopene is "found" in tomatoes is improper because it is either an undefined characterization that a nutrient is found in a food at some undefined level or because it is a synonym for a defined term like "contains" as there is no difference in meaning between the statement "tomatoes contain Lycopene" and the statement "Lycopene is found in tomatoes." Both characterize the fact the tomatoes contain Lycopene at some undefined level.

180.    The Defendant made similar unlawful antioxidant claims on the labels of its Swiss Miss cocoa products claiming that unnamed antioxidants were found in cocoa. It also claimed that Swiss Miss cocoa was a "source" of unnamed antioxidants.

181.    Plaintiffs relied on these unlawful antioxidant nutrient content claims when making their purchase decisions and were misled because they erroneously believed the implicit misrepresentation that the tomato and cocoa products they were purchasing met the minimum nutritional threshold to make such antioxidant claims.  This threshold represents the lowest level that a nutrient can be present in a food before it becomes deceptive and misleading to highlight its presence in a nutrient content claim. Plaintiffs would not have purchased these products had they known that the tomatoes and cocoa did not in fact satisfy such minimum nutritional requirements with regard to Lycopene and unnamed antioxidants.  Plaintiffs had other alternatives that lacked such ingredients and Plaintiff also had cheaper alternatives.

182.    For these reasons, Defendant's antioxidant claims at issue in this Complaint are false and misleading and in violation of 21 C.F.R. § 101.54 and California law, and the products at issue are misbranded as a matter of law.  Misbranded products cannot be legally manufactured, advertised, distributed, held or sold, and are legally worthless.

**8.    Defendant Violates California Law By Making Unlawful Fresh Claims On Its Products' Labels**

183.    California law regulates the use of the word "fresh" in connection with food. Pursuant to 21 C.F.R. § 101.95 which has been adopted by the State of California:

the word "fresh," when used on the label or in labeling of a food in a manner that suggests or implies that the food is unprocessed, means that the food is in its raw state and has not

been frozen or subjected to any form of thermal processing or any other form of preservation. The restrictions on the use of the term "fresh" "pertain to any use of the subject terms …. in a brand name and use as a sensory modifier" such as "fresh taste."

184.    The Defendant violates this provision by representing that its Misbranded Food Products are fresh or have a fresh taste when they have been thermally processed, preserved and contain chemical preservatives.

185.    For example, the label of Hunt's canned tomato products like the diced tomatoes purchased by Plaintiffs bear a FlashSteam Freshness symbol that appears to depict a raw unskinned tomato with beads of water on it.  Hunt's claims that:

> Only Hunt's tomatoes are peeled with FlashSteam, our proprietary natural steam process that maintains the natural tomato goodness of every tomato in our Diced, Whole, and Stewed varieties. Some brands peel their tomatoes using lye or other harsh chemicals. FlashSteam, however, is a process that's completely chemical-free—our Diced, Whole, and Stewed tomatoes are treated to nothing more harsh than a steam treatment.

186.    Given the thermal processing other than the FlashSteam process and the preservation of Hunt's canned tomatoes and the addition of the chemical preservatives, citric acid and calcium chloride, to the canned tomatoes, the use of the FlashSteam Freshness symbol and the claim that the tomato products have a "fresh taste" is deceptive and misleading.

187.    Notwithstanding the claim that the process is "completely chemically free" at some point in the process the chemicals citric acid and calcium chloride are introduced to the tomato products. Given the addition of the preservatives and chemicals the "completely chemical free"  claim is deceptive and misleading.

188.    Despite the legal prohibition against doing so Hunt's repeatedly claims that its tomato products have a "fresh taste." For example, Hunt's website describes the "vine-ripened fresh taste of Hunt's tomatoes."

189.    Moreover, Hunt's also asserts:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

For diced, whole and stewed tomatoes, Hunt's unique flash-steam process helps keep in the flavor and color of tomatoes picked at their peak of ripeness. This allows Hunt's varieties to deliver the high nutritional profile and fresh taste that canned tomatoes consumers desire.

190.    This use of the term "fresh taste" despite thermal processing, preservation and the chemicals that are added to the tomato products by Hunt's is deceptive and misleading for the reasons stated above.  Not surprisingly, the National Advertising Division of the Council of Better Business Bureaus has determined that ConAgra Foods should discontinue certain of its tomato related claims because in connection with the term "100% Natural" they might falsely leave consumers with the impression that Hunt's tomato products were prepared from fresh unprocessed ingredients.

191.    A reasonable consumer would expect that when the Defendant made a representation on its products' labels that such products had a "fresh taste" or made representations as to its freshness that such a representations were not contrary to regulatory requirement for making such claims, A reasonable consumer would also expect that when a manufacturer represented that its vegetable products were fresh that those vegetable products were fresh and had not been  chemically preserved or subjected to processes inconsistent with a freshness claim.

192.    Plaintiffs saw and relied on Defendant's label representation of freshness and its other representations of freshness and fresh taste and they based their purchasing decisions in part on the belief that such products were fresh, would have a fresh taste and had not been subjected to chemical preservation or processes inconsistent with a freshness claim.

193.    Plaintiffs did not know, and had no reason to know, that Defendant's canned tomato products contained chemical preservatives and had undergone processes inconsistent with a freshness claim because the Defendant made false representations of freshness on its label and labeling of its products. Moreover, as discussed above, the Defendant falsely represented that its canned tomato products were "free of artificial ingredients & preservatives" and 2) failed to disclose those chemical preservatives and artificial ingredients as required by California and federal law.

194.    Consumers are thus misled into purchasing Defendant's products with false and misleading labeling statements and ingredient descriptions, which violate California law and the regulations related to clams related to freshness contained in 21 C.F.R. §§ 101.95 which has been adopted as law by California..

195.    Had Plaintiffs been aware that the Misbranded Food Products they purchased contained chemical preservatives and artificial ingredients and thus were not truly fresh as falsely represented they would not have purchased the products. Plaintiffs had other alternatives that lacked such ingredients and Plaintiff also had cheaper alternatives.

196.    Because of their false label representations about freshness Defendant's Misbranded Food Products are in this respect misbranded under identical federal and California law.   Misbranded products cannot be legally sold and are legally worthless. Plaintiffs and members of the Class who purchased these products paid an unwarranted premium for these products.

### 9.    Defendant Makes Unlawful Health Claims

197.    The Defendant violated identical California and federal law by making numerous unapproved health claims about its tomato products. It also violated identical California and federal law by making numerous unapproved claims about the ability of its tomato products to cure, mitigate, treat and prevent various diseases that render its products unapproved drugs under California and federal law. Moreover, in promoting the ability of its tomato products to have an effect on certain diseases such as cancer, diabetes, high blood pressure, heart and vascular disease and asthma among others, Defendant violated the advertising provisions of the Sherman law.

198.    A health claim is a statement expressly or implicitly linking the consumption of a food substance (*e.g.*, ingredient, nutrient, or complete food) to risk of a disease (*e.g.*, cardiovascular disease) or a health-related condition (*e.g.*, hypertension). *See* 21 C.F.R. § 101.14(a)(1), (a)(2), and (a)(5). Only health claims made in accordance with FDCA requirements, or authorized by FDA as qualified health claims, may be included in food labeling. Other express or implied statements that constitute health claims, but that do not meet statutory requirements, are prohibited in labeling foods.

199.    21 C.F.R. § 101.14, which has been expressly adopted by California, provides when and how a manufacturer may make a health claim about its product.  A "Health Claim" means any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication, including "third party" references, written statements (*e.g*., a brand name including a term such as "heart"), symbols (*e.g*., a heart symbol), or vignettes, characterizes the relationship of any substance to a disease or health-related condition. Implied health claims include those statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition (*see* 21 CFR § 101.14(a)(1)).

200.    Further, health claims are limited to claims about disease risk reduction, and cannot be claims about the diagnosis, cure, mitigation, or treatment of disease. An example of an authorized health claim is: "Three grams of soluble fiber from oatmeal daily in a diet low in saturated fat and cholesterol may reduce the risk of heart disease. This cereal has 2 grams per serving."

201.    A claim that a substance may be used in the diagnosis, cure, mitigation, treatment, or prevention of a disease is a drug claim and may not be made for a food. 21 U.S.C. § 321(g)(1)(D).

202.    For example, ConAgra specifically promotes the antioxidant health benefits of its tomato-based canned products. ConAgra maintains the website http://www.conagrafoodssscienceinstitute.com, which contains statements such as:

> Antioxidant properties lend tomatoes toward lowering risk for a number of chronic diseases and improving health status overall.

203.    This website also contains material such as a ConAgra's tomato "superfood" webinar where ConAgra, like the snake oil salesmen of yore with their cure-all elixirs, promotes the ability of the Lycopene in its tomato products to prevent cancer, osteoporosis, asthma, cardiovascular disease, diabetes, psoriasis, erythema, premature skin aging, sun damage,

dementia, Alzheimer's disease, Parkinson's disease, and mild cognitive impairment and to promote "brain health," "bone health," "skin health," and "body weight control."

204.   ConAgra also has issued press releases and other marketing materials touting the healthy nature of its canned tomato products, including that tomatoes "may have a measurable impact on heart disease prevention" and contribute to "a significant decrease in blood pressure." http://media.conagrafoods.com/phoenix.zhtml?c=202310&p=irol-newsArticle&ID=1494219&highlight.

205.   In addition to is product labels,, press releases and website claims, ConAgra has also aggressively sought out other mediums to disseminate its unapproved tomato related health and nutrient claims such as paid bloggers who are given talking points and material as well as the ability to incorporate or link to material like the webinar thus resulting in ConAgra's unapproved claims being widely advertised on places such as the web where they are viewed by consumers such as Plaintiffs who saw such claims and relied on Defendant's health claims which influenced their decision to purchase Defendant's tomato products.  Plaintiff's would not have bought the products had they known the Defendant's claims were unapproved and that the products were thus misbranded.

206.   Plaintiffs were misled into the belief that such claims were legal and had passed passed regulatory muster and were supported by science capable of securing regulatory acceptance. Because this was not the case the Plaintiffs were deceived.

207.   These materials and advertisements not only violate regulations adopted by California such as 21 C.F.R. § 101.14 they also violate California Health & Safety Code § 110403 which prohibits the advertisement of products that are represented to have any effect  on enumerated conditions, disorders and diseases including cancer, diabetes, heart and vascular diseases, high blood pressure, unless it has federal approval.

208.   Because of Defendant's unlawful unapproved claims about its tomato products, the tomato products are in this respect misbranded under identical federal and California law. Misbranded products cannot be legally sold and are legally worthless. Plaintiffs and members of the Class who purchased these products paid an unwarranted premium for these products.

1  Plaintiffs had other alternatives that lacked such ingredients and Plaintiff also had cheaper

2  alternatives.

3  **D.     Defendant Has Violated California Law**

4      209.   Defendant has manufactured, advertised, distributed and sold products that are

5  misbranded under California law.   Misbranded products cannot be legally manufactured,

6  advertised, distributed, or sold or held and are legally worthless as a matter of law.

7      210.   Defendant has violated California Health & Safety Code §§ 109885 and 110390

8  which make it unlawful to disseminate false or misleading food advertisements that include

9  statements on products and product packaging or labeling or any other medium used to directly or

10  indirectly induce the purchase of a food product.

11      211.   Defendant has violated California Health & Safety Code § 110395 which makes it

12  unlawful to manufacture, sell, deliver, hold or offer to sell any misbranded food.

13      212.   Defendant has violated California Health & Safety Code § 110398 which makes it

14  unlawful to deliver or proffer for delivery any food that has been falsely advertised.

15      213.   Defendant's Misbranded Food Products are misbranded under California Health &

16  Safety Code § 110660 because their labeling is false and misleading in one or more ways.

17      214.   Defendant's Misbranded Food Products are misbranded under California Health &

18  Safety Code § 110665 because their labeling fails to conform to the requirements for nutrient

19  labeling set forth in 21 U.S.C. § 343(q) and the regulations adopted thereto.

20      215.   Defendant's Misbranded Food Products are misbranded under California Health &

21  Safety Code § 110670 because their labeling fails to conform with the requirements for nutrient

22  content and health claims set forth in 21 U.S.C. § 343(r) and the regulations adopted thereto.

23      216.   Defendant's Misbranded Food Products are misbranded under California Health &

24  Safety Code § 110705 because words, statements and other information required by the Sherman

25  Law to appear on its labeling either are missing or not sufficiently conspicuous

26      217.   .Defendant's Misbranded Food Products are misbranded under California Health

27  & Safety Code § 110725 because they fail to bear labels clearly stating the common or usual

28  name of each ingredient they contain.

218.    Defendant's Misbranded Food Products are misbranded under California Health & Safety Code § 110740 because they contain artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on their labeling.

219.    Defendant has violated California Health & Safety Code § 110760 which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

220.    Defendant has violated California Health & Safety Code § 110765 which makes it unlawful for any person to misbrand any food.

221.    Defendant has violated California Health & Safety Code § 110770 which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

222.    Defendant has violated California Health & Safety Code §§ 110820, 110830, and 110890  which make it unlawful for any person to sell, offer for sale, advertise or label products in violation of the organic provisions of the Sherman Law and the federal requirements it adopts and incorporates by reference.

223.    Defendant has violated the standard set by 21 C.F.R. § 101.2, 101.4, 101.22 and 102.5 all of which have been adopted and incorporated by reference in the Sherman Law, by failing to include on their product labels the nutritional information required by law.

224.    Defendant has violated the standards set by 21 CFR §§ 101.13, 101.14, 101.54, 101.65 and 101.95 which have been adopted and incorporated by reference in the Sherman Law, by including unauthorized antioxidant and nutrient content and fresh claims on their products.

**E.    Plaintiffs Purchased Defendant's Misbranded Food Products**

225.    Plaintiffs care about the nutritional content of food and seek to maintain a healthy diet.

226.    Plaintiffs purchased Defendant's Misbranded Food Products at issue in this Complaint, including Hunt's canned tomatoes products, PAM cooking spray, and Swiss Miss cocoa, since April of 2008, and throughout the Class Period.

1

227.    Plaintiffs purchased Defendant's Misbranded Food Products, including Hunt's

2   Petite Diced Tomatoes in a 14.5 oz. can and other Hunt's canned tomato products such as its

3   tomato paste in an 8 oz can.

4   ///

5   ///

6   ///

7   ///

8   ///

9   ///

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







228.    Plaintiffs purchased 100% Natural PAM Original cooking spray in a 12 oz. can. They also purchased 100% Natural PAM Certified Organic Olive Oil Cooking spray in a 5 oz. can.



1
2
3
4
5
6
7
8



9
10
11
12
13
14
15
16
17
18
19

20    229.    Plaintiffs purchased Swiss Miss Classics Milk Chocolate cocoa in a 7.3 oz. box.

21



22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21



22      230.    Plaintiffs read the labels on Defendant's Misbranded Food Products, including the

23 "100% Natural" claims; the "Organic" claims, the Lycopene antioxidant nutrient content claim;

24 the "free of artificial ingredients & preservatives" claim; the ingredient claims and the

25 FlashSteam freshness claim before purchasing them.

26      231.    Plaintiffs read Defendant's website and web claims concerning Defendant's

27 Misbranded Food Products, including the "100% Natural" claims; the "Organic" claims, the

28 Lycopene antioxidant nutrient content claim; the "free of artificial ingredients & preservatives"

claim,  the nutrient content claims related to potassium and Lycopene, the antioxidant claims related to Lycopene, the health and disease related claims about tomatoes, and the freshness and "fresh taste" claims related to tomatoes before purchasing them.

232.    Plaintiffs reasonably relied on Defendant's package labeling, website and web claims, including the "100% Natural" claims; the "Organic" claims, the  Lycopene antioxidant nutrient content claim; the "free of artificial ingredients & preservatives" claim,  the nutrient content claims related to potassium and Lycopene, the antioxidant claims related to Lycopene, the health and disease related claims about tomatoes, and the freshness and fresh taste claims related to tomatoes

233.    At point of sale, Plaintiffs did not know, and had no reason to know, that Defendant's products were misbranded as set forth herein, and would not have bought the products had they known the truth about them.

234.    At point of sale, Plaintiffs did not know, and had no reason to know, that Defendant's "100% Natural" claims; "Organic" claims, Lycopene antioxidant nutrient content claim; "free of artificial ingredients & preservatives" claim; and FlashSteam freshness claim on the products' labels or Defendant's website and web claims were unlawful as set forth herein, and would not have bought the products had they known the truth about them.

235.    After Plaintiffs learned that Defendant's Misbranded Food Products are falsely labeled, they stopped purchasing them.

236.    As a result of Defendant's misrepresentations, Plaintiffs and thousands of others in California purchased the products at issue.

237.    Defendant's labeling, advertising, and marketing as alleged herein is false and misleading and designed to increase sales of the products at issue.  Defendant's misrepresentations are part of an extensive labeling, advertising and marketing campaign, and a reasonable person would attach importance to Defendant's representations in determining whether to purchase the products at issue.

238.    A reasonable person would attach importance to whether Defendant's products were legally salable and capable of legal possession and to Defendant's representations about

these issues in determining whether to purchase the products at issue. Plaintiffs would not have purchased Defendant's Misbranded Food Products had they known they were not capable of being legally sold or held.

239.    These Misbranded Food Products 1) whose essential characteristics had been misrepresented by the Defendant; 2) which contained ingredients the Plaintiffs sought to avoid in their food; 3) which had their nutritional and health benefits misrepresented and overstated by the Defendant, and 4) which <u>were misbranded products which could not be resold</u> and whose very possession was illegal; were worthless to the Plaintiffs and as a matter of law.

## **CLASS ACTION ALLEGATIONS**

240.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in California who, within the last four years, purchased a PAM cooking spray product, or a Hunt's canned tomato product, or a Swiss Miss Cocoa product (the "Class").

241.    The following persons are expressly excluded from the Class:  (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; and (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

242.    This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

243.    <u>Numerosity</u>:  Based upon Defendant's publicly available sales data with respect to the misbranded products at issue, it is estimated that the Class numbers in the thousands, and that joinder of all Class members is impracticable.

244.    <u>Common Questions Predominate</u>:  This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members.  Thus, proof of a common set of facts will establish the right of each Class member to recover.  Questions of law and fact common to each Class member include, for example:

    a.   Whether  Defendant  engaged  in  unfair,  unlawful  or  deceptive

*Amended Class Action Complaint*

1    business practices by failing to properly package and label their Misbranded Food Products sold to consumers;

2    b.  Whether the food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

3

4    c.  Whether Defendant made unlawful and misleading antioxidant claims with respect to their food products sold to consumers;

5    d.  Whether Defendant made unlawful and misleading nutrient content claims with respect to their food products sold to consumers;

6

7    e.  Whether Defendant made unlawful and misleading "100% Natural" claims with respect to their food products sold to consumers;

8

9    f.  Whether Defendant made unlawful and misleading "Organic" claims with respect to their food products sold to consumers;

10   g.  Whether Defendant failed to list ingredients by their common or usual names or to list ingredients in descending order by weight;

11

12   h.  Whether Defendant failed to disclose the presence of preservatives or falsely represented that products did not contain preservatives or artificial ingredients;

13

14   i.   Whether Defendant made unlawful and misleading fresh claims;

15   j.  Whether Defendant violated California Bus. & Prof. Code § 17200 *et seq.*, California Bus. & Prof. Code § 17500 *et seq.*, the Consumer Legal Remedies Act, Cal. Civ. Code. § 1750 *et seq.*, and the Sherman Law;

16

17   k.  Whether Plaintiffs and the Class are entitled to equitable and/or injunctive relief;

18

19   l.  Whether Defendant's unlawful, unfair and/or deceptive practices harmed Plaintiffs and the Class; and

20   m.  Whether Defendant was unjustly enriched by its deceptive practices.

21

22       245.  Typicality:  Plaintiffs' claims are typical of the claims of the Class because

23   Plaintiffs bought Defendant's Misbranded Food Products during the Class Period.  Defendant's

24   unlawful, unfair and/or fraudulent actions concern the same business practices described herein

25   irrespective of where they occurred or were experienced.  Plaintiffs and the Class sustained

26   similar injuries arising out of Defendant's conduct in violation of California law.  The injuries of

27   each member of the Class were caused directly by Defendant's wrongful conduct.  In addition,

28   the factual underpinning of Defendant's misconduct is common to all Class members and

1   represents a common thread of misconduct resulting in injury to all members of the Class.

2   Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims

3   of the Class members and are based on the same legal theories.

4         246.    Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Class.

5   Neither Plaintiffs nor Plaintiffs' counsel have any interests that conflict with or are antagonistic to

6   the interests of the Class members.  Plaintiffs have retained highly competent and experienced

7   class action attorneys to represent their interests and those of the members of the Class.  Plaintiffs

8   and Plaintiffs' counsel have the necessary financial resources to adequately and vigorously

9   litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to

10  the Class members and will diligently discharge those duties by vigorously seeking the maximum

11  possible recovery for the Class.

12        247.    Superiority:   There is no plain, speedy or adequate remedy other than by

13  maintenance of this class action.  The prosecution of individual remedies by members of the

14  Class will tend to establish inconsistent standards of conduct for Defendant and result in the

15  impairment of Class members' rights and the disposition of their interests through actions to

16  which they were not parties.  Class action treatment will permit a large number of similarly

17  situated persons to prosecute their common claims in a single forum simultaneously, efficiently

18  and without the unnecessary duplication of effort and expense that numerous individual actions

19  would engender.  Further, as the damages suffered by individual members of the Class may be

20  relatively small, the expense and burden of individual litigation would make it difficult or

21  impossible for individual members of the Class to redress the wrongs done to them, while an

22  important public interest will be served by addressing the matter as a class action.  Class

23  treatment of common questions of law and fact would also be superior to multiple individual

24  actions or piecemeal litigation in that class treatment will conserve the resources of the Court and

25  the litigants, and will promote consistency and efficiency of adjudication.

26        248.    The prerequisites to maintaining a class action for injunctive or equitable relief

27  pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds

28

generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

249. The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3) are met as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

250. Plaintiffs and Plaintiffs' counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Business and Professions Code § 17200, *et seq.*
### Unlawful Business Acts and Practices

251. Plaintiffs incorporate by reference each allegation set forth above.

252. Defendant's conduct constitutes unlawful business acts and practices.

253. Defendant sold Misbranded Food Products in California during the Class Period.

254. Defendant is a corporation and, therefore, is a "person" within the meaning of the Sherman Law.

255. Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of Defendant's violations of the advertising provisions of the Sherman Law (Article 3) and the misbranded food provisions of the Sherman Law (Article 6).

256. Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of Defendant's violations of § 17500, *et seq.*, which forbids untrue and misleading advertising.

257. Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of Defendant's violations of the Consumer Legal Remedies Act, Cal. Civ. Code. § 1750 *et seq.*

258. Defendant sold Plaintiffs and the Class Misbranded Food Products that were not capable of being sold or held legally and which were legally worthless. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

259.    As a result of Defendant's illegal business practices, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and to restore to any Class Member any money paid for the Misbranded Food Products.

260.    Defendant's unlawful business acts present a threat and reasonable continued likelihood of injury to Plaintiffs and the Class.

261.    As a result of Defendant's conduct, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiffs and the Class.

<div align="center">

**SECOND CAUSE OF ACTION**
**Business and Professions Code § 17200,** *et seq.*
**Unfair Business Acts and Practices**

</div>

262.    Plaintiffs incorporate by reference each allegation set forth above.

263.    Defendant's conduct as set forth herein constitutes unfair business acts and practices.

264.    Defendant sold Misbranded Food Products in California during the Class Period.

265.    Plaintiffs and members of the Class suffered a substantial injury by virtue of buying Defendant's Misbranded Food Products that they would not have purchased absent Defendant's illegal conduct as set forth herein.

266.    Defendant's deceptive marketing, advertising, packaging and labeling of its Misbranded Food Products and its sale of unsalable Misbranded Food Products that were illegal to possess was of no benefit to consumers, and the harm to consumers and competition is substantial.

267.    Defendant sold Plaintiffs and the Class Misbranded Food Products that were not capable of being legally sold or held and that were legally worthless. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

268.    Plaintiffs and the Class who purchased Defendant's Misbranded Food Products had no way of reasonably knowing that the products were misbranded and were not properly marketed, advertised, packaged and labeled, and thus could not have reasonably avoided the injury each of them suffered.

269.    The consequences of Defendant's conduct as set forth herein outweighs any justification, motive or reason therefor.  Defendant's conduct is and continues to be illegal and contrary to public policy, and is substantially injurious to Plaintiffs and the Class.

270.    As a result of Defendant's conduct, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiffs and the Class.

### THIRD CAUSE OF ACTION
#### Business and Professions Code § 17200, *et seq.*
#### Fraudulent Business Acts and Practices

271.    Plaintiffs incorporate by reference each allegation set forth above.

272.    Defendant's conduct as set forth herein constitutes fraudulent business practices under California Business and Professions Code sections § 17200, *et seq.*

273.    Defendant sold Misbranded Food Products in California during the Class Period.

274.    Defendant's misleading marketing, advertising, packaging and labeling of the Misbranded Food Products and misrepresentation that the products were salable, capable of legal possession and not misbranded was likely to deceive reasonable consumers, and in fact, Plaintiffs and members of the Class were deceived.  Defendant has engaged in fraudulent business acts and practices.

275.     Defendant's fraud and deception caused Plaintiffs and the Class to purchase Defendant's Misbranded Food Products that they would otherwise not have purchased had they known the true nature of those products.

276.     Defendant sold Plaintiffs and the Class Misbranded Food Products that were not capable of being sold or held legally and that were legally worthless. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

277.     As a result of Defendant's conduct as set forth herein, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiffs and the Class.

<div align="center">

**FOURTH CAUSE OF ACTION**
**Business and Professions Code § 17500, *et seq.***
**<u>Misleading and Deceptive Advertising</u>**

</div>

278.     Plaintiffs incorporate by reference each allegation set forth above.

279.     Plaintiffs asserts this cause of action for violations of California Business and Professions Code § 17500*, et seq*. for misleading and deceptive advertising against Defendant.

280.     Defendant sold Misbranded Food Products in California during the Class Period.

281.     Defendant engaged in a scheme of offering Misbranded Food Products for sale to Plaintiffs and members of the Class by way of, *inter alia*, product packaging and labeling, and other promotional materials.  These materials misrepresented and/or omitted the true contents and nature of Defendant's Misbranded Food Products.  Defendant's advertisements and inducements were made within California and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that such product packaging and labeling, and promotional materials were intended as inducements to purchase Defendant's Misbranded Food Products and are statements disseminated by Defendant to Plaintiffs and the Class that were intended to reach members of the Class.  Defendant knew that these statements were misleading and deceptive as set forth herein.

282.    In furtherance of its plan and scheme, Defendant prepared and distributed within California and nationwide via product packaging and labeling, and other promotional materials, statements that misleadingly and deceptively represented the ingredients contained in and the nature of Defendant's Misbranded Food Products.  Plaintiffs and the Class necessarily and reasonably relied on Defendant's materials, and were the intended targets of such representations.

283.    Defendant's conduct in disseminating misleading and deceptive statements in California and nationwide to Plaintiffs and the Class was and is likely to deceive reasonable consumers by obfuscating the true ingredients and nature of Defendant's Misbranded Food Products in violation of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*

284.    As a result of Defendant's violations of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the expense of Plaintiffs and the Class.  Misbranded products cannot be legally sold or held and are legally worthless. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

285.    Plaintiffs and the Class, pursuant to Business And Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiffs and the Class.

### FIFTH CAUSE OF ACTION
### Business and Professions Code § 17500, *et seq.*
### Untrue Advertising

286.    Plaintiffs incorporate by reference each allegation set forth above.

287.    Plaintiffs asserts this cause of action against Defendant for violations of California Business and Professions Code § 17500, *et seq.*, regarding untrue advertising.

288.    Defendant sold Misbranded Food Products in California during the Class Period.

289.    Defendant engaged in a scheme of offering Misbranded Food Products for sale to Plaintiffs and the Class by way of product packaging and labeling, and other promotional

1  materials.   These materials misrepresented and/or omitted the true contents and nature of

2  Defendant's Misbranded Food Products.   Defendant's advertisements and inducements were

3  made in California and come within the definition of advertising as contained in Business and

4  Professions Code §17500, *et seq.* in that the product packaging and labeling, and promotional

5  materials were intended as inducements to purchase Defendant's Misbranded Food Products, and

6  are statements disseminated by Defendant to Plaintiffs and the Class.   Defendant knew that these

7  statements were untrue.

8       290.   In furtherance of their plan and scheme, Defendant prepared and distributed in

9  California and nationwide via product packaging and labeling, and other promotional materials,

10  statements that falsely advertise the ingredients contained in Defendant's Misbranded Food

11  Products, and falsely misrepresented the nature of those products.   Plaintiffs and the Class were

12  the intended targets of such representations and would reasonably be deceived by Defendant's

13  materials.

14       291.   Defendant's conduct in disseminating untrue advertising throughout California and

15  nationwide deceived Plaintiffs and members of the Class by obfuscating the contents, nature and

16  quality of Defendant's Misbranded Food Products in violation of the "untrue prong" of California

17  Business and Professions Code § 17500.

18       292.   As a result of Defendant's violations of the "untrue prong" of California Business

19  and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the expense of

20  Plaintiffs and the Class.   Misbranded products cannot be legally sold or held and are legally

21  worthless. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

22       293.   Plaintiffs and the Class, pursuant to Business and Professions Code § 17535, are

23  entitled to an order enjoining such future conduct by Defendant, and such other orders and

24  judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any

25  money paid for Defendant's Misbranded Food Products by Plaintiffs and the Class.

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SIXTH CAUSE OF ACTION

## Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*

294.    Plaintiffs incorporate by reference each allegation set forth above.

295.    This cause of action is brought pursuant to the CLRA.  Defendant's violations of the CLRA were and are willful, oppressive and fraudulent, thus supporting an award of punitive damages.

296.    Plaintiffs and the Class are entitled to actual and punitive damages against Defendant for its violations of the CLRA.  In addition, pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiffs and the Class are entitled to an order enjoining the above-described acts and practices, providing restitution to Plaintiffs and the Class, ordering payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

297.    Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

298.    Defendant sold Misbranded Food Products in California during the Class Period.

299.    Plaintiffs and members of the Class are "consumers" as that term is defined by the CLRA in Cal. Civ. Code §1761(d).

300.    Defendant's Misbranded Food Products were and are "goods" within the meaning of Cal. Civ. Code §1761(a).

301.    By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(5), of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it misrepresents the particular ingredients, characteristics, uses, benefits and quantities of the goods.

302.    By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(7) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it misrepresents the particular standard, quality or grade of the goods.

303.    By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(9) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it advertises goods with the intent not to sell the goods as advertised.

304.    By engaging in the conduct set forth herein, Defendant has violated and continues to violate Section 1770(a)(16) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it represents that a subject of a transaction has been supplied in accordance with a previous representation when they have not.

305.    Plaintiffs request that the Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to Cal. Civ. Code § 1780(a)(2).  If Defendant is not restrained from engaging in these practices in the future, Plaintiffs and the Class will continue to suffer harm.

306.    Pursuant to Section 1782(a) of the CLRA, on April 17, 2012, Plaintiffs' counsel served ConAgra with notice of ConAgra's violations of the CLRA.  As authorized by ConAgra's counsel, Plaintiffs' counsel served ConAgra by certified mail, return receipt requested.  A true and accurate copy of the CLRA demand notice is attached hereto as Exhibit F.  ConAgra, through its counsel, acknowledged receipt of the CLRA demand notice, as evidenced by the Domestic Return Receipt signed by its agent, a true and accurate copy of which is attached hereto as Exhibit G.

307.    ConAgra has refused or failed to respond to the CLRA demand notice.

308.    ConAgra has failed to provide appropriate relief for its violations of the CLRA within 30 days of its receipt of the CLRA demand notice.  Accordingly, pursuant to Sections 1780 and 1782(b) of the CLRA, Plaintiffs are entitled to recover actual damages, punitive damages, attorneys' fees and costs, and any other relief the Court deems proper.

309.    Plaintiffs make certain claims in this First Amended Complaint that were not included in the original Complaint filed on April 2, 2012, and were not included in the CLRA demand notice.  Specifically, Plaintiffs herein allege that Defendant violated the CLRA by:

310.   This cause of action does not currently seek monetary relief and is limited solely to injunctive relief, as to Defendant's violations of the CLRA not included in the original Complaint.  Plaintiffs intend to amend this Complaint to seek monetary relief in accordance with the CLRA after providing Defendant with notice of Plaintiffs' new claims pursuant to Cal. Civ. Code § 1782.

311.   At the time of any amendment seeking damages under the CLRA, Plaintiffs will demonstrate that the violations of the CLRA by Defendant were willful, oppressive and fraudulent, thus supporting an award of punitive damages.

312.   Consequently, Plaintiffs and the Class will be entitled to actual and punitive damages against Defendant for its violations of the CLRA.  In addition, pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiffs and the Class will be entitled to an order enjoining the above-described acts and practices, providing restitution to Plaintiffs and the Class, ordering payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

## SEVENTH CAUSE OF ACTION
### Restitution Based on Unjust Enrichment/Quasi-Contract

313.   Plaintiffs incorporate by reference each allegation set forth above.

314.   As a result of Defendant's unlawful, fraudulent and misleading labeling, advertising, marketing and sales of Defendant's Misbranded Food Products, Defendant was enriched at the expense of Plaintiffs and the Class.

315.   Defendant sold Misbranded Food Products to Plaintiffs and the Class that were not capable of being sold or held legally and which were legally worthless.  Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

316.   It would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits they received from Plaintiffs and the Class, in light of the fact that the products were not what Defendant purported them to be.  Thus, it would be unjust and inequitable for Defendant to retain the benefit without restitution to Plaintiffs and the Class of all monies paid to Defendant for the products at issue.

317.   As a direct and proximate result of Defendant's actions, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

<div align="center">

**EIGHTH CAUSE OF ACTION**
**Beverly-Song Act (Cal. Civ. Code § 1790, *et seq.*)**

</div>

318.   Plaintiffs incorporate by reference each allegation set forth above.

319.   Plaintiffs and members of the Class are "buyers" as defined by Cal. Civ. Code § 1791(b).

320.   Defendant is a "manufacturer" and "seller" as defined by Cal. Civ. Code § 1791(j) & (l).

321.   Defendant's food products are "consumables" as defined by Cal. Civ. Code § 1791(d).

322.   Defendant's nutrient and health content claims constitute "express warranties" as defined by Cal. Civ. Code § 1791.2.

323.   Defendant, through its package labels, create express warranties by making the affirmation of fact and promising that its Misbranded Food Products comply with food labeling regulations under federal and California law.

324.   Despite Defendant's express warranties regarding its food products, it does not comply with food labeling regulations under federal and California law.

325.   Defendant breached its express warranties regarding its Misbranded Food Products in violation of Cal. Civ. Code § 1790, *et seq.*

326.   Defendant sold Plaintiffs and members of the Class Misbranded Food Products that were not capable of being sold or held legally and which were legally worthless. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

327.   As a direct and proximate result of Defendant's actions, Plaintiffs and the Class have suffered damages in an amount to be proven at trial pursuant to Cal. Civ. Code § 1794.

328.   Defendant's breaches of warranty were willful, warranting the recovery of civil penalties pursuant to Cal. Civ. Code § 1794.

## NINTH CAUSE OF ACTION
## Magnuson-Moss Act (15 U.S.C. § 2301, *et seq.*)

329.    Plaintiffs incorporate by reference each allegation set forth above.

330.    Plaintiffs and members of the Class are "consumers" as defined by 15 U.S.C. § 2301(3).

331.    Defendant is a "supplier" and "warrantor" as defined by 15 U.S.C. § 2301(4) & (5).

332.    Defendant's food products are "consumer products" as defined by 15 U.S.C. § 2301(1).

333.    Defendant's nutrient and health content claims constitute "express warranties."

334.    Defendant, through its package labels, create express warranties by making the affirmation of fact and promising that its Misbranded Food Products comply with food labeling regulations under federal and California law.

335.    Despite Defendant's express warranties regarding its food products, it does not comply with food labeling regulations under federal and California law.

336.    Defendant breached its express warranties regarding its Misbranded Food Products in violation of 15 U.S.C. §§ 2301, *et seq.*

337.    Defendant sold Plaintiffs and members of the Class Misbranded Food Products that were not capable of being sold or held legally and which were legally worthless. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

338.    As a direct and proximate result of Defendant's actions, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of their claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, and on behalf of the general public, pray for judgment against Defendant as follows:

A.    For an order certifying this case as a class action and appointing Plaintiffs and

their counsel to represent the Class;

     B.    For an order awarding, as appropriate, damages, restitution or disgorgement to Plaintiffs and the Class;

     C.    For an order requiring Defendant to immediately cease and desist from selling its Misbranded Food Products in violation of law; enjoining Defendant from continuing to market, advertise, distribute, and sell these products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

     D.    For all remedies available pursuant to Cal. Civ. Code § 1780;

     E.    For an injunction pursuant to California Health & Safety Code § 111910 restraining Defendant from violating Section 7 of the Sherman Law;

     F.    For an order awarding attorneys' fees and costs;

     G.    For an order awarding punitive damages;

     H.    For an order awarding pre-and post-judgment interest; and

     I.    For an order providing such further relief as this Court deems proper.

Dated:  June 29, 2012           Respectfully submitted,

                      By: /s/ Ben F. Pierce Gore
                      Ben F. Pierce Gore (SBN 128515)
PRATT & ASSOCIATES
1901 S. Bascom Avenue, Suite 350
Campbell, CA  95008
Telephone:  (408) 429-6506
Fax:  (408) 369-0752
pgore@prattattorneys.com

Jay Nelkin
Carol Nelkin
Stuart Nelkin
NELKIN & NELKIN, P.C.
5417 Chaucer
Houston, Texas 77005
Telephone:  (713) 526-4500
Facsimile:  (281) 825-4161
jnelkin@nelkinpc.com
cnelkin@nelkinpc.com
snelkin@nelkinpc.com

Don Barrett
Brian Herrington
Katherine B. Riley
David McMullan
Don Barrett, P.A.
P.O. Box 927
404 Court Square North
Lexington, MS 39095
Telephone: (662) 834-2488
Toll Free: (877) 816-4443
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com
donbarrettpa@gmail.com
bherrington@barrettlawgroup.com
kbriley@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Charles Barrett
Charles Barrett, P.C.
6518 Hwy. 100, Suite 210
Nashville, TN 37205
Telephone: (615) 515-3393
Fax: (615) 515-3395
charles@cfbfirm.com

Richard Barrett
Law Offices of Richard R. Barrett, PLLC
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: (662) 380-5018
Fax: (866) 430-5459
rrb@rrblawfirm.net

J. Price Coleman
Coleman Law Firm
1100 Tyler Avenue, Suite 102
Oxford, MS 38655
Telephone: (662) 236-0047
Fax: (662) 513-0072
colemanlawfirmpa@bellsouth.net

Dewitt M. Lovelace
Lovelace Law Firm, P.A.
12870 U.S. Hwy 98 West, Suite 200
Miramar Beach, FL 32550
Telephone: (850) 837-6020
Fax: (850) 837-4093
dml@lovelacelaw.com

David Shelton
Attorney at Law
1223 Jackson Avenue East, Suite 202
Oxford, MS 38655
Telephone: (662) 281-1212
Fax: (662) 281-1312
david@davidsheltonpllc.com

*Amended Class Action Complaint*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Keith M. Fleischman
Frank Karam
Ananda  N. Chaudhuri
FLEISCHMAN LAW FIRM
565 Fifth Avenue, 7th Floor
New York, New York  10017
Telephone:  212-880-9571
keith@fleischmanlawfirm.com
frank@fkaramlaw.com
achaudhuri@fleischmanlawfirm.com

Zona Jones
Darren Brown
PROVOST UMPHREY LAW FIRM LLP
490 Park Street
P.O. Box 4905
Beaumont, TX 77704
Telephone: (409) 299-5178
zjones@provostumphrey.com
dbrown@provostumphrey.com

*Attorneys for Plaintiffs*

*Amended Class Action Complaint*