Robert B. Hawk (Bar No. 118054)
J. Christopher Mitchell (Bar No. 215639)
Stacy R. Hovan (Bar No. 271485)
HOGAN LOVELLS US LLP
4085 Campbell Avenue, Suite 100
Menlo Park, California  94025
Telephone:  (650) 463-4000
Facsimile:  (650) 463-4199
robert.hawk@hoganlovells.com
chris.mitchell@hoganlovells.com
stacy.hovan@hoganlovells.com

Douglas M. Schwab (Bar No. 43083)
Benjamin T. Diggs (Bar No. 245904)
HOGAN LOVELLS US LLP
3 Embarcadero Center, 15th Floor
San Francisco, CA  94111
Telephone:  (415) 374-2300
Facsimile:  (415) 374-2499
douglas.schwab@hoganlovells.com
benjamin.diggs@hoganlovells.com

Attorneys for Defendant
CONAGRA FOODS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JONES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CONAGRA FOODS, INC., <br><br> Defendant. | Case No.  12-cv-1633-CRB <br><br> **DECLARATION OF DOMINIQUE M. HANSSENS, PH.D. (HUNT'S)** <br><br> Date: June 6, 2014 <br> Time: 10:00 AM <br> Judge: Hon. Charles R. Breyer |

**Table of Contents**

| | | |
|---|---|---|
| **I.** | Qualifications ................................................................................................... | 1 |
| **II.** | Assignment and Materials Relied Upon ............................................................. | 2 |
| **III.** | Introduction and Plaintiff's Allegations............................................................... | 2 |
| **IV.** | Many Factors Affect Consumers' Purchase Decisions and There is Heterogeneity in the Purchase Decision Process Across Individual Consumers ... | 3 |
| **V.** | The Evidence Does Not Support Dr. Caswell's Conclusion Regarding Materiality of the Challenged Label Claims ............................................................ | 8 |
| | A.   There was no price premium linked to the "100% Natural" and "Free of artificial ingredients & preservatives" claims on Hunt's canned tomato products ................................................................................................................ | 8 |
| | B.   A review of the Hunt's labels over time and across product lines shows that ConAgra did not consistently use the "Free of artificial ingredients & preservatives" claim on all the products at issue ..................................................... | 9 |
| | C.   The "100% Natural" claim has no universal meaning ............................. | 10 |
| **VI.** | Plaintiff's Expert Has Not Shown that the "100% Natural" or "Free of Artificial Ingredients & Preservatives" Label Claims on Hunt's Canned Tomato Products Were Material to the Putative Class Members' Purchase Decisions .................... | 11 |
| **VII.** | Conclusion ....................................................................................................... | 14 |

**I.      Qualifications**

1.      I am the Bud Knapp Distinguished Professor of Marketing at the UCLA Anderson School of Management, in Los Angeles, California, where I have served on the faculty since 1977.  I received my Licentiate from the University of Antwerp in Applied Economics and received my M.S. and Ph.D. degrees in Management from Purdue University.  At UCLA I have taught a variety of marketing courses including Elements of Marketing, Marketing Strategy & Planning, and Customer Information Strategy.  I have received awards for distinguished teaching in the MBA and Executive MBA programs, including the UCLA Anderson School's Neidorf "Decade" teaching award.

2.      My research focuses on strategic marketing problems, to which I apply expertise in data-analytic methods such as econometrics and time-series analysis.  I am the co-author of Market Response Models: Econometric and Time Series Analysis and various book chapters.  I have served as an area editor for *Marketing Science* and an associate editor for *Management Science* and the *Journal of Marketing Research*.  My papers have appeared in the leading academic and professional journals in marketing, economics and statistics.  Five of these articles have won Best Paper awards, in *Marketing Science* (1995, 2001, 2002), *Journal of Marketing Research* (1999, 2007) and *Journal of Marketing* (2010), and eight were award finalists.

3.      From July 2005 to June 2007 I served as the Executive Director of the Marketing Science Institute in Cambridge, Massachusetts.  In 2007, I was the recipient of the Churchill Lifetime Achievement Award of the American Marketing Association (AMA), and in 2010 I was elected as a Fellow of the INFORMS Society for Marketing Science.  In 2013 I received the AMA Mahajan Award for Career Contributions to Marketing Strategy Research.

4.      I have frequently consulted on marketing issues for companies in a variety of industries such as consumer products, software, entertainment, technology, information services, and retailing.  I am also a founding partner of MarketShare, a global marketing analytics firm headquartered in Los Angeles.  My complete CV is attached as Exhibit A.

5.      I am being compensated at my usual rate of $750 per hour.  A list of my prior testimony is attached as Exhibit B.

## II.     Assignment and Materials Relied Upon

6.      I was asked by counsel for ConAgra to opine on the following issues based on my expertise in marketing and my review of materials in connection with this matter:

- Describe the various factors that may be considered by different consumers when deciding whether or not to purchase a food or beverage product.

- Provide an opinion regarding the impact on consumers' purchase decisions of the "100% Natural" and "Free of artificial ingredients & preservatives" label claims on Hunt's canned tomato products.

7.      I have reviewed the declaration of Dr. Julie Caswell in support of Plaintiff's motion for class certification[1] and I respond to her declaration in this declaration.

8.      A list of documents I relied upon in this matter is attached as Exhibit C.

9.      The facts set forth herein are within my own personal knowledge and, if called as a witness, I could testify competently thereto.  I reserve the right to modify my opinions if new information and data become available.

## III.    Introduction and Plaintiff's Allegations

10.     Hunt's canned tomato products are manufactured by ConAgra Foods, Inc., and are available in several different product segments, including Diced Tomatoes, Whole Peeled Tomatoes, Stewed Tomatoes, Crushed Tomatoes, Tomato Sauce, Tomato Paste, and Tomato Puree.[2]  Hunt's canned tomato products are sold in supermarkets and other retail food outlets.

---

[1] Declaration of Julie Caswell in Support of Plaintiff's Motion for Class Certification (Hunt's), 2/7/14 ("Caswell Declaration").
[2] Deposition of Timothy Nangle, 6/27/13, p. 21.

2

11.     Plaintiff alleges that ConAgra's Hunt's canned tomato products were unlawfully labeled "100% Natural" and "Free of artificial ingredients & preservatives," while containing calcium chloride and/or citric acid.[3]

### IV.   Many Factors Affect Consumers' Purchase Decisions and There is Heterogeneity in the Purchase Decision Process Across Individual Consumers

12.     Marketing professionals understand, and the marketing literature confirms, that the consumer decision process is multi-faceted.[4]  Multiple different marketing factors influence each potential buyer's decision, and these factors interact with both external factors and buyer-specific characteristics in a complex decision-making process.  Below, I describe some of the more common factors that influence various individual consumers' purchase decisions and explain how these factors interact with individual characteristics as well as external factors.  All of these considerations apply to consumer products in the food and beverage industry, including Hunt's canned tomato products.  A comprehensive treatment may be found in *Consumer Behavior and Marketing Strategy*, by J. Paul Peter and Jerry C. Olson.[5]

13.     Several factors generally known as "marketing stimuli" are understood to influence consumer decision making and the extent of their influence is determined by the individual characteristics of the consumer.  The marketing stimuli are usually organized in four categories called the "4 Ps of Marketing – Price, Product, Place, and Promotion."  Taken together the 4 Ps constitute the so-called "marketing mix."[6]  In addition to the marketing stimuli, there are a host of other factors that affect, to varying degrees, any individual purchase decision.  Below is a description of the marketing stimuli and other factors.

---

[3] Second Amended Complaint for Damages, Equitable and Injunctive Relief, *Levi Jones, Christine Sturges, and Edd Ozard, et al. v. ConAgra Foods, Inc.,* 1/15/13.
[4] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th edition, McGraw-Hill, 2010, ch. 3.
[5] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th edition, McGraw-Hill, 2010.
[6] Philip Kotler and Kevin Lane Keller, *Marketing Management*, 14th edition, Prentice Hall, 2012, ch. 1.

14. Price is a factor that affects the sales of every product. Basic economics and marketing tells us that, all else equal, as the price of a product goes up, lower quantities of the product will be sold and as price goes down, more of the product will be sold.[7]

15. A product is a bundle of physical characteristics and other benefits that provide value to the consumer and thus influence his or her purchase decision. For example, canned tomato characteristics can include taste, texture, added seasonings, nutrient content, and caloric content. In addition, "brand" is a set of associations that create the personality of a product, and can be established and communicated in different ways.[8] For example, brand can be communicated through logos or symbols (such as Nike's "swoosh" or McDonald's golden arches), names (such as "Coke" or "Cheerios"), and sounds (such as Harley-Davidson's engine sound and NBC's chime). The influence of a "brand" on consumer decision making can vary depending on each consumer's preferences and characteristics. For example, some consumers tend to repeatedly purchase a brand's products once they determine which brand they prefer[9] while others are not loyal to a particular brand and frequently switch brands.

16. Product characteristics can be communicated to consumers in many ways, including via the product label. The academic literature demonstrates that consumers' information-seeking behavior can depend on many factors, including how familiar consumers are with the product. For example, Kiel and Layton (1981) and Beatty and Smith (1987) found that the greater the consumer's past experience and familiarity with the product category, the less he or she seeks information about the product.[10] Conversely, lack of past experience may prompt some consumers to seek more information about the product. I note that Plaintiffs Christine Sturges and Levi Jones

---

[7] Philip Kotler and Kevin Lane Keller, *Marketing Management*, 14th edition, Prentice Hall, 2012, ch. 14.
[8] Philip Kotler and Kevin Lane Keller, *Marketing Management*, 14th edition, Prentice Hall, 2012, ch. 9.
[9] See e.g., Emma K. Macdonald and Byron M. Sharp, "Brand Awareness Effects on Consumer Decision Making for a Common, Repeat Purchase Product: A Replication," *Journal of Business Research*, Vol. 48, 2000, pp. 5–15.
[10] Geoffrey C. Kiel and Roger A. Layton, "Dimensions of Consumer Information Seeking Behavior," Journal of Marketing Research, Vol. 18, No. 2, May, 1981, pp. 233-239; Sharon E. Beatty and Scott M. Smith, "External Search Effort: An Investigation Across Several Product Categories," *Journal of Consumer Research*, Vol. 14, No. 1, June, 1987, pp. 83-95.

stated that their examination of food product labels depends on their familiarity with the product.[11]

17. The academic literature also finds that once buying habits are formed, advertising and new product information, e.g., on labels, may not change some consumers' purchase behavior.[12] Plaintiff Levi Jones testified that he has been buying Hunt's canned diced tomatoes for 15 to 20 years.[13]

18. Place, or the retail environment, also impacts consumers' purchasing decisions. Retail environments can be physical or virtual, and a given retailer will often have both physical and virtual stores (for example Walmart sells both through its stores and through Walmart.com).[14] Both physical and online retail environments vary widely and can significantly impact a product's sales. For example, one retailer may offer a more upscale shopping experience compared to another retailer, and this difference can affect sales even though the product sold in the two environments is identical. Product placement within a particular retail outlet can also affect sales volume and the types of consumers who buy the product.[15] For example, consumers shopping in an organic or natural section of a supermarket may differ in their preferences and buying habits compared to consumers shopping in other sections of the supermarket.

19. Promotional aspects will also affect product sales. Promotion generally captures the sum total of communications that the marketer uses.[16] Types of promotion that can impact purchasing decisions include advertising (which can be product-specific or aimed at creating or reinforcing a broader brand image), sales promotions (point of purchase displays, coupons, rebates, and free offers), and public relations (the maintenance of an entity's public image). Both manufacturers and retailers may run promotions. For

---

[11] Deposition of Christine Sturges, 5/6/13, pp. 55-56, 84; Deposition of Levi Jones, 5/8/13, p. 41.
[12] See *Consumer Insights: Findings from Behavioral Research*, edited by J. Alba, Marketing Science Institute, 2011, p. 91.
[13] Deposition of Levi Jones, 5/8/13, p. 49.
[14] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th edition, McGraw-Hill, 2010, ch. 19; "History Timeline," Walmart.com, http://corporate.walmart.com/our-story/history/history-timeline, accessed 3/24/14.
[15] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th edition, McGraw-Hill, 2010, ch. 19.
[16] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th edition, McGraw-Hill, 2010, ch. 17.

example, a manufacturer may send coupons in the mail, while a retailer may have discounts at the point of purchase. Also, some retailers employ loyalty programs that provide discounts based on purchase history. Due to the myriad communication channels available to marketers, the promotion environment can vary significantly from consumer to consumer. For example, one consumer may be exposed primarily to print advertising and coupons while another may be exposed to only radio and online advertising.

20.     In addition to the above marketing stimuli, another dimension of influences on purchase behavior relates to external factors.[17] For example, factors such as the economy, competition, technology, and culture may impact a given person's decision to purchase or not purchase a product. Different consumers also rely on many different sources of information on products, including recommendations from others and different media channels. Another external factor is "time of year" or "seasonality," for example in categories where consumption is related to weather conditions or holidays. The magnitude of any such external effects will vary depending on the potential purchaser and could also vary for a given purchaser over time.[18]

21.     In addition, it is important to note that the influence of the marketing mix and external factors for a given consumer interacts with that consumer's unique considerations. For example, while the marketer may be able to control a product's price, he has no control over whether an individual who purchases the product views it as part of his or her regular shopping cycle or as an unplanned purchase. Once the product is purchased, consumers may use it with varying frequency (e.g., depending on family size or health considerations), which will affect purchase frequency. This is a consumer-specific consideration that will vary even if the price of the product stays constant.

22.     In short, not only are there multiple marketing factors that will influence (to varying degrees) an individual buyer's decision, but such factors interact with both external factors and buyer-specific characteristics in a complex decision-making process. For a quantification of some of these buyer influence factors I refer to *Empirical*

---

[17] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th edition, McGraw-Hill, 2010, ch. 11.
[18] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th edition, McGraw-Hill, 2010, ch. 11.

6

*Generalizations of Marketing Impact*, edited by D. Hanssens, and *Consumer Insights: Findings from Behavioral Research*, edited by J. Alba.[19] As an example of quantification, brand-level price sensitivities (that is, the sensitivity of demand for a brand to a change in price, which is measured as elasticity) are over twenty times higher in magnitude than advertising elasticities (that is, the sensitivity of demand for a product to changes in the advertising level).[20] This suggests that the influence of price can be significantly more than the influence of advertising on consumers' purchase decisions viewed collectively.

23. The variety of factors that influence consumer purchase decisions, and the different weights put on these factors by different consumers, means that there is a high degree of heterogeneity in the purchase decision process at the consumer level. That is to say that two consumers exposed to the same factors may arrive at different purchasing decisions for Hunt's canned tomato products based on each consumer's prioritization and valuation of these factors. And even if those two consumers both purchase the product, their purchase decisions will frequently be driven by a different mix of factors.

24. The testimony of Hunt's Senior Brand Manager, Tim Nangle, is consistent with this conclusion:

> Consumers break into various groups and different groups of consumers care about different things. Some care about the flavor, some care about the recipes, some care about the price, some care about the size of the can or where it's shelfed [sic] in the grocery store. Some care about the nutritionals. It varies quite a bit, and it's hard to generalize as to consumer.[21]

25. I note that Dr. Caswell appears to agree that there is significant heterogeneity in the consumer purchase decision process, as she testified that the attribute set considered, as well as the weight placed on each attribute, differs by consumer.[22] She also testified

---

[19] *Empirical Generalizations of Marketing Impact*, edited by D. Hanssens, Marketing Science Institute, 2009; *Consumer Insights: Findings from Behavioral Research*, edited by J. Alba, Marketing Science Institute, 2011.
[20] *Empirical Generalizations of Marketing Impact*, edited by D. Hanssens, Marketing Science Institute, 2009, pp. 55 and 83.
[21] Deposition of Timothy Nangle, 6/27/13, pp. 142-143.
[22] Deposition of Julie Caswell, 8/23/13, p. 184.

7

that there is variation in label usage among consumers and that reliance on information sources about a food product varies from consumer to consumer. [23]

26.     Given the heterogeneity in the purchase decision process, it is speculative to assume that the "100% Natural" or the "Free of artificial ingredients & preservatives" label claims on Hunt's canned tomato products were a factor in the purchase decision for all or many of the putative class members, absent evidence directly supporting that assumption. I see no such evidence in the Caswell Declaration.

27.     One potential way to ascertain why individual consumers chose to purchase Hunt's canned tomatoes is to conduct a rigorous empirical study, in accordance with existing scientific and professional standards, on the factors that drove individual consumers' purchase decisions regarding Hunt's canned tomato products. To my knowledge, Plaintiff has not conducted any empirical analysis that would reveal the factors that drove the purchasing decisions of the putative class members.

### V.     The Evidence Does Not Support Dr. Caswell's Conclusion Regarding Materiality of the Challenged Label Claims

#### A.     There was no price premium linked to the "100% Natural" and "Free of artificial ingredients & preservatives" claims on Hunt's canned tomato products

28.     The marketing and economics literature tells us that consumers are willing to pay more for a product feature that offers value to them.[24] Consequently, if a product with a particular valued feature is offered at a certain price to consumers, one would expect that the same product without that valued feature would command a lower price.[25] Thus pricing can be an indicator of the importance to consumers of a particular product feature.

---

[23] Deposition of Julie Caswell, 8/23/13, pp. 45-46, 199.
[24] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th edition, McGraw-Hill, 2010, ch. 18.
[25] See, e.g., Gregory A. Baker and Peter J. Crosbie, "Measuring Food Safety Preferences: Identifying Consumer Segments," *Journal of Agricultural and Resource Economics*, Vol. 18, No. 2, 1993, pp. 277-287; Patrick De Pelsmacker, Liesbeth Driesen, and Glenn Rayp, "Do Consumers Care about Ethics? Willingness to Pay for Fair-Trade Coffee," *Journal of Consumer Affairs*, Vol. 39, No. 2, 2005, pp. 363-385.

8

29.     I have reviewed the declaration of Mr. Nangle ("Nangle Declaration")[26] and I understand that ConAgra has made no price distinctions to its customers (e.g., retailers) among Hunt's canned tomato products based on the presence or absence of the "100% Natural" and "Free of artificial ingredients & preservatives" claims.[27] If ConAgra had considered the claims to command a price premium, I expect that it would have charged its customers such a premium.

> **B.     A review of the Hunt's labels over time and across product lines shows that ConAgra did not consistently use the "Free of artificial ingredients & preservatives" claim on all the products at issue**

30.     Hunt's canned tomato products are offered in several varieties, including different flavors and different package sizes, each with a distinct label. In addition, ConAgra has periodically changed the labels on these products. I have reviewed a collection of these Hunt's labels and conclude that they do not support the notion that the "Free of artificial ingredients & preservatives" label claim was an influential factor in all or many consumers' purchase decisions.

31.     First, my review of the Hunt's labels as well as deposition testimony shows that some of the product varieties did not include the "Free of artificial ingredients & preservatives" label claim, at least for some periods of time during the class period.[28] For example, ConAgra removed the "Free of artificial ingredients & preservatives" claim from its best-selling canned tomatoes product, the 14.5-ounce diced tomatoes, in the fall of 2011 and replaced it with a recipe box because the Hunt's marketing team saw a need to educate their core consumers on more ways to use the product.[29] Around the same time, ConAgra launched three new varieties of canned diced tomatoes and included recipes instead of the "Free of artificial ingredients & preservatives" claim.[30] Since that time, ConAgra has removed the "Free of artificial ingredients & preservatives" claim

---

[26] Declaration of Timothy Nangle in Support of ConAgra Foods, Inc.'s Opposition to Plaintiffs' Motion for Class Certification, 4/4/14.
[27] Nangle Declaration, ¶ 8.
[28] See also Nangle Declaration, ¶ 14.
[29] Deposition of Timothy Nangle, 6/27/13, pp. 69-72, 77-78.
[30] The three new varieties were Rosemary and Oregano, Spicy Red Pepper, and Fennel and Red Pepper 14.5-ounce diced tomatoes. Deposition of Timothy Nangle, 6/27/13, pp. 73, 78.

9

from other varieties in favor of including a recipe box.[31] On other products, ConAgra replaced the "Free of artificial ingredients & preservatives" claim with information about ConAgra's partnership with the charity "Child Hunger Ends Here."[32] These are just some examples, among others, of Hunt's canned tomato products that did not include the "Free of artificial ingredients & preservatives" claim for at least part of the class period.

32. If ConAgra believed that the claim was an influential factor in the purchase decisions of all or a very large fraction of consumers, I would expect that it would have advertised this claim on all of the Hunt's canned tomato products.

33. Second, the "Free of artificial ingredients & preservatives" claim, when it did appear on the Hunt's canned tomato products, was located on the back panel of the can, not on the front. This placement of the claim on the back of the package suggests that a significant proportion of purchasers may not have been exposed to the claim. Mr. Nangle stated in his declaration that text on the back panel of the product was not usually visible to shoppers viewing the supermarket shelf unless the cans are turned around.[33] He also testified that the front of the label is "the part of the label that consumers interact most with."[34]

34. Taken together, these facts are consistent with the conclusion that ConAgra did not view the "Free of artificial ingredients & preservatives" claim as a factor driving the purchase decisions for all or many of the consumers buying its products.

### C. The "100% Natural" claim has no universal meaning

35. Insofar as the "100% Natural" claim was relevant for some consumers, the term has no uniform meaning. Even the U.S. Food and Drug Administration (FDA) acknowledges the difficulty in defining what food products are or are not "natural." Regarding the meaning and use of the "natural" label on food products, the FDA states:

> From a food science perspective, it is difficult to define a food product that is 'natural' because the food has probably been processed and is no longer

---

[31] Deposition of Timothy Nangle, 6/27/13, p. 78.
[32] See Nangle Declaration, ¶ 11.
[33] Nangle Declaration, ¶ 10.
[34] Deposition of Timothy Nangle, 6/27/13, p. 149.

the product of the earth. That said, FDA has not developed a definition for use of the term natural or its derivatives. However, the agency has not objected to the use of the term if the food does not contain added color, artificial flavors, or synthetic substances.[35]

36.     Plaintiff's expert, Dr. F. Edward Scarbrough, who worked at the FDA, also noted in a declaration filed in support of Plaintiff's motion to certify a PAM cooking spray class that the FDA does not have a regulatory definition of "natural" and that his group considered the term "natural" as applied to food labeling and concluded that the term as used in the market had a variety of meanings.[36]

37.     Given the lack of a consensus definition of "natural," it is likely that consumers had varying expectations for Hunt's canned tomato products based on the "100% Natural" claim. This adds to the heterogeneity in the consumer decision process I detailed in Section IV and undermines Plaintiff's contention that all, or a substantial portion, of consumers' buying decisions were impacted by the "100% Natural" claim.

**VI.    Plaintiff's Expert Has Not Shown that the "100% Natural" or "Free of Artificial Ingredients & Preservatives" Label Claims on Hunt's Canned Tomato Products Were Material to the Putative Class Members' Purchase Decisions**

38.     The Caswell Declaration supports my opinion that different consumers can be influenced by many different factors in making their purchase decisions. However, it fails to provide any evidence on how different consumers weigh these factors in their purchase decisions or whether the label claims at issue were material to the purchase decisions of the putative class members.

39.     Dr. Caswell describes five categories of intrinsic attributes for food products: food safety, nutrition, sensory/organoleptic, value/function, and process.[37] Each of these categories contains many different attributes which may be considered by individual consumers. The Caswell Declaration also states that "[c]onsumers receive product

---

[35] "What is the meaning of 'natural' on the label of food?," U.S. Food and Drug Administration, http://www.fda.gov/aboutfda/transparency/basics/ucm214868.htm, accessed 12/7/13.
[36] Declaration of F. Edward Scarbrough in Support of Plaintiff's Motion for Class Certification, 8/7/13, ¶ 8.
[37] Caswell Declaration, ¶ 15.

11

quality indicators and cues from a broad range of extrinsic sources including, for example, from labeling, price, and brand name."[38] Dr. Caswell does not dispute the fact that different consumers may weigh these attributes differently and some may consider only a subset of these factors in their purchase decision while ignoring others.

40.     Though Dr. Caswell mentions only product attributes as factors in purchase decisions, there are other factors that are considered by various consumers in making purchase decisions. These other factors, described above in Section IV, include the retail environment, familiarity with the product, and other external factors such as receiving information or cues from other consumers.

41.     For example, putative class member Christine Sturges testified that a factor that affected her purchase decision was that her mother purchased Hunt's canned tomato products.[39] Class representative Levi Jones similarly testified that the fact that his parents bought Hunt's probably affected his purchase decision.[40] He also stated that he had been buying Hunt's canned tomatoes for 20 years and that for the duration of the class period he bought Hunt's because he was a creature of habit.[41] He explained that, as a loyal customer, the label was not a factor in his decision to purchase Hunt's canned diced tomatoes.[42]

42.     Dr. Caswell describes two types of purchasing decision errors that consumers may make when encountering false or misleading product labeling: errors of commission, where the consumer's view is too favorable, and errors of omission, where the consumer's view is not favorable enough, compared to the opinion the consumer would have had if the label were accurate. Dr. Caswell states that a "too favorable opinion due to misbranding leads to purchases that cause economic harm to consumers because purchasing other products would have better met their needs."[43] But Dr. Caswell has not shown that the alleged mislabeling of Hunt's canned tomato products influenced all or

---

[38] Caswell Declaration, ¶ 22.
[39] Deposition of Christine Sturges, 5/6/13, pp. 70, 81.
[40] Deposition of Levi Jones, 5/8/13, p. 52.
[41] Deposition of Levi Jones, 5/8/13, p. 52.
[42] Deposition of Levi Jones, 5/8/13, pp. 53-54.
[43] Caswell Declaration, ¶ 13.

many of the consumers in the proposed class to buy the product when they otherwise would not have bought it.

43. The Caswell Declaration offers no empirical evidence addressing the relevance to putative class members of the "100% Natural" and "Free of artificial ingredients & preservatives" label claims on Hunt's canned tomato products or the effect that the claims had on the putative class members' purchasing decisions. She also does not appear to have considered whether or not consumers attributed any importance to the two ingredients Plaintiff alleges were at odds with the "Free of artificial ingredients & preservatives" label claim – citric acid and calcium chloride. It is likely that the presence of one or both of the two ingredients would not have affected at least some of the putative class members' purchase decisions. For example, lead plaintiff Levi Jones testified that the two ingredients did not affect his purchase decisions.[44]

44. The Caswell Declaration essentially assumes its conclusion, namely that the label claims at issue "would be material to a reasonable consumer."[45] Dr. Caswell has effectively assumed away the heterogeneity which I have described above in Section IV, the heterogeneity to which the Hunt's senior brand manager testified, and the heterogeneity which she alludes to in describing the many factors that affect different consumers' purchase decisions. She does not establish, nor propose a method to establish, that the "100% Natural" and "Free of artificial ingredients & preservatives" labels had any effect, let alone a material effect, on all or many putative class members' purchase decisions.

45. Dr. Caswell's only support for the assertion that the label was material to consumers is her statement that "reasonable consumers would rely on this label to identify products that are natural and in comparison shopping between food products."[46] In my opinion, this constitutes circular reasoning as she is essentially just defining what it means for a label claim to be material. No support is offered for this statement, and I note that a similar assertion (i.e., consumers would rely on a label to identify products consistent with that label) could be made for any claim on the product label, however

---

[44] Deposition of Levi Jones, 5/8/13, pp. 77-80.
[45] Caswell Declaration, ¶ 27.
[46] Caswell Declaration, ¶ 27.

13

inconsequential. That does not mean that claim had an effect on the purchase decisions of all or many of the putative class members.

## VII. Conclusion

46. In conclusion, my review of the marketing and economics literature on consumer decision making reveals that purchasing decisions are multi-faceted and that consumers are heterogeneous with respect to the factors affecting their purchase decisions. Therefore, one cannot conclude that the particular label claims "100% Natural" and "Free of artificial ingredients & preservatives" are material to all or many putative class members without empirical evidence. The declaration of Dr. Caswell offers no such evidence.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Boston, MA, on April 11, 2014.

_____

Dominique M. Hanssens, Ph.D.