1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   LEVI JONES, et al.,                          No. C 12-01633 CRB

12              Plaintiffs,                    **ORDER DENYING MOTIONS FOR
                                               CLASS CERTIFICATION**
13      v.

14   CONAGRA FOODS, INC.,

15              Defendant.
     _____/
16

17          This is a putative consumer class action about allegedly deceptive and misleading

18   labels on three types of food products.  This district has seen a flood of such cases,[1] in which

19   plaintiffs have challenged, with varying degrees of success, marketing claims on everything

20   from iced tea to nutrition bars.  This Order does not–and, given their multiformity, could

21   not–speak to the merits of all such cases.  It addresses only whether Plaintiffs have met their

22   burden in this case.  In this case, Plaintiffs have moved to certify three separate classes under

23   Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3)–one for each type of food product at

24   issue.  Because the Court finds that Plaintiffs have failed to meet several of the requirements

25   of Rule 23, it DENIES all three pending motions.

26   //

27   //

28

     _____

          [1] See Nicole E. Negowetti, "Defining Natural Foods: The Search for a Natural Law," 26 Regent
     U.L. Rev. 329, 333 (2014) (recognizing that the Northern District of California is known as the "Food
     Court.").

1

## I.    BACKGROUND

2       On April 2, 2012, Plaintiffs Levi Jones, Christine Sturges, and Edd Ozard,[2] on behalf

3  of themselves and others similarly situated, filed a class action suit alleging that Defendant

4  ConAgra's website and products—including Hunt's tomato products, PAM cooking spray

5  products, and Swiss Miss hot cocoa products—contain deceptive and misleading

6  information.  See generally Compl. (dkt. 1).  They filed a First Amended Complaint on July

7  2, 2012.  See generally FAC (dkt. 27).  On December 17, 2012, this Court granted in part

8  Defendant's Motion to Dismiss the FAC.  Order Granting In Part MTD (dkt. 91).

9       On January 15, 2013, Plaintiffs filed a Second Amended Complaint, alleging

10  (1) unlawful, unfair, and fraudulent business acts and practices in violation of California

11  Business and Professions Code section 17200 ("UCL"), (2) misleading, deceptive, and

12  untrue advertising in violation of California Business and Professions Code section 17500

13  ("FAL"), (3) violations of the Consumers Legal Remedies Act ("CLRA"), and (4) restitution

14  based on unjust enrichment.  See SAC (dkt. 95) ¶¶ 255-321.  Plaintiffs sought to certify a

15  PAM cooking spray class in December of 2013, but the Court directed Plaintiffs to move for

16  class certification of all three product lines at the same time.  See Minutes (dkt. 183).

17  Plaintiffs have now done so.  See generally  PAM Mot. (dkt. 128); Hunt's Mot. (dkt. 189);

18  SM Mot. (dkt. 190).  This Order addresses all three motions, breaking out discussion by

19  product group.

20       ### A.    Hunt's

21       As to Hunt's, Plaintiffs seek to certify a class under Rule 23(b)(2) and Rule 23(b)(3)

22  of "All persons in the state of California who, from April 2, 2008, until the date of notice,

23  purchased a Hunt's® canned tomato product bearing the label statement '100% Natural' or

24  'Free of artificial ingredients & preservatives' but which contained the following ingredients:

25  citric acid and/or calcium chloride."  Hunt's Mot. at i.  There are seven segments of Hunt's

26  tomato products: diced tomatoes, crushed tomatoes, stewed tomatoes, whole tomatoes,

27

28       [2] Ozard has since voluntarily dismissed his claims.  See Order Denying Motion for Fees (dkt. 182) at 1.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    tomato sauce, tomato puree, and tomato paste.  SAC ¶ 8; Nagle Decl. (dkt. 203) Ex. A at 21.

2    There are also numerous varieties and sizes (as well as multi-packs) of each segment.

3    See Opp'n to Hunt's Mot. (dkt. 202) at 3 (asserting as an example that there were 16 flavor

4    varieties of diced tomatoes).  Plaintiff Levi Jones purchased diced tomatoes and tomato

5    sauce.  Shelton Decl. (dkt. 189-8) Ex. B (Jones Depo) at 48-50, 56-57.  The products that

6    Jones purchased were labeled "100% Natural" and "Free of artificial ingredients &

7    preservatives."  Hunt's Mot. at 2.  Hunt's diced tomatoes contain citric acid and calcium

8    chloride, and Hunt's tomato sauce includes citric acid, but not calcium chloride.  Id.

9         According to Plaintiffs, all Hunt's tomato products included the "100% Natural" and

10   "Free of artificial ingredients & preservatives" labels, although some segments contained

11   only citric acid (crushed tomatoes, tomato sauce, tomato paste, and tomato puree), while

12   some contained both citric acid and calcium chloride (diced tomatoes, whole tomatoes, and

13   stewed tomatoes).  Id. at 2-3.  According to Defendant, the product labels changed during the

14   proposed class period, and "for some product varieties, no references to preservatives were

15   ever made on the label."  Opp'n to Hunt's Mot. at 4; Nagle Decl. ¶¶ 6 (handful of Hunt's

16   tomato products do not state "100% Natural"), 10-11 ("for some product varieties, no

17   references to preservatives were ever made on the label"), 14 (Defendant removed the

18   "artificial/preservatives" label from most Hunt's products during the class period, and at

19   various times between 2011 and 2013).

20        **B.    PAM**

21        As to PAM, Plaintiffs seek to certify a class under Rule 23(b)(2) and Rule 23(b)(3) of

22   "All persons in the State of California who, from four years prior to the filing of the original

23   complaint until the date of notice, purchased PAM cooking spray labeled '100%

24   NATURAL.'"  PAM Mot. at i.  Plaintiffs assert that the PAM products are not natural

25   because "they contain significant quantities of undisclosed petrochemicals such as Petroleum

26   gas (liquefied), Propane, Propane 2-methyl (isobutane) and Butane."  Id. at 1.[3]  Plaintiff

27

28        _____

          [3] According to Defendant, the two organic PAM varieties use carbon dioxide as a propellant.
     See Opp'n to PAM Mot. (dkt. 149) at 4.

                                          3

United States District Court
For the Northern District of California

1    Christine Sturges purchased PAM Original Cooking Spray in a 12 ounce can, and PAM

2    Certified Organic Olive Oil Spray in a 5 ounce can.  Id.[4]

3          According to Plaintiffs, "[t]here are two varieties of PAM cooking spray products at

4    issue."  Id. at 3.  According to Defendant, there are seven varieties of PAM for retail sale:

5    Original, Butter, Baking, Grilling, Olive Oil, Organic Olive Oil, and Organic Canola Oil.

6    Opp'n to PAM Mot. at 2; Richardson Decl. (dkt. 160) ¶ 6.  The Butter, Baking and Grilling

7    varieties never had a "100% Natural" label.   Opp'n to PAM Mot. at 3; Richardson Decl. ¶ 8.

8    The PAM Original and Olive Oil varieties included a "100% Natural" label at the beginning

9    of the class period, and then in 2010, Defendant replaced the "100% Natural" claim with a

10   claim that the products were "made with 100% natural canola [or olive] oil."  Opp'n to PAM

11   Mot. at 2-3; Richardson Decl. ¶ 13.[5]  The timing of that label change varied between the two

12   products and among the different sizes.  Opp'n to PAM Mot. at 3; Richardson Decl. ¶ 19.

13   The Organic Olive Oil and Organic Canola Oil products have not gone through relevant label

14   changes.  Id.

15         **C.    Swiss Miss**

16         As to Swiss Miss, Plaintiffs seek to certify a class under Rule 23(b)(2) and Rule

17   23(b)(3) of "All persons in the State of California who, from April 2, 2008, until the date of

18   notice, purchased a Swiss Miss® hot cocoa product bearing the label statement 'Natural

19   Source of Antioxidants' or 'Natural Antioxidants Are Found in Cocoa.'"  SM  Mot. at i.

20   Plaintiffs assert that Defendant is "forbidden from making unauthorized antioxidant claims

21   on products that fail to meet the minimum nutritional requirements required for the

22   antioxidant claim being made."  Id. at 1, 2.[6]  During the class period, Plaintiff Christine

23

---

24         [4] Plaintiffs do not challenge the "organic" designation.

25         [5] Plaintiffs do not challenge the newer "made with" label.

26         [6] This assertion is based on the Sherman Law's having incorporated the FDA's regulations into
California law, and specifically on 21 C.F.R. § 101.54.  Id. at 2.

27

28         Section 101.54(b) provides that "The terms 'high,' 'rich in,' or 'excellent source of' may be used
on the label and in the labeling of foods . . . provided that the food contains 20 percent of more of the
RDI [Reference Daily Intake] or the DRV [Daily Reference Value] per reference amount customarily

4

Sturges purchased Swiss Miss cocoa products, including Classics Milk Chocolate cocoa in a 7.3 ounce box.  Id. at 1.  The products purchased by Plaintiff were labeled with the statements "Natural Source of Antioxidants" and "Natural Antioxidants Are Found in Cocoa."  Id.

According to Plaintiffs, "Purchasers of ConAgra's Swiss Miss® hot cocoa mix bought products with the identical labeling claims."  Id. at 1-2.  According to Defendant, it has offered over a dozen varieties of Swiss Miss for sale during the class period, in multiple sizes, boxes and canisters.  Kensicki Decl. (dkt. 198) ¶ 6.  During the class period, labels on some Swiss Miss varieties included one of the two challenged statements about antioxidants, while others made no antioxidant references.  Id. ¶ 12.  The antioxidant statements were either on the top box panel or on the back of the canister.  Id. ¶ 10.  The following chart is a partial reproduction of one from the Swiss Miss brand manager's declaration:

| Swiss Miss Variety | No antioxidant reference | Natural Source of Antioxidants | Natural Antioxidants Are Found in Cocoa |
|---|---|---|---|
| Rich Chocolate (10 pk) | until 7/29/10 | | since 7/29/10 |
| Rich Chocolate (54 oz.) | until 6/28/10 | | since 6/28/10 |
| Milk Chocolate (6 pk) | until 11/1/07 | 11/1/07-7/29/10 | since 7/29/10 |

consumed."  Such terms are permitted provided that "(i) The product contains a food that meets the definition of 'high' in paragraph (b)(1). . . .; and (ii) The label or labeling clearly identifies the food that is the subject of the claim. . . ."

Section 101.54(c) provides that "(1) The terms 'good source,' 'contains,' or 'provides' may be used on the label and in the labeling of foods . . . provided that the food contains 10 to 19 percent of the RDI or the DRV per reference amount customarily consumed."  Such terms are permitted provided that "(2)(i) The product contains a food that meets the definition of 'good source' in paragraph (c)(1). . . .; and (ii) The label or labeling clearly identifies the food that is the subject of the claim. . . ."

Section 101.54(g) governs antioxidant claims, and provides that "A nutrient content claim that characterizes the level of antioxidant nutrients present in a food may be used on the label or in the labeling of that food when: (1) An RDI has been established for each of the nutrients; (2) The nutrients that are the subject of the claim have recognized antioxidant activity. . . .; (3) The level of each nutrient that is the subject of the claim is sufficient to qualify for the § 101.54(b), (c), or (e) claim. . . .; and (4) The names of the nutrients that are the subject of the claim are included as part of the claim. . . ."

5

| Milk Chocolate (10 pk) | until 10/19/07 | 10/19/07-7/29/10 | since 7/29/10 |
|---|---|---|---|
| Milk Chocolate (10+2 pk) | since introduction 8/2/11 | | |
| Milk Chocolate (30 pk) | until 6/18/10 | | since 6/18/10 |
| Milk Chocolate (50 pk) | throughout class period | | |
| Milk Chocolate (19 oz./26 oz.) | until 11/5/07 & since 6/23/10 | 11/5/07-6/23/10 | |
| Marshmallow (6 pk) | until 10/23/07 | 10/23/07-7/29/10 | since 7/29/10 |
| Marshmallow (10+2 pk) | since introduction 8/2/11 | | |
| Marshmallow (30 pk) | until 6/18/10 | | since 6/18/10 |
| No Sugar Added (13.8 oz.) | until 12/5/07 & since 6/25/10 | 12/5/07-6/25/10 | |
| No Sugar Added (60 pk) | throughout class period | | |
| Dark Chocolate Sensation (8 pk) | until 9/12/07 | 9/12/07-5/5/10 | since 5/5/10 |
| French Vanilla (6 pk/8 pk) | until 10/30/07 & since 6/18/12 | 10/30/07-7/29/10 | 7/29/10-6/18/12 |

See id. ¶ 12 (additional rows omitted).

## II.     LEGAL STANDARD

Class certification under Rule 23 is a two-step process.  First, Plaintiffs must meet the four requirements of 23(a): "numerosity," "commonality," "typicality," and "adequacy." Fed. R. Civ. P. 23.  "One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied."  Wang v. Chinese

1   Daily News, Inc., 709 F.3d 829, 833 (9th Cir. 2013) (quoting Wal-Mart Stores, Inc. v. Dukes,

2   131 S.Ct. 2541, 2551 (2011)).

3          Second, Plaintiffs must also establish that one of the bases for certification in Rule

4   23(b) is met.  Rule 23(b)(2) applies when "the party opposing the class has acted or refused

5   to act on grounds that apply generally to the class, so that final injunctive relief or

6   corresponding declaratory relief is appropriate respecting the class as a whole."  Rule

7   23(b)(3) provides that a class may be maintained where "questions of law or fact common to

8   class members predominate over any questions affecting only individual members," and a

9   class action would be "superior to other available methods for fairly and efficiently

10  adjudicating the controversy."  Id.; see also Local Joint Exec. Bd. of Culinary/Bartender

11  Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1163 (9th Cir. 2001) (holding Rule

12  23(b)(3) satisfied where "[i]ndividualized issues [were] few, and most of them [were] likely

13  to be relatively easy").

14         The party seeking class certification bears the burden of demonstrating by a

15  preponderance of the evidence that all four requirements of Rules 23(a) and at least one of

16  the three requirements under Rule 23(b) are met.  See Dukes, 131 S.Ct. at 2551 ("A party

17  seeking class certification must affirmatively demonstrate his compliance with the

18  Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous

19  parties, common questions of law or fact, etc.").

20  **III.    DISCUSSION**

21          **A.    Plaintiffs' Standing**

22         "[N]amed plaintiffs who represent a class must allege and show that they personally

23  have been injured, not that injury has been suffered by other, unidentified members of the

24  class to which they belong and which they purport to represent."  Lewis v. Casey, 518 U.S.

25  343, 357 (1996) (internal quotation marks omitted).

26                 **1.    Hunt's**

27         As to Hunt's, Defendant asserts that Jones lacks standing to bring suit because he did

28  not rely on the allegedly misleading labels, because compliance with the law was not a factor

United States District Court
For the Northern District of California

in his purchasing decisions, because he was not injured, and because he only purchased two of the many products at issue.  Opp'n to Hunt's Mot. at 8-11.  Aside from the argument about the unpurchased products, which really pertains to typicality, see also Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998) (representative claims need only be "reasonably co-extensive with those of absent class members; they need not be substantially identical."), these arguments are initially persuasive, based on Jones's deposition testimony.  Jones testified that there was nothing particular on the label that was a factor in his decision to purchase Hunt's diced tomatoes but that he bought them because his parents did and he was a "loyal customer."  Hawk Decl. II (dkt. 205) Ex. D (Jones Depo) at 53-54.  He testified initially that he was "absolutely" influenced in part by the "100% natural" label to purchase Hunt's products, id. at 58, then immediately conceded that he did not know whether the "100% natural" statement on the label was a factor in his purchases, id. at 59.  He testified that he had no specific recollection of seeing the "free of artificial ingredients and preservatives" label.  Id. at 81.  He testified that citric acid is not a food he tries to avoid, id. at 77, that calcium chloride is not an ingredient he has ever tried to avoid, id. at 79, and that "if those tomatoes had calcium chloride and citric acid in them when [he] purchased them, and [he'd] known that, [he] still would have purchased them," id. at 80.  Indeed, after this suit was filed, he purchased multiple other brands of tomato products that also contained citric acid and/or calcium chloride.  Id. at 114, 117-18, 121-22.

　　　Nonetheless, Plaintiffs' counsel rehabilitated Jones later in the same deposition. Under questioning from his counsel,[7] Jones testified that he did read the "100% natural" label at the time he made his purchase and that he relied on it.  Id. at 134-35.  He went on to say that he makes an effort to seek out natural foods in his diet, id. at 136, and that had he known that Hunt's products had citric acid and calcium chloride, he would not have purchased them, id.  He testified that he did not know that citric acid and calcium chloride were unnatural products, and that when he found out that Hunt's products contained those ingredients, he

---

[7] Defense counsel rightly objected to some of these questions as leading.  See id. at 134-36. Nonetheless, "Did you in any way rely on that label?" is permissible.  See id. at 135.

United States District Court
For the Northern District of California

1    stopped buying them.  Id. at 137-38.[8]  Given this testimony, Jones has made a sufficient

2    showing that he relied on the labels in purchasing a product that he would not have otherwise

3    purchased.  This Order addresses the question of damages in its discussion of Rule 23(b)(3)

4    predominance.

5                    **2.     PAM**

6         As to PAM, Defendant does not challenge Plaintiff Sturges's standing.

7                    **3.     Swiss Miss**

8         As to Swiss Miss, Defendant challenges Plaintiff Sturges's standing, arguing that she

9    was not deceived by the challenged statements and that she was not injured.  See Opp'n to

10   SM Mot. (dkt. 197) at 10-12.  Sturges's testimony indeed presents a problem for Plaintiffs.

11        Although Sturges's testimony undermined the notion that she was injured, at least it

12   did not entirely disclaim injury, see Hawk Decl. I (dkt. 151) Ex. A (Sturges Depo) at 150-51

13   (answering that she did not know whether she suffered "any kind of injury, financial or

14   otherwise," or whether the Swiss Miss products were "worth what [she] paid for them.")–and

15   this Order will discuss whether it is possible to quantify her injury in its discussion of Rule

16   23(b)(3) predominance.

17        More problematic, despite testifying adequately that she relied on an antioxidant

18   statement,[9] see Hawk Decl. II Ex. A (Sturges Depo) at 86 (Q: "So, in . . . deciding to buy

19   Swiss Miss, what factors influenced you in your purchases since April 2008?" A: "I liked

20   that it said antioxidants, I liked that it had calcium, and then I know the brand."), Sturges also

21   testified that the statement was not misleading:

22
23        Q: Is the statement natural antioxidants are found in cocoa, to your understanding now
          as you sit here, is that a true statement?
          A: Yes.
24        Q: Is there anything that you know of that is misleading about that statement?
          . . . A: I don't – I don't know if it's misleading.  Now, I don't think so.
25

26        [8] Plaintiff's counsel did not walk back Jones's testimony that he never considered whether the
     labeling of a product complied with state or federal labeling laws.  See id. at 63.  The "illegal products"
27   basis for standing is therefore unavailable here, and Jones could represent no such class.

28        [9] Sturges testified that the only antioxidant statement that she relied on was "Natural
     Antioxidants Are Found In Cocoa."  Id. at 98.

Q: You don't think so what?
A: I would say it's not misleading now, but I don't know, 'cuz it just says–
Q: Well, was it misleading to you when you read it before you bought Swiss Miss?
A: No, I'm just saying it's one of the things that I was attracted to when I bought it.
Q: All right.  But I – I was really trying to focus on whether it was misleading or not. . . . your testimony is that it's not misleading today, correct?
A: Correct.

Id. at 98-99.  She went on to testify that "it made me think I was buying something with antioxidants in it, as opposed to just saying they're in cocoa."  Id. at 101.[10]  She later stated that she did not know whether she felt that it was misleading when she bought the product. Id. at 101-102.  And she responded "No" to the question of whether "a belief that [her] family would enjoy some particular health benefit from drinking Swiss Miss" was a factor in her purchase.  Id. at 88.[11]  This testimony falls short of the requirement in Hinojos v. Kohl's Corp., 718 F.3d 1098, 1109 (9th Cir. 2013), that to establish standing to bring a UCL or FAL claim, a consumer must allege, among other things, that "the defendant made a false representation about a product."  Of course the SAC alleges that the challenged antioxidant statements are misleading, see SAC ¶ 3(H), but Sturges's testimony contradicts that allegation.

Based on her testimony, Sturges lacks standing.

**B.     Rule 23(a) factors**

**1.     Numerosity**

The requirement of numerosity is that the class be so numerous that joinder of all members individually would be impracticable.  See Fed. R. Civ. P. 23(a)(1); Staton v. Boeing, 327 F.3d 938, 953 (9th Cir. 2003).  "Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises forty or more

---

[10] Importantly, Plaintiffs point to no evidence that this is false.  Their argument is not that Swiss Miss products do not contain antioxidants but instead that Defendant did not comply with 21 C.F.R. § 101.54.  See Reply to SM Mot. (dkt. 211) at 5 ("ConAgra's antioxidant claims . . . are unlawful and render the product mislabeled because the label claim does not include the specific name of the nutrient that is an antioxidant; there is no established RDI for that unnamed antioxidant; and the antioxidant nutrient does not meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b)."); see also Hawk Decl. II Ex. F (Andon Decl.) ¶ 2 (concluding that Swiss Miss antioxidant statement is factually accurate).

[11] Sturges also testified that whether or not the product's labeling complied with federal or state law was not a factor in her decision to purchase it.  Id.

members." <u>See</u> <u>Krzesniak v. Cendant Corp.</u>, No. 05-05156, 2007 WL 1795703, at *7 (N. D. Cal. June 20, 2007).

### a.   Hunt's

As to Hunt's, Plaintiffs represent that "this element is easily satisfied, as Defendant has sold hundreds of thousands (if not millions) of Hunt's canned tomato products during the class period in California." Hunt's Mot. at 7. Defendant does not dispute numerosity.

### b.   PAM

As to PAM, Plaintiffs represent that "[b]ased on sales data, it is estimated that hundreds of thousands of consumers have purchased PAM cooking spray labeled '100% Natural' in California during the class period." PAM Mot. at 6. Defendant does not dispute numerosity.

### c.   Swiss Miss

As to Swiss Miss, Plaintiffs represent that "Defendant has sold hundreds of thousands (if not millions) of Swiss Miss hot cocoa products during the class period in California." SM Mot. at 5. Defendant does not dispute numerosity.

### 2.   Commonality

The requirement of commonality demands that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The requirements for showing commonality are "minimal." <u>See</u> <u>Hanlon</u>, 150 F.3d at 1020. The showing required for Rule 23(a)(2) is "less rigorous" than the related requirements of Rule 23(b)(3). <u>See</u> <u>id.</u> at 1019. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." <u>Id.</u> Commonality is satisfied where claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution–which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Dukes</u>, 131 S. Ct. at 2551.

//

//

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

### a.    Hunt's

As to Hunt's, Plaintiffs assert that there are numerous common questions of law and fact, such as whether the "100% natural" and "free of artificial ingredients & preservatives" labels are unlawful, unfair, deceptive, or misleading when afixed to products containing citric acid and/or calcium chloride.  Hunt's Mot. at 8; see also Chavez v. Blue Sky Natural Bev. Co., 268 F.R.D. 365, 377 (N.D. Cal. 2010) (concluding that class member claims had common issue of "whether the Blue Sky packaging and marketing materials are unlawful, unfair, deceptive or misleading to a reasonable consumer.").  Defendant does not dispute commonality.

### b.    PAM

As to PAM, Plaintiffs assert that there is a common core of facts–purchase of Defendant's cooking spray products with the same misleading label–and a common question: "can Defendant use the term '100% Natural' when the product includes unnatural ingredients?"  PAM Mot. at 6.  Defendant does not dispute commonality.

### c.    Swiss Miss

As to Swiss Miss, Plaintiffs assert that there is a common core of facts, in that all class members purchased one of Defendant's hot cocoa products with the same misleading antioxidant language.  SM Mot. at 6.  There are also common questions, such as "whether the antioxidant label representations are unlawful, unfair, deceptive, or misleading to reasonable consumers."  Id.  Defendant does not dispute commonality.

### 3.    Typicality

The requirement of typicality is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). Representative claims need only be "reasonably co-extensive with those of absent class members; they need not be substantially identical."  See Hanlon, 150 F.3d at 1020.

### a.    Hunt's

As to Hunt's, Defendant argues that Jones is not typical because he lacks standing. Opp'n to Hunt's Mot. at 15.  Because the Court concludes above that Jones has adequately

1   established standing, it also finds that he is typical.  Jones's claims are based on Defendant's

2   products being misbranded in exactly the same way as set out in the proposed class

3   definition.  See Chavez, 268 F.R.D. at 377 (finding plaintiff typical where his claims arose

4   "out of the allegedly false statement, worded in several variations, made on every Blue Sky

5   container indicating that the beverages are connected to Santa Fe, New Mexico").

6                                          **b.     PAM**

7           As to PAM, Defendant argues that Sturges is not typical because she cannot assert

8   ingredient list claims, because she cannot pursue claims premised on purchases of illegal

9   products, and because she did not buy all of the varieties of PAM.  Opp'n to PAM Mot. at

10  11-12.[12]  Defendant's first two arguments are persuasive.

11          It is not clear from Plaintiffs' moving papers whether they intended to certify a class

12  based on Defendant's having listed "propellant" on the ingredient list instead of identifying

13  each of the component parts of the propellant.  See, e.g., PAM Mot. at 7 ("Defendant

14  misbranded an ingredient as 'propellant' instead of using the common or usual name").

15  Assuming that they did move to certify such a class, Sturges conceded in her deposition that

16  she did not read the ingredient list and was not curious about the composition of the

17  propellant.  See Hawk Decl. II Ex. A (Sturges Depo) at 92.  In their reply, Plaintiffs state that

18  "Plaintiff's claim is not that she relied on the ingredient list to her detriment.  Her claim is

19  that she relied on the label statement '100% Natural,' when in fact the products were not

20  100% natural."  Reply to PAM Mot. (dkt. 172) at 5.  Accordingly, Plaintiffs agree that

21  Sturges cannot represent a "propellant" ingredient class.

22

23

24

25

26          [12] Defendant also argues that Sturges is atypical because she cannot recover for any alleged
    injury–noting that she cannot recall what she paid for the products and does not know whether she paid
27  more than they were worth.  Id. at 12 (citing Hawk Decl. I Ex. A (Sturges Depo) at 73, 150, 152, 193).
    This is not really a typicality argument–indeed, Defendant would probably argue that Sturges is typical
28  in that none of the class members know what they paid–but an argument about ascertainability and
    Plaintiffs' damages plan.

                                               13

1    Nor can Sturges represent a class based on claims about purchases of illegal

2  products.[13]  Sturges testified that it was never "a factor in [her] decision to buy PAM,

3  whether or not the labeling on the can complied with state or Federal law."  Hawk Decl. II

4  Ex. A at 91.  Plaintiffs argue that "[t]his testimony does not lead to the conclusion that

5  Plaintiff did not care whether the products were legal or not," Reply at 5, but that seems

6  precisely what it means.

7    Sturges can, however, represent a class of people who purchased different PAM

8  varieties than the two she purchased, provided that the varieties at issue all contained the

9  same allegedly misleading label and are alleged to be misleading for the same reason.  Her

10  claims are reasonably co-extensive with those of absent class members, even if they bought

11  Organic Canola Oil PAM and she bought Organic Olive Oil PAM.  See Chavez, 268 F.R.D.

12  at 377 (finding plaintiff typical where his claims arose "out of the allegedly false statement,

13  worded in several variations, made on every Blue Sky container indicating that the beverages

14  are connected to Santa Fe, New Mexico").

15              **c.    Swiss Miss**

16    As to Swiss Miss, Defendant argues that Sturges is not typical because (1) she was not

17  deceived by the challenged statements and (2) she cannot claim that she "would not have

18  purchased Defendant's Misbranded Food Products had [she] known they were not capable of

19  being legally sold or held," SAC ¶¶ 238, 242, having disclaimed that position, Opp'n to SM

20  Mot.  Defendant is correct on both counts.  Sturges indeed testified that compliance with

21  labeling law was not a factor in her purchase.  See Hawk Decl. I Ex. A (Sturges Depo) at 88.

22  And, given Sturges's testimony that the statement she relied on was not misleading, she is not

23  typical of a class of consumers who were allegedly misled.  See Stearns v. Ticketmaster

24  Corp., 655 F.3d 1013, 1019-20 (9th Cir. 2011) (upholding district court's holding that

25  proposed class representative who did not see challenged statement, and other who was not

26

27

28    [13] The SAC alleges that Sturges "would not have purchased Defendant's Misbranded Food
Products had [she] known they were not capable of bring legally sold or held."  SAC ¶¶ 238, 242.

14

**United States District Court**
For the Northern District of California

1   deceived by challenged statement, were not typical).  The Court finds that Sturges is not

2   typical.

3                         **4.    Adequacy**

4          The requirement of adequate representation asks whether the representative "will

5   fairly and adequately protect the interests of the class."  <u>See</u> Fed. R. Civ. P. 23(a)(4).  Courts

6   are to inquire (1) whether the named plaintiffs and counsel have any conflicts of interest with

7   the rest of the class and (2) whether the named plaintiff and counsel will prosecute the action

8   vigorously for the class.  <u>See</u> <u>Hanlon</u>, 150 F.3d at 1020.

9                         **a.    Hunt's**

10         As to Hunt's, Defendant argues that Jones is inadequate because he is not typical.

11  Opp'n to Hunt's Mot. at 15.  Because the Court concludes above that he is typical, it rejects

12  this argument.  Defendant also contends that Jones is inadequate because he "has handed the

13  car keys to his lawyers"–by not having reviewed the initial complaint or the SAC before they

14  were filed and by having no independent understanding of whether calcium chloride or citric

15  acid are synthetic.  <u>Id.</u> (citing Hawk Decl. II Ex. D (Jones Depo) at 104, 107).  "Individuals

16  are not adequate representatives of a class when 'it appears that they have abdicated any role

17  in the case beyond that of furnishing their names as plaintiffs.'"  <u>See</u> <u>Keegan v. Am. Honda</u>

18  <u>Motor Co.</u>, 284 F.R.D. 504, 525 (C.D. Cal. 2012).  Jones did not abdicate; he made himself

19  available for a lengthy deposition and he read the original complaint after it was filed.

20  <u>See</u> Hawk Decl. II Ex. D (Jones Depo) at 105-106 (explaining the he had not read every

21  paragraph but "what I have read, I have agreed with.  But to say cover for cover and took

22  notes on it, absolutely not.").  Though he is no expert on the ingredients at issue, it is

23  sufficient for present purposes that he tries to live a healthy lifestyle, and that he "work[s] on

24  the assumption that [a label] is true. . . . that a hundred percent natural means it is a much–it's

25  a better alternative than the cans sitting next to it."  <u>Id.</u> at 135-36.  Jones is an adequate

26  representative.

27         Defendant argues that Plaintiffs' counsel is inadequate because it misrepresented key

28  facts in the complaints, primarily allegations concerning Jones's reliance.  Opp'n to Hunt's

                                        15

**United States District Court**
For the Northern District of California

1   Mot. at 15-16.  Defendant's best example is that the SAC alleged that Plaintiff relied on a

2   label about lycopene, but Jones stated in his deposition that he had never heard of lycopene

3   before speaking with counsel, and that he did not see any statement about lycopene on a

4   Hunt's label until after filing suit.  See Hawk Decl. II Ex. D (Jones Depo) at 64-66.[14]

5   Although Defendant casts the lycopene allegation as a violation of Rule 11, Opp'n to Hunts

6   Mot. at 16, an overreaching complaint is hardly sufficient to find inadequacy.  Every

7   indication is that Plaintiffs' counsel would prosecute the case vigorously.  Moreover, there is

8   no evidence of a conflict.  The Court therefore finds that Plaintiffs have demonstrated

9   adequacy.

10                                      **b.      PAM**

11          As to PAM, Defendant argues that neither Sturges nor her counsel are adequate,

12   because of the typicality arguments discussed above, and because they disregard the Court's

13   deadlines, made misrepresentations in the complaints, and retained a conflicted expert

14   witness in another case.  Opp'n to PAM Mot. at 12-15.  None of these arguments are

15   persuasive.  The Court has already addressed Plaintiffs' having moved for class certification

16   on just their PAM claims; although the Court did not grant severance, Plaintiffs' actions do

17   not make them inadequate.  In addition, as with Hunt's, the complaints overreached, but do

18   not make counsel inadequate.  Finally, this Court will not insert itself into Judge Koh's Kane

19   v. Chobani case.  Plaintiffs' counsel is adequate.

20                                   **c.      Swiss Miss**

21          As to Swiss Miss, Defendant argues that "[f]or many of the same reasons she fails the

22   typicality requirement, Sturges is not an adequate representative."  Opp'n to SM Mot. at 12-

23   13 (citing Kandel v. Brother Int'l Corp., 264 F.R.D. 630, 634 (C.D. Cal. 2010)).  Defendant

24   further argues that Sturges is inadequate because her counsel has misrepresented key facts in

25   the complaints, such as the allegations that Sturges relied on statements on the website.  Id. at

26   13 (citing AC ¶¶ 231-32, SAC ¶¶ 235-36).  Sturges's deposition revealed that she never

27   visited the websites.  Hawk Decl. I Ex. A (Sturges Depo) at 57, 79, 88.  As with Hunt's and

28

---

[14] Plaintiffs are not seeking to certify a class involving the lycopene label.

PAM, the complaints overreached, but do not render counsel inadequate.  Nonetheless, because of her testimony about not being misled, Sturges is not an adequate class representative.

### 5.     Ascertainability

Although there is no explicit ascertainability requirement in Rule 23, courts in this district have routinely required plaintiffs to demonstrate ascertainability as part of Rule 23(a). See, e.g., Astiana v. Ben & Jerry's Homemade, Inc., No. 10-4387, 2014 WL 60097, at *1 (N.D. Cal. Jan. 7, 2014) ("apart from the explicit requirements of Rule 23, the party seeking class certification must also demonstrate that an identifiable and ascertainable class exists."). A class is not ascertainable unless membership can be established by means of objective, verifiable criteria.  Xavier v. Philip Morris USA, Inc., 787 F. Supp. 2d 1075, 1088-90 (N.D. Cal. 2011).  "Without an objective, reliable way to ascertain class membership, the class quickly would become unmanageable, and the preclusive effect of final judgment would be easy to evade."  Id. at 1089.  Nonetheless, "'not all class members need to be ascertained prior to class certification.'"  Mauto v. Gen. Motors Corp., No. 07-892, 2008 WL 2775004, at *4 (E.D. Cal. July 15, 2008).

### a.     Hunt's

As to Hunt's, Defendant argues that the class is unascertainable because it is overbroad and because there is no objective and verifiable criteria for determining its members.

Defendant maintains that the proposed class includes individuals who either bought Hunt's products for reasons other than the labels, or who would not consider the labels misleading.  Opp'n to Hunt's Mot. at 11.  Judge Walker considered a similar argument in Chavez, and concluded that under the UCL and CLRA, a consumer class was ascertainable without needing to inquire into prospective class members' states of mind.  268 F.R.D. at 376 (explaining that under the UCL, relief "is available without individualized proof of deception, reliance and injury" and under the CLRA, "reliance on the alleged misrepresentations may be inferred as to the entire class if the named plaintiff can show that

**United States District Court**
For the Northern District of California

1   material misrepresentations were made to the class members.").  Although the Hunt's

2   products' labeling changed over time, Opp'n to Hunt's Mot. at 14, the class definition only

3   includes products "bearing the label statement '100% Natural' or 'Free of artificial

4   ingredients & preservatives,'" Hunt's Mot. at i, so individuals who purchased products

5   without the challenged label statements are not at issue.  <u>See</u> Notice of Supplemental

6   Authority (dkt. 213) Ex. A (Order Denying Motion for Class Certification in <u>Algarin v.</u>

7   <u>Maybelline</u>, No. 12-3000 (S.D. Cal. May 12, 2014) hereinafter "Algarin Order") at 11

8   ("Consumer action classes that have been found to be overbroad generally include members

9   who were never exposed to the alleged misrepresentations at all.").  The overbreadth

10  question therefore comes down to whether the challenged label statements are material; that

11  question is better addressed in the context of 23(b)(3) predominance.

12       Defendant next argues that there is no way to know who is really a member of the

13  class.  Opp'n to Hunt's Mot. at 13-15.  This is a subject upon which courts in this Circuit

14  have diverged.  <u>See</u> <u>Sethavanish v. ZonePerfect Nutrition Co.</u>, No. 12-2907, 2014 WL

15  580696, at *5 (N.D. Cal. Feb. 13, 2014) (recognizing split).

16       Some courts have concluded that the ascertainability requirement cannot be met in the

17  case of low-cost consumer purchases that customers would have no reliable way of

18  remembering.  <u>See, e.g.</u>, <u>id.</u> at *6 (in which Judge Conti found it administratively unfeasible

19  to determine who purchased ZonePerfect bars during the class period, or how many they

20  purchased); <u>In re POM Wonderful LLC</u>, No. 10-2199, 2014 WL 1225184, at *6 (C.D. Cal.

21  Mar. 25, 2014) (unascertainable because "[f]ew, if any, consumers are likely to have retained

22  receipts during the class period" and "there is no way to reliably determine who purchased

23  Defendant's [juice] products or when they did so."); <u>Red v. Kraft Foods, Inc.</u> No. 10-1028,

24  2012 WL 8019257, at *5 (C.D. Cal. Apr. 12, 2012) (finding unascertainable a proposed class

25  of purchasers of various cracker and cookie products marketed as healthy despite including

26  partially hydrogenated vegetable oil and other unhealthy ingredients); <u>Hodes v. Van's Int'l</u>

27  <u>Foods</u>, No. 09-1530, 2009 WL 2424214, at *4 (C.D. Cal. July 23, 2009) (court had concerns

28  about "how Plaintiffs will identify each class member and prove which brand of Van's frozen

waffles each member purchased, in what quantity, and for what purpose" given low probability class members saved receipts).

Some courts have found such classes ascertainable, largely out of a concern that to find otherwise would render a vast number of consumer class actions dead on arrival. See, e.g., Ries v. Ariz. Beverages USA LLC, 287 F.R.D. 523, 535 (N.D. Cal. 2012) (in which Judge Seeborg concluded that lack of receipts for iced tea purchases cannot be dispositive, or "there would be no such thing as a consumer class action."); Astiana v. Kashi Co., 291 F.R.D. 493, 500 (S.D. Cal. 2013) (relying on Ries in holding that "As long as the class definition is sufficiently definite to identify putative class members, '[t]he challenges entailed in the administration of this class are not so burdensome as to defeat certification.'"); Thurston v. Bear Naked, Inc., No. 11-2890, 2013 WL 5664985, at *3 (S.D. Cal. July 30, 2013) (same judge also following Ries); McCrary v. The Elations Co., LLC, No. 13-242, 2014 WL 1779243, at *8 (C.D. Cal. Jan. 13, 2014) ("In this Circuit, it is enough that the class definition describes a 'set of common characteristics sufficient to allow' a prospective plaintiff 'to identify himself or herself as having a right to recover based on the description.'").

Plaintiffs argue that the class here can be ascertained by reference to objective criteria, and that "the objective criteria here is whether a consumer purchased one of the products at issue during the class period." Reply to Hunt's Mot. (dkt. 210) at 5. Plaintiffs propose having putative class members identify the Hunt's brand products they purchased "by photographic verification"[15] and "through notice and by the requirement of sworn testimony that each class member purchased a Hunt's canned tomato product with the subject label claims." Id. at 4. This is problematic.

Even assuming that all proposed class members would be honest, it is hard to imagine that they would be able to remember which particular Hunt's products they purchased from 2008 to the present, and whether those products bore the challenged label statements. As

---

[15] Plaintiffs never state what that actually means. That the class members take pictures of cans they own? Class members would not have saved all of their cans for the last six years. That the class notice include pictures? That is not verification.

United States District Court
For the Northern District of California

1  Defendant points out, there were "literally dozens of varieties with different can sizes,

2  ingredients, and labeling over time" and "some Hunt's cans included the challenged

3  language, while others included no such language at all."  Opp'n to Hunt's Mot. at 14, 15

4  n.10.[16]  Plaintiffs argued at the motion hearing that there is evidence that the named plaintiffs

5  remember their specific purchases, and no evidence that any class members would have

6  difficulty remembering theirs.  But Defendant noted that Plaintiffs' own materiality expert

7  testified in this case that she had "no idea" whether the PAM she owned had a "100 percent

8  natural" claim on it.  Hawk Decl. I Ex. D (Caswell Depo) at 104.  The Court observed that it

9  has bought PAM and did not recall what its label said.[17]  Common sense tells us that while

10 named plaintiffs might make a point of remembering in great detail their history with the

11 products about which they have filed suit, but see Hawk Decl. II Ex. D (Jones Depo) at 56

12 (Q: "Have you purchased Hunt's tomato paste since April 2008?" A: "Maybe.  I don't

13 know."), regular class members might not.

14        Thus in Xavier, Judge Alsup concluded that a proposed class of individuals with a

15 twenty-or-more-pack-a-year smoking history was unascertainable because "[t]here is no good

16 way to identify such individuals" and "we cannot expect smokers to recall the cumulative

17 total of Marlboro packs they have smoked."  787 F. Supp. 2d at 1089.[18]  Although Xavier is

18 somewhat distinguishable on its facts (the class definition here does not require that class

19 members have bought a particular number of Hunt's products), its rejection of class member

20 affidavits due to a "subjective memory problem" applies with equal force here, as the class

21

22        [16] The Court notes that the "100% Natural" label was more widespread (i.e., more consistently
    present on more Hunt's products) than the "free of artificial ingredients & preservatives" label.  See
23  generally Nagle Decl.  In general there appears to be the least amount of label variation in the Hunt's
    product group as compared to the other two product groups at issue.  But there is still variation.

24        [17] Of course, the Court and Plaintiff's expert could presumably both go home, look in their
    pantries, and check what the labels say.  But that means of verification "is incomplete for purposes of
25  this action," see Xavier, 787 F. Supp. 2d at 1090 (reaching same conclusion as to Marlboro Miles
    customer loyalty program, which would not capture all class members), and Plaintiffs have expressed
26  no interest in certifying a class consisting only of people who currently have Hunt's, PAM, or Swiss
    Miss products in their pantries.

27

28        [18] The court further held that "[s]wearing 'I smoked 146,000 Marlboro cigarettes' is categorically
    different from swearing 'I have been to Paris, France,' or 'I am Jewish,' or even 'I was within ten miles
    or the toxic explosion on the day it happened.'"  Id. at 1090.

United States District Court
For the Northern District of California

1   definition carves out some Hunt's products that did not contain the challenged labels.[19]

2   See id. at 1090.  Xavier's concern that the defendant "would be forced to accept [class

3   members'] estimates without the benefit of cross-examination" is also applicable.  Id.  The

4   court in Red explained that "cases where self-identification alone has been deemed sufficient

5   to render a class ascertainable generally involve situations where consumers are likely to

6   have retained receipts. . . where the relevant purchase was a memorable bigticket item . . . or

7   where the defendant would have access to a master list of either consumers or retailers who

8   dealt with the items at issue."  2012 WL 8019257, at *5 (collecting cases).  This case fits

9   none of those categories.  Although this Court might be persuaded that a class of "all people

10  who bought Twinkies," for example, during a certain period, could be ascertained–one would

11  at least have more confidence in class members' ability to accurately self-identify– the

12  variation in the Hunt's products and labels makes self-identification here unfeasible.[20]

13      Accordingly, the Court follows Xavier rather than Ries in this case.  See Sethavanish,

14  2014 WL 580696, at *5 ("While [the Xavier] line of cases may restrict the types of consumer

15  classes that can be certified, they do not bar certification in consumer class actions

16  altogether.").  The class is unascertainable.[21]

17      In the end this question is not dispositive, because a "lack of ascertainability alone

18  will generally not scuttle class certification."  Red, 2012 WL 8019257, at *6.  This Order

19  _____

20      [19] Plaintiffs' argument at the motion hearing that the variation in labels is "irrelevant" because
    products that do not contain the challenged label statements are "not at issue," misses the point.
21  Indisputably, such products are not at issue.  The problem is that class members will not be able to
    remember whether they purchased the products that are not at issue, or the ones that are.
22
        [20] To be clear, the Court does not fault Plaintiffs for failing to identify all class members prior
23  to class certification, see Mauto, 2008 WL 2775004, at *4; it holds that Plaintiffs have not established
    how they will accurately identify all class members ever.
24
        [21] Moreover, the availability of a cy pres award does not solve the problem of not knowing who
25  the class is:

26      [T]he cy pres doctrine governs distribution of unclaimed monies. Applicability of this doctrine
        presupposes a scenario in which plaintiffs have emerged victorious at the end of this litigation.
27      The doctrine therefore does not help plaintiffs overcome the problem of how to enforce the res
        judicata effect of final judgment against an unsuccessful, unascertainable plaintiff class.
28
    Xavier, 787 F. Supp. 2d at 1090-91.

United States District Court
For the Northern District of California

1    therefore goes on to analyze the other Rule 23 factors–noting that, of course, "these

2    administrative difficulties implicate not only the threshold ascertainability question, but also

3    manageability and superiority concerns under Rule 23(b)(3)." See In re POM Wonderful

4    LLC, 2014 WL 1225184, at *6 n.8.

5                 **b.    PAM**

6       As to PAM, there are also significant ascertainability problems.  Defendant makes the

7    same arguments that it did as to Hunt's–that the class is overbroad and that there is no

8    objective, verifiable criteria for determining membership.  See Opp'n to PAM Mot. at 7-11.

9       Again, the overbreadth determination turns on materiality: if the class constitutes

10    people who were exposed to a material misrepresentation, then it is not overbroad.

11    See Chavez, 268 F.R.D. at *376.  This Order discusses materiality in its discussion of

12    23(b)(3) predominance.

13       Again, there is no good way to determine who bought the relevant products.  Sturges

14    was unable to produce any receipts of PAM purchases.  See Hawk Decl. I ¶ 2.  It is unlikely

15    that any other customers would retain such receipts.[22]  And Defendant does not know who

16    the ultimate purchasers of its products are.  Richardson Decl. ¶ 5.  Moreover, that there are

17    seven varieties of PAM, id. ¶ 6, some which bore the "100% Natural" label and some of

18    which did not, id. ¶ 8, and that two of the products bearing the "100% Natural" label stopped

19    bearing that label in 2010, id. ¶ 13, makes it all the less likely that a consumer would

20    accurately remember whether he had been exposed to the label.  Indeed, as Defendant notes,

21    because there were periods of time in which the same variety of PAM was on store shelves

22    with the "100% Natural" label and without that label, it will be hard for customers to

23    accurately self-identify even if they know, for example, that they bought a can of original

24    PAM in 2010.  See Opp'n to PAM Mot. at 8 (citing Richardson Decl. ¶ 17).  That some PAM

25    products during the class period had a "Made with 100% Natural Vegetable [or Canola] [or

26

27           [22] Even if class members had receipts, the label changes did not alter the UPC of each PAM
product, and so for the PAM products for which the "100% Natural" label was removed, a receipt would
not show whether the PAM product purchased bore the old or new label.  See Ugone Decl. (dkt. 161)

28    at 19-20 n.60; Richardson Decl. ¶ 18 ("although the content of the labels changed, the UPC codes on
the products remained the same.").

United States District Court
For the Northern District of California

1   Olive] Oil" label–a label not challenged by Plaintiffs–instead of a "100% Natural" label, <u>see</u>

2   Richardson Decl. ¶¶ 8, 13, will cause further class member confusion.  Plaintiffs cite <u>Johnson</u>

3   <u>v. General Mills, Inc.</u>, 276 F.R.D. 519, 521 (C.D. Cal. 2011), for the proposition that a UCL

4   class should be certified when all class members were "misled by a common advertising

5   campaign that had little to no variation."  <u>See</u> Reply to PAM Mot. at 2.  Here, however, there

6   was variation.  It is no answer that "[i]f certain varieties of PAM never bore a '100% natural'

7   claim . . . then those products are not at issue."  <u>See</u> Reply to PAM Mot. at 2.  The variety of

8   products and of labels, combined with the lack of receipts and the low cost of the purchases,

9   means that consumers are unlikely to accurately self-identify.  Plaintiffs have offered no

10  verifiable means of identifying class members.  And so the Court finds that the class is

11  unascertainable.

12                          **c.      Swiss Miss**

13          As to Swiss Miss, the parties make the same arguments and the Court reaches the

14  same conclusion.  <u>See</u> Opp'n to SM Mot. at 7-10; Reply to SM Mot. (dkt. 211) at 1-3.  The

15  class is not necessarily overbroad, but it is not verifiable.  While Plaintiffs are correct in a

16  sense that "[w]hether a putative class member bought a particular Swiss Miss cocoa product

17  with the antioxidant label claims is an objective inquiry that can be answered by asking

18  consumers a straightforward question to determine whether they are class members," Reply

19  to SM Mot. at 3, there is no way to know that the answers consumers give will be accurate.

20  Given the variety of products and sizes, and the different timing for the label changes (such

21  that some variants of Swiss Miss products had the challenged label statements for some

22  points in the class period and not others, <u>and</u> during certain periods of time, versions of a

23  given product with and without the challenged statements were for sale at the same time,

24  <u>see</u> Kensicki Decl. ¶¶ 10-12), that a consumer simply recalls buying a Swiss Miss product in

25  2010, or even buying a Rich Chocolate 10 pack in 2010, does not establish that the consumer

26

27

28

1    was exposed to the challenged statement.[23]  Accordingly, the Court finds the class

2    unascertainable.

3         **C.    Rule 23(b)(2)**

4         Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on

5    grounds that apply generally to the class, so that final injunctive relief or corresponding

6    declaratory relief is appropriate respecting the class as a whole."  "'Class certification under

7    Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or

8    injunctive.'"  Ellis v. Costco Wholesale Corp., 657 F.3d 970, 986 (9th Cir. 2011).

9              **1.    Hunt's**

10        As to Hunt's, Plaintiffs seek "an injunction to stop Defendant from continuing to

11   misbrand and sell its products in the same way it has done so during the class period."

12   Hunt's Mot. at 16.  Defendant opposes certification of a Rule 23(b)(2) class, arguing that (1)

13   Plaintiffs failed to make a proper 23(a) showing, (2) Plaintiff seeks monetary relief, and (3)

14   Jones lacks standing because he no longer buys Hunt's and does not intend to do so in the

15   future.  Opp'n to Hunt's Mot. at 25.  This Order has already addressed the first argument.

16        Defendant's second argument, about monetary relief, is not an insurmountable hurdle.

17   Plaintiffs assert that they are "not seeking certification of a (b)(2) class for [their] restitution

18   claims under the UCL, FAL, and CLRA or for their damages claim under the CLRA."  Reply

19   to Hunt's Mot. at 15.  And they cite Dukes for the proposition that damages incidental to an

20   injunction are still available.  Id.  This is not a controversial position, and nothing would

21   prevent the Court from following Ries, which granted class certification "for the purposes of

22   declaratory and injunctive relief and denied [it] to the extent plaintiffs seek monetary

23   damages, including restitution, refund, reimbursement and disgorgement."  287 F.R.D. 523,

24   542; see also Lanovaz v. Twinings N. Am., Inc., No. 12-2646, 2014 WL 1652338, at *5

25   (N.D. Cal. Apr. 24, 2014) (same).

26

27

---

28        [23] That the label was not even on the front of the products further undermines any confidence
     the Court could have that a consumer would remember seeing it.  See id. ¶ 10.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   Defendant's third argument, about standing, is more persuasive.  Courts have rejected

2   the argument that a plaintiff cannot establish standing if he has learned that a label is

3   misleading and therefore will not be fooled by it again.  See Ries, 287 F.R.D. at 533 ("were

4   the Court to accept the suggestion that plaintiffs' mere recognition of the alleged deception

5   operates to defeat standing for an injunction, then injunctive relief would never be available

6   in false advertising cases, a wholly unrealistic result.").  Nonetheless, courts do require

7   plaintiffs to express an intent to purchase the products in the future.  See, e.g., Rahman v.

8   Mott's LLP, No. 13-3482, 2014 WL 325241, at *10 (N.D. Cal. Jan. 29, 2014) ("to establish

9   standing [for injunctive relief], plaintiff must allege that he intends to purchase the products

10  at issue in the future")[24]; Jou v. Kimberly-Clark Inc., No. 13-3075, 2013 WL 6491158, at *4

11  (N.D. Cal. Dec. 10, 2013) ("[b]ecause Plaintiffs fail to identify any allegation in their

12  Complaint that suggests that they maintain an interest in purchasing the diapers or wipes, or

13  both, in the future, Plaintiffs have not sufficiently alleged standing to pursue injunctive

14  relief."); Moheb v. Nutramax Labs., Inc., No. 12-3633, 2012 WL 6951904, at *6 (C.D. Cal.

15  Sept. 4, 2012) ("Plaintiff and other members of the Class no longer buy Cosamin and, thus,

16  will obtain no benefit from an injunction concerning Defendant's advertising because they

17  cannot demonstrate a probability of future injury.").  This is somewhat problematic, policy-

18  wise: if a plaintiff bought a product that claimed to be "nutritious" but actually contained

19  arsenic, would he have to claim that he intends to buy it again?  On the other hand, citric acid

20  is not arsenic, and there is no way around the principle that a plaintiff must establish a "'real

21  and immediate threat of repeated injury'" to establish standing for injunctive relief.  See Jou,

22  2012 WL 6491158, at *4 (quoting Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th

23  Cir. 2007)).

24  Here, Jones testified that he "stopped buying" Hunt's products once he found out that

25  they contained the challenged ingredients, and he did not attest to having any intention of

26  buying Hunt's products in the future.  See Hawk Decl. II Ex. D (Jones Depo) at 138.  While

27

28  [24] In Rahman, Judge Illston changed her position on this issue, declining to follow her prior
analysis in Larsen v. Trader Joe's Co., No. 11-5188, 2012 WL 5458396, at *4 (N.D. Cal. June 14, 2012).

United States District Court
For the Northern District of California

1    Jones testified that he makes an effort to seek out natural foods in his diet, id. at 136, he also

2    testified that he might actually prefer products not labeled "natural" depending on price,

3    content and flavor.  Id. at 75.  He also, after filing the lawsuit, purchased other brands of

4    canned tomatoes that contained citric acid and calcium chloride.  See, e.g., id. at 114.

5    Accordingly, Jones could have testified, if true, that he bought the Hunt's products in

6    reliance on the label because he seeks out natural products, but that he might purchase Hunt's

7    products in the future if they were properly labeled.  He did not so testify.  And Plaintiffs

8    failed to respond to this argument in their reply brief, arguing only that the "class members

9    are no longer being misled" argument (which Defendant does not make) "is unconscionable

10   and contrary to the better-reasoned law on this issue."  Reply to Hunt's Mot. at 15.

11        Plaintiffs argued for the first time at the motion hearing that a named plaintiff's intent

12   to purchase in the future is irrelevant, because what Plaintiffs are really seeking is akin to a

13   public injunction under the UCL.  But Judge Chhabria recently explained why this argument

14   fails:

15        It may very well be that the legislative intent behind California's consumer protection
          statutes would be best served by enjoining deceptive labeling. . . . But the power of
16        federal courts is limited, and that power does not expand to accommodate the policy
          objectives underlying state law.  See Hollingsworth v. Perry, 133 S.Ct. 2652, 2664
17        (2013) (explaining that California's policy-related interests in seeing ballot measures
          vigorously defended in court do not override federal standing limitations).

18   Garrison v. Whole Foods Mkt. Grp., Inc., No. 13-5222, 2014 WL 2451290, at *5 (N.D. Cal.

19   June 2, 2014).

20        Accordingly, the Court finds that Plaintiffs lack standing under Rule 23(b)(2).

21             **2.    PAM**

22        As to PAM, "Plaintiff seeks an injunction to stop Defendant from continuing to sell its

23   unlawful products."  PAM Mot. at 14.  Defendant opposes certification of a Rule 23(b)(2)

24   class, arguing that (1) Plaintiffs failed to make a proper 23(a) showing, (2) Plaintiff seeks

25   monetary relief, and (3) Sturges lacks standing because in 2010, "long before this action was

26   filed, ConAgra ceased using a '100% natural' claim on any PAM products containing

27   hydrocarbon propellants," and because Sturges no longer buys PAM products.  Opp'n to

28

1    PAM Mot. at 25.  This Order has already addressed the first argument, and the second is not

2    an insurmountable hurdle, as discussed above regarding Hunt's.

3         Defendant's third argument, about standing, is again persuasive.  Plaintiffs point to no

4    evidence that Sturges intends to buy PAM products again.  She testified that she still has two

5    cans of PAM and that she has not used them at all since the litigation was filed.  Hawk Decl.

6    I (Sturges Depo) Ex. A at 144.  Without any evidence that Sturges plans to buy PAM

7    products in the future, she does not have standing to bring an injunctive class.  Jou, 2012 WL

8    6491158, at *4.  Again, Plaintiffs failed to respond to this argument in their reply brief,

9    see Reply to PAM Mot. at 12 (arguing about monetary relief).[25]  The Court finds that

10   Plaintiffs lack standing under Rule 23(b)(2).

### 3.   Swiss Miss

12        As to Swiss Miss, "Plaintiff seeks an injunction to stop Defendant from continuing to

13   misbrand and sell its products in the same way it has done during the class period."  SM Mot.

14   at 14.  Defendant opposes certification of a Rule 23(b)(2) class, arguing that (1) Plaintiffs fail

15   to make a proper 23(a) showing, (2) Plaintiff seeks monetary relief, and (3) Sturges lacks

16   standing to seek injunctive relief because she no longer buys Swiss Miss and has not alleged

17   any intent to do so in the future.  Opp'n to SM Mot. at 24 (citing Hawk Decl. II Ex. A at 144)

18   (Sturges has not used any Swiss Miss products since litigation was filed).  The 23(a)

19   argument is persuasive, as discussed above.  And Plaintiffs again fail to respond to

20   Defendant's future injury argument–instead taking on the straw horse of Plaintiff not getting

21   fooled again, see Reply to SM Mot. at 15.  This is a fatal flaw.  Accordingly, the Court finds

22   that Plaintiffs lack standing under Rule 23(b)(2).

23   //

---

25        [25] Defendant's argument that an injunction is also unnecessary because Defendant no longer uses the "100% Natural" label on products with hydrocarbon propellants, Opp'n to PAM Mot. at 25, is not
26   persuasive.  The Organic Olive Oil and Organic Canola Oil varieties of PAM continue to bear the label, which Plaintiffs allege is misleading.  See Richardson Decl. ¶ 19; PAM Mot. at 2.  In addition,
27   Defendant states elsewhere that "[a]fter any label change is made, a period follows in which ConAgra and its retailers have a mix of old and new labeled product in their facilities."  Opp'n to PAM Mot. at
28   3.  Accordingly, there could still be some PAM varieties with hydrocarbon propellants and "100% Natural" labels on the shelves; an injunction could lead to those products being pulled.

27

United States District Court
For the Northern District of California

1    **D.    Rule 23(b)(3)**

2        Rule 23(b)(3) provides that a class may be maintained where "questions of law or fact

3    common to class members predominate over any questions affecting only individual

4    members," and a class action would be "superior to other available methods for fairly and

5    efficiently adjudicating the controversy."

6                        **1.    Predominance**

7                        **a.    Individual Determinations**

8        Rule 23(b)(3)'s predominance requirement is more stringent than Rule 23(a)(2)'s

9    commonality requirement, and "tests whether the proposed classes are sufficiently cohesive

10   to warrant adjudication by representation." Wang, 737 F.3d at 545 (quoting Hanlon, 150

11   F.3d at 1022).

12                        **i.    Hunt's**

13       As to Hunt's, Defendant argues that individual questions of reliance predominate.

14   Opp'n to Hunt's Mot. at 16-20. Plaintiffs argue that "[t]he predominant issue is whether [the

15   challenged Hunt's] labels are misbranded as alleged under California law," and "there are no

16   individual reliance components (individual issues) for Plaintiff's UCL, FAL and CLRA

17   claims." Hunt's Mot. at 17.

18       Plaintiffs argue that, under the UCL and the FAL, they need not establish the class's

19   reliance at all. Hunt's Mot. at 18. In re Tobacco II Cases, upon which Plaintiffs rely, held

20   that, for the purposes of standing, so long as the representative plaintiff can establish

21   causation and injury under the UCL, the class members will also have standing. 46 Cal. 4th

22   298, 315-16 (2009). That case "does not stand for the proposition that causation and injury

23   should be inferred on a class-wide basis" in every case. Campion v. Old Republic Home

24   Prot. Co., 272 F.R.D. 517, 533 n.4 (S.D. Cal. 2011). Nor did it "eliminate the need to satisfy

25   the requirements for class certification, including the predominance requirement." Id.; see

26   also Hodes, 2009 WL 2424214, at *4 (explaining that "[w]hile proof of individual reliance

27   may not be necessary to assert claims under the FAL and UCL," citing In re Tobacco II,

28   "[c]ourts in the Ninth Circuit and in California have regularly found that where such inquiries

United States District Court
For the Northern District of California

1   predominate over common questions . . . courts may refuse to certify a class action."); Cohen

2   v. DIRECTV, Inc., 178 Cal. App. 4th 966, 981 (2009) (limiting Tobacco II holding to

3   standing and finding it "irrelevant" as to commonality).  Thus, in Stearns, 655 F.3d at 1020,

4   which relied on In re Tobacco in reversing and remanding a district court's denial of class

5   certification, the Ninth Circuit explained: "We do not, of course, suggest that predominance

6   would be shown in every California UCL case.  For example, it might well be that there was

7   no cohesion among the members because they were exposed to quite disparate information

8   from various representatives of the defendant."  Here, there is a lack of cohesion among the

9   class members, both because consumers were exposed to label statements that varied by can

10  size, variety, and time period (and the challenged ingredients also differed), but more

11  importantly because "even if the challenged statements were facially uniform, consumers'

12  understanding of those representations would not be."  See Opp'n to Hunt's Mot. at 19.  As

13  discussed below, there is no fixed meaning for the word "natural." [26] [27]

14          Under the CLRA, each class member must "have an actual injury caused by the

15  unlawful practice," see Stearns, 655 F.3d at 1022, but a plaintiff may demonstrate that a

16  defendant's alleged deceptive conduct caused the same damage to the class by showing that

17  the alleged misrepresentation would have been material to reasonable persons, see In re

18  Steroid Hormone Prod. Cases, 181 Cal. App. 4th 145, 156-57 (2010).  Under California law,

19  a misrepresentation is material "if a reasonable man would attach importance to its existence

20  or nonexistence in determining his choice of action in the transaction in question."  Id. at 157

21  (internal quotation marks omitted).  "If the misrepresentation or omission is not material as to

22  all class members, the issue of reliance 'would vary from consumer to consumer' and the

23

24

25          [26] In their reply brief, Plaintiffs cite to Hinojos, 718 F.3d at 1107, which held that a legislative
    decision to prohibit a particular misleading advertising practice is evidence that the practice is a material
26  misrepresentation. Reply to Hunt's Mot. at 12.  But Plaintiffs point to no relevant legislation about the
    word "natural," and in fact their brief discusses "legislative regulation of the antioxidant statements,"
27  which has nothing to do with the Hunt's products.  Id.

28          [27] In addition, as already noted, Jones does not have standing to represent a class of individuals
    who would not have purchased the products at issue if they had known that those products were illegally
    labeled.  An "unlawful" theory will not solve Plaintiffs' reliance problem.

                                              29

United States District Court
For the Northern District of California

1    class should not be certified." Stearns, 655 F.3d at 1022-23 (citing In re Vioxx Class Cases,

2    180 Cal. App. 4th 116, 129 (2009)).

3           Plaintiffs' materiality argument–that "[u]ndoubtedly, a reasonable consumer would

4    attach significance to the challenged label statements" and that defendant must believe that

5    the statements are material or it would not have included them on its labels–is rather weak.

6    See Hunt's Mot. at 11.[28]  The only evidence Plaintiffs rely on in support of this contention is

7    the Caswell Declaration. Id.  Caswell, Plaintiffs' materiality expert, concluded that "In my

8    experience with labeling statements and consumer choice, it is my opinion that the

9    [challenged statements] would be material to a reasonable consumer." Caswell Decl. (dkt.

10   189-5) ¶ 27.  She concluded that the "100% Natural" label would be material "because

11   reasonable consumers would rely on this label to identify products that are natural and in

12   comparison shopping between food products" and that the "Free of artificial ingredients &

13   preservatives" label "is material because consumers would rely on this label to identify

14   products that do not contain both (a) artificial ingredients and (b) preservatives in comparison

15   shopping between food products." Id. ¶¶ 27-28.  This is a bit of an ipse dixit.

16          Caswell did not explain how the challenged statements, together or alone, were a

17   factor in any consumer's purchasing decisions.  She did not survey any customers to assess

18   whether the challenged statements were in fact material to their purchases, as opposed to, or

19   in addition to, price, promotions, retail positioning, taste, texture, or brand recognition. See

20   Hanssens Decl. (dkt. 204) ¶¶ 12-26.  Caswell acknowledged in her deposition that some

21   customers have never noted the "natural claim," have never looked at the ingredients list,

22   would buy a product regardless of whether the product says "natural," and do not care about

23   labeling statements. Hawk Decl. II Ex. B (Caswell Depo) at 191-93.  She also testified that

24

25

26

27          [28] Defendant submits evidence that it did not alter its prices to retailers depending on whether
28   the "Free of Artificial Ingredients & Preservatives" label appeared on the label. See Opp'n to Hunt's
     Mot. at 18 (citing Nangle Decl. ¶ 8).  At best, Defendant's decision to include the representations
     indicates that Defendant hoped that the representations could be material to some customers.

1   she personally "do[es] not pay much attention to 'natural' claims," because "[t]hey're not

2   important to [her] in [her] purchase decisions." Id. at 116-17.[29]

3          Caswell's rather startling admission might have something to do with the fact that

4   there is no single, controlling definition of the word "natural." See Pelayo v. Nestle USA,

5   Inc., No. 13-5213, 2013 WL 5764644, at *4-5 (C.D. Cal. 2013) (discussing lack of a

6   common understanding of the term "all natural" that is shared by reasonable consumers).  It

7   is undisputed that the FDA has not defined the word "natural." See Lockwood v. ConAgra

8   Foods, Inc., 597 F. Supp. 2d 1028, 1034 (N.D. Cal. 2009) ("Although the FDA

9   acknowledges that consumers are being misled by the use of the term 'natural,' it has

10  declined to adopt any regulations governing this term."); "Defining Natural Foods," 26

11  Regent U.L. Rev. at 330 (explaining that in 1991, the FDA adopted an "informal policy" that

12  "natural means merely that 'nothing artificial or synthetic (including colors regardless of

13  source) is included in, or has been added to, the product that would not normally be expected

14  to be there,'" but that such "policy carries only the weight of an advisory opinion, and it does

15  not establish a legal requirement.").  Moreover, it is not clear that the challenged ingredients

16  here are not "natural." See Hawk Decl. II Ex. H (Michelizzi Decl.) ¶¶ 2-3 (ConAgra

17  purchases calcium chloride from a natural source; ConAgra's citric acid is purchased from

18  suppliers who manufacture it using "a natural process of fermentation, using naturally

19  defined carbohydrates, and [it] is confirmed to be natural by these suppliers."); RJN (dkt.

20  206) Ex. B (FDA letter of May 8, 2012 stating that, provided citric acid was from a natural

21  source, "we would not take issue with its use on a product labeled as 'natural.'").

22         While the Court has no trouble believing that the "100% natural" claim is material to

23  some customers, Caswell's testimony does not demonstrate that it is necessarily "material to

24  reasonable consumers."  See In re Steroid Hormone Prod. Cases, 181 Cal. App. 4th at 156-

25  57.  This Court held in Badella v. Deniro Mktg. LLC, No., 10-3908, 2011 WL 5358400, at

26  *9 (N.D. Cal. Nov. 4, 2011), that "[m]ateriality is an objective standard, but still, Plaintiffs

27

28         [29] Caswell further testified that she did not think her husband was deceived in purchasing the
bottle of PAM they had at home "but I don't think he was necessarily paying attention to '100 percent'
claims."  Hawk Decl. I Ex. D (Caswell Depo) at 104.

United States District Court
For the Northern District of California

will need to point to some type of common proof, particularly given Defendant's arguments

that people join Amateur Match for many different reasons and for many different purposes."

Here, although only two challenged label statements are at issue, there are numerous reasons

a customer might buy Hunt's tomatoes, and there is a lack of evidence demonstrating the

impact of the challenged label statements.  Accordingly, Plaintiffs lack common proof of

materiality.  See also Astiana, 291 F.R.D. at 508 (finding inadequate showing of materiality

where "Plaintiffs fail to sufficiently show that 'All Natural' has any kind of uniform

definition among class members, that a sufficient portion of class members would have relied

to their detriment on the representation, or that Defendant's representation of 'All Natural' in

light of the presence of the challenged ingredients would be considered to be a material

falsehood by class members.")[30]; Algarin Order at 16 (holding, as to commonality under Rule

23(a)(2), that "given the persuasive evidence presented on consumer expectations, the

varying factors that influence purchasing decision[s], and consumer satisfaction, the Court

finds that Plaintiffs have also failed to demonstrate that the elements of materiality and

reliance are subject to common proof."); but see Werdebaugh v. Blue Diamond Growers, No.

12-2724, 2014 WL 2191901, at *12-14, 18 (N.D. Cal. May 23, 2014) (finding that

materiality is a question common to the class, noting that representations did not differ for

each proposed class member, concluding that predominance was met for the same reason

commonality was met).[31]

     Even assuming that Plaintiffs had met their burden as to reliance, however, there are

other individual questions that threaten to predominate.  In Hodes, 2009 WL 2424214, at *4,

the court explained that there were "individualized purchasing inquiries" that would need to

---

[30] That court went on to note that even the named plaintiffs disagreed about the definition of "all natural," id., which is also the case here, see Opp'n to Hunt's Mot. at 7 (to Jones, natural "means that the contents of the package contain products that come from nature"; to Sturges, natural means "no added chemicals" and for tomatoes means "just the tomato"; and to Ozzard,  natural means "nonprocessed.").

[31] Judge Koh noted in that case that "Blue Diamond does not assert that differences in its products' labels cause prospective consumers to understand the representations differently." Id. at 25. Although Defendant here does not point to differences in its products labels, it certainly argues–and the record reflects–that consumers understood, and weighed, the 100% natural representations differently.

United States District Court
For the Northern District of California

1  be made.  Explaining that courts in this Circuit have refused to certify classes where such

2  inquiries predominated, the court declared itself "not convinced that the common questions

3  of Van's liability would predominate over the individual questions of <u>who</u> purchased Van's

4  frozen waffles during the relevant class period, <u>which kind</u> of frozen waffles they purchased,

5  <u>how many</u> they purchased, and whether the kinds they purchased contained false nutritional

6  information."  <u>Id.</u>  Whether this is a predominance question, an ascertainability question, or a

7  manageability question, it is also the case here that "ConAgra has no way to determine,

8  through IRI data or otherwise, who the purchasers of its canned tomato products are, i.e., the

9  identity of class members."  Opp'n to Hunt's Mot. at 6.  And it is true that individualized

10  purchasing inquiries will be required to determine how many and which kind of Hunt's

11  products each class member bought.

12      Accordingly, the Court finds that individual inquiries predominate over common ones

13  as to Hunt's.

14              **ii.    PAM**

15      As to PAM, Plaintiffs face the same problems.  Plaintiffs point to Defendant's

16  common conduct of (1) misbranding PAM products as "100% Natural" when they were not,

17  and of (2) identifying a group of ingredients as "propellant," and argue that such common

18  conduct predominates over any individual questions.  PAM Mot. at 16.[32]

19      Plaintiffs' argument under the UCL is that "class-wide reliance is not required."  PAM

20  Mot. at 18.  But the Ninth Circuit recognized in <u>Stearns</u>, 655 F.3d at 1020, that predominance

21  would not "be shown in every California UCL case," such as where there is "no cohesion

22  among the members."  As with Hunt's, there is a lack of cohesion among the class members

23  here, both because consumers were exposed to label statements that changed over time and

24  from product to product, and, more importantly, because "even if  the challenged statements

25  were <u>facially</u> uniform, consumers' <u>understanding</u> of those representations would not be."

26  <u>See</u> Opp'n to PAM Mot. at 19.  As already discussed, there is no fixed meaning for the word

27

28      [32] Defendant notes that Plaintiffs fail to address predominance as to the FAL and unjust enrichment claims.  Opp'n to PAM Mot. at 15 n.6.  Plaintiffs reply that they do seek certification of those claims.  Reply to PAM Mot. at 8 n.4.

United States District Court
For the Northern District of California

"natural."  And, as Defendant notes, Plaintiffs' objection to the term here relates to the propellant; it is not clear that Plaintiff or anyone else would understand the "natural" clam to extend to such substances.  See Hawk Decl. I Ex. A (Sturges Depo) at 109-110 (Q: "Can a food delivered with a propellant . . . be natural?" A: "I don't really know."), 129-30 (food she was intending to consume was cooking oil, not propellant, and she does not understand the cooking oil in PAM to be made up in part of propellant); Hawk Decl. I Ex. D (Caswell Depo) at 151 (Q: "Do consumers understand a 'natural' claim on PAM to pertain to the propellant?" A: "Again, I have not studied that. . . . As a result, I do not know.").

Plaintiffs' argument under the CLRA is that "class-wide reliance is presumed when the misrepresentations or omissions would have been material to 'reasonable persons.'" PAM Mot. at 19.  But Plaintiffs again rely entirely on the Caswell Declaration to establish materiality, id., and that Declaration is again lacking, see Caswell Decl. (dkt. 128-1) ¶ 26 ("The labeling of the product as '100% Natural['] is material because reasonable consumers would rely on this label to identify products that are natural and in comparison shopping between food products.").[33]  As with Hunt's, Caswell did not explain how the challenged statement was a factor in any consumer's purchasing decisions.  She did not survey any customers.  She testified that some percentage of PAM consumers never noted the natural claim on the label, never looked at the ingredient list, bought PAM because they grew up using it and would buy PAM regardless of the natural label, and do not care what the propellant is made from.  Hawk Decl. I Ex. D (Caswell Depo) at 191-93.  She further testified that the "most important attributes of PAM" will vary "by consumer."  Id. at 211.  And of course she testified that she does "not pay much attention to 'natural' claims" in making her own purchasing decisions.  Id. at 116.  As with Hunt's, Plaintiffs have failed to demonstrate materiality.  See Astiana, 291 F.R.D. at 508.

---

[33] Notably, Caswell's opinion is limited to the PAM products "containing significant quantities of undisclosed petrochemicals such as Petroleum Gas (liquified), Propane, Propane 2-methyl (Isobutane) and Butane that comprise 24% or more of the products' ingredients," Caswell Decl. ¶ 25; it does not pertain to the organic PAM products, which used a different propellant, see Opp'n to PAM Mot. at 4.

1    Also, as with Hunt's, even assuming that Plaintiffs had met their burden as to reliance,

2  other individual questions threaten to predominate.  See Hodes, 2009 WL 2424214, at *4.

3  Here, too, individualized purchasing inquiries will be required to determine how many PAM

4  products each class member bought, which kind of PAM products they bought, when they

5  bought them, and what label they bore.

6    Accordingly, the Court finds that individual inquiries predominate over common ones

7  as to PAM.

8                                    **iii.      Swiss Miss**

9    As to Swiss Miss, Plaintiffs again fall short.  Plaintiffs argue that "Defendant's label

10  statements on a given product are the same, everywhere in California.  So, all consumers

11  would have seen the same labeling claims as Plaintiff.  Further, there are no individual

12  reliance components (individual issues) for Plaintiff's UCL, FAL and CLRA claims."  SM

13  Mot. at 15-16.

14    Plaintiffs' argument under the UCL is again that "class-wide reliance is not required."

15  SM Mot. at 16.  But predominance cannot be shown where there is "no cohesion among the

16  members."  See Stearns, 655 F.3d at 1020.  As with Hunt's and PAM, there is a lack of

17  cohesion among the class members here.  Consumers were exposed to label statements that

18  changed over time, at different times, from product to product.  Although the class is limited

19  to Swiss Miss products that included antioxidant statements, some class members will never

20  have seen the challenged statements (because the statements were on the top or back of the

21  products, for example), and there is no way to determine whether a class member ever bought

22  a product with a challenged statement on it.

23    Plaintiffs seek to avoid any need for proof by arguing that the labels are illegal: "If

24  Defendant's labels violate the unlawful prong of the UCL, the inquiry ends there and whether

25  unnamed class members relied on the relevant statement is not an issue before the Court."

26  SM Mot. at 16 (citing In re Steroid Hormone Prod. Cases, 181 Cal. App. 4th at 155).  But In

27  re Steroid Hormone Prod. Cases involved a product (a bodybuilding drug) that was illegal

28  because of what it was (a Schedule III substance unlawful to sell or possess without a

United States District Court
For the Northern District of California

prescription), not how it was labeled.  181 Cal. App. 4th at 155.  Swiss Miss hot cocoa–even if it was mislabeled–is not analogous to a Schedule III substance.  See Gitson v. Trader Joe's Co., No. 13-1333, 2013 WL 5513711, at *6 (N.D. Cal. Oct. 4, 2013) (distinguishing In re Steroid Hormone Prod. Cases, holding in case about yogurt, soy milk, and other grocery products that court would "not presume that a reasonable person would not have purchased the products at issue had the person known of the alleged mislabeling.").  Even if the products were analogous, Sturges has disavowed the "unlawful" theory.  See Hawk Decl. II Ex. A (Sturges Depo) at 88.

Plaintiffs' argument under the CLRA is that "class-wide reliance is presumed when the misrepresentations or omissions would have been material to 'reasonable persons.'"  SM Mot. at 16.  But Plaintiffs again rely entirely on the Caswell Declaration to establish materiality, see Reply to SM Mot. at 7,[34] and that Declaration is again lacking, see Caswell Decl. (dkt. 190-4) ¶ 27 ("The labeling of the product as containing "antioxidants" is material because reasonable consumers would rely on this label to identify products that have particular nutrition attributes and in comparison shopping between food products.").  As with Hunt's and PAM, Caswell did not explain how the (apparently factually accurate) challenged statements were a factor in any consumer's purchasing decisions.  She did not survey any customers.  In addition, Caswell testified that individual consumers' perceptions of what affects their purchasing decisions would be important in determining the materiality of label statements, Hawk Decl. II Ex. B (Caswell Depo) at 66-68, but that she has no knowledge of how customers viewed the challenged statement, id. at 58-60.  Caswell acknowledged that some consumers do not read food labels at all beyond the brand and type of food, and that others do not care about labeling statements and would purchase products regardless of their labels.  Id. at 191-93, 211.  She also asserted that the word "delicious" would be material, and

---

[34] To the extent that Plaintiffs in their reply brief seek to rely on "the legislative decision to prohibit certain types of label statements regarding antioxidants," Reply to SM Mot. at 8, section 101.54 pertains to the level of antioxidants in a product, not simply their presence.  That the legislature prohibited statements about the amount of antioxidants is not conclusive evidence that all statements about antioxidants are material.  See also Hawk Decl. II Ex. A (Sturges Depo) at 98 (Sturges testified that she did not interpret the challenged label statement to say anything about the amount of antioxidants in the products.).

1    that "all the information that appears on labels is of use to consumers and, yeah it's material

2    or could be material." Id. at 125 (emphasis added); compare Hanssens Decl. (dkt. 200) ¶¶

3    29-33 ("Given the heterogeneity in the purchase decision process, it is speculative to assume

4    that the [challenged label statements] on Swiss Miss hot cocoa products were a factor in the

5    purchase decision for all or many of the putative class members, absent evidence directly

6    supporting that assumption.")

7          Also, as with Hunt's and PAM, even assuming that Plaintiffs had met their burden as

8    to reliance, other individual questions threaten to predominate. See Hodes, 2009 WL

9    2424214, at *4. Here, too, individualized purchasing inquiries will be required.

10          Accordingly, the Court finds that individual inquiries predominate over common ones

11   as to Swiss Miss.

12                              **b.    Damages**

13          In Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1433-34 (2013), the Supreme Court

14   held that in order to satisfy the predominance inquiry, plaintiff must also present a model that

15   (1) identifies damages that stem from the defendant's alleged wrongdoing and (2) is

16   "susceptible of measurement across the entire class." 133 S.Ct. at 1433-34. Finding that

17   plaintiffs' damages model did not isolate damages resulting from the accepted theory of

18   antitrust impact, the Court reversed the district court's certification of the class. Id. at 1435.

19   "At class certification, plaintiff must present a likely method for determining class damages,

20   though it is not necessary to show that his method will work with certainty at this time."

21   Chavez, 268 F.R.D. at 379 (internal quotation marks omitted). Individualized damage

22   calculations alone cannot defeat class certification. See Leyva v. Medline Indus., Inc., 716

23   F.3d 510, 513 (9th Cir. 2013) (citing Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d

24   1087, 1094 (9th Cir. 2010)).

25                              **i.    Hunt's**

26          As to Hunt's, Plaintiffs assert that their expert, Dr. Oral Capps, Ph.D., has set forth

27   "sound methods by which the Court may award restitution or a jury may award damages."

28

**United States District Court**
For the Northern District of California

1   Hunt's Mot. at 19 (citing Capps Decl. (dkt. 189-7)).  Plaintiffs seek restitution under the UCL

2   and FAL, and damages under the CLRA.  Id.

3          Capps asserts that "Restitution may be partial, such as in the form of the wholesale

4   price of the products; full, such as in the form of the retail price of the products; or restitution

5   [sic], such as in the form of differences in prices between Defendant's products and similar

6   products not marketed with the unlawful and misleading label statements."  Capps Decl. at 4.

7   Return of the full retail or wholesale prices is not a proper measure of restitution,[35] as it fails

8   to take into account the value class members received by purchasing the products.[36]  Judge

9   Seeborg recently reiterated that "[t]he difference between what the plaintiff paid and the

10  value of what the plaintiff received is a proper measure of restitution."  Ries v. Ariz.

11  Beverages USA LLC, No. 10-1139, 2013 WL 1287416, at *7 (N.D. Cal. Mar. 28, 2013)

12  (citing Vioxx, 180 Cal. App. 4th at 131); see also Lanovaz, 2014 WL 1652338, at *6 ("The

13  proper measure of restitution in a mislabeling case is the amount necessary to compensate the

14  purchaser for the difference between a product as labeled and the product as received."); In re

15  POM Wonderful, 2014 WL 1225184, at *3 (also citing Vioxx, 180 Cal. App. 4th at 131).

16  Plaintiffs' assertion that "restitution is not limited to the difference between what the plaintiff

17  received versus what he or she paid," Reply to Hunt's Mot. at 14, is therefore incorrect in this

18  context.[37]

19  _____

20     [35] Using the full retail or wholesale price does not represent the economic loss attributable to the
    alleged wrongful conduct.  See Ugone Decl. (dkt. 196-3) at 17-20.

21

22     [36] Capps asserts in a reply declaration that he "did not ignore the value received by class
    members from the purchase and use of the subject products in question," he just "did not consider this
    issue to be relevant especially when operating under the assumption that the misbranded or challenged
23  products are worthless from a legal standpoint."  Capps Reply Decl. (dkt. 209) at 6.

24     [37] Plaintiffs argue that the Ninth Circuit held in FTC v. Figgie Int'l, 994 F.2d 595, 606 (9th Cir.
    1993), that once a defendant is liable for deceptive practices, recovery is not limited "to the difference
25  between what [plaintiffs] paid and a fair price for [the product]."  Id. at 14 n.6.  Figgie is distinguishable.
    Importantly, the FTC brought that case to seek consumer redress under the FTC Act, 15 U.S.C. § 57b.
26  994 F.2d at 598.  That statute allows a court to "grant such relief as the court finds necessary to redress
    injury to consumers or other persons, partnerships, and corporations resulting from the rule violation
27  or the unfair or deceptive act or practice, as the case may be.  Such relief may include, but shall not be
    limited to, rescission or reformation of contracts, the refund of money or return of property, the payment
28  of damages, and public notification respecting the rule violation or the unfair and deceptive act or
    practice, as the case may be."  Id. at 605 (citing 15 U.S.C. § 57b(b)).  The language Plaintiffs cite comes

United States District Court
For the Northern District of California

1  The other means of calculating restitution that Capps offers (he later refers to this as

2  the "benefit of the bargain approach") is to take a comparable product and compare the price

3  between it and the allegedly mislabeled Hunt's product.  See Capps Decl. at 5-6.  On

4  February 4, 2014, at the Safeway Kitchens in San Jose, California, Hunt's canned tomato

5  sauce labeled "100% Natural" and "Free of artificial ingredients & preservatives" in a 15

6  ounce can, containing citric acid as an ingredient, sold for $1.49, or 9.9 cents per ounce.  Id.

7  at 6.  Safeway Kitchens canned tomato sauce labeled "100% Natural" but not containing

8  citric acid and not labeled "Free of artificial ingredients & preservatives" in a 15 ounce can

9  sold for $0.99, or 6.6 cents per ounce.  Id.  Capps concludes that "[t]he price difference per

10  ounce subsequently amounts to 3.33 cents per ounce."  Id.  Capps promises that "additional

11  comparable products are likely to be identified," and asserts that "[t]he difference in the price

12  of the ConAgra products from comparable products without the misbranding statement . . .

13  constitutes the damages per unit sold."  Id. at 6-7.

14  This approach is deeply flawed.  It is inadequate to identify a single comparator, given

15  the seven product lines and multiple varieties within each Hunt's product line.  See Nagle

16  Decl. ¶ 6 (listing all Hunt's products).[38]  Even the single comparator that Capps selects is

17  inadequate–first, because it has a 100% natural statement, so it cannot demonstrate any price

18  difference associated with that statement, see Ugone Decl. ¶¶ 33-34, and second, because

19  Safeway is a generic brand, while "Hunt's is a market leader that has spent decades building

20  a brand synonymous with canned tomatoes," id. ¶¶ 37-38.  One cannot assume that the entire

21  price difference between the Hunt's and Safeway cans is attributable to the alleged

22  misstatements.  See In re POM Wonderful, 2014 WL 1225184, at *5 ("Rather than answer

23  the critical question of why that price difference existed, or to what extent it was a result of

24  Pom's actions, Nolte instead assumed that 100% of that price difference was attributable to

25

26  from the court's discussion of an appropriate refund.  See id. at 606.  There is no reason to import the remedies from the FTC Act into a California UCL or FAL case, and Plaintiffs point to no authority that does so.

27

28  [38] Defendant's expert, Keith R. Ugone, Ph.D., opines that "given the complexity of the Hunt's . . . product lines (e.g. large numbers of segments and multiple flavors in each segment), it is not clear that suitable benchmark products exist for each Challenged Product."  Ugone Decl. ¶ 35.

39

**United States District Court**
For the Northern District of California

1   Pom's alleged misrepresentations. . . . This damages 'model' does not comport with

2   <u>Comcast</u>'s requirement that class-wide damages be tied to a legal theory.").

3       To calculate damages under the CLRA, Capps points to the difference in price

4   between Hunt's products and comparator products, Capps Decl. at 6, discussed above, as

5   well as regression analysis.  But the regression analysis he proposes is vague and abstract:

6

7       With the econometric or regression approach, the key finding is the difference in sales
        of the respective products before and after the claims made by ConAgra first appeared
        on the labels.  To glean this difference in sales while controlling for other factors

8       which may be related to sales, the appropriate methodological approach is the use of
        econometric analysis with dummy variables. . . . The subsequent calculations of

9       damages rests on the estimated coefficients associated with these dummy variables,
        controlling for other factors that may also affect sales.

10

11  <u>Id.</u> at 8-9.  Capps does not provide a clearly defined list of variables, he has not determined

12  whether the data related to any or all of his proposed control variables exists, and he has not

13  determined, or shown how he would determine, which competing and complementary

14  products he would use.  <u>See</u> Ugone Decl. ¶ 50.  In <u>Kottaras v. Whole Foods Market, Inc.</u>, 281

15  F.R.D. 16, 25-27 (D.D.C. 2012), where Capps had "not yet performed a single regression,[39]

16  [and] could not even tell the Court the precise analyses he intended to undertake," the court

17  found that his proposed methodology was "not sufficiently developed to meet Plaintiff's

18  burden of showing that common questions predominate."  The Court reaches the same

19  conclusion here.  Plaintiffs have not presented an adequate damages model as to Hunt's.[40]

20                          **ii.      PAM**

21      As to PAM, Plaintiffs face the same problems.

22      Capps proposes to effect restitution under the UCL and FAL simply by "return of the

23  purchase price" to class members.  Capps Decl. (dkt. 128-7) ¶ 6; Hawk Decl. I Ex. E (Capps

24  Depo) at 90 (assuming class members "would be refunded 100 percent of the price he or she

25      [39] Capps did a "preliminary regression[]" in his reply declaration here, Capps Reply Decl. ¶ 19
    & figs. 5-6, but Defendant complains that it does "not include the variable that he previously identified
26  as his 'key finding': a variable associated with the presence of absence of the Challenged Claims . . .
    over time."  Obj. to Reply Decl. (dkt. 215) at 3.

27

28      [40] The Court observes that Judge Koh recently assessed Capps's work in <u>Werdebaugh</u>, 2014 WL
    2191901, at *21-26, and while she rejected his restitution analysis for many of the reasons discussed
    herein, <u>see id.</u> at *22-23, she found that his regression analysis was "sufficient," <u>id.</u> at *24-26.

                                    40

**United States District Court**
For the Northern District of California

paid for the product."). That method does not account for the value class members received from the PAM products, and so it is incorrect. See Ries, No. 10-1139, 2013 WL 1287416, at *7 (citing Vioxx, 180 Cal. App. 4th at 131). Capps acknowledges that PAM is not "economically worthless." Hawk Decl. I Ex. E (Capps Depo) at 91. And he admits that, absent the legal assertion that PAM products had no value to class members, his restitution analysis would have no correlation to any economic injury suffered. Id. at 101. He further concedes that his model would not work without "some sort of proof of purchase," "[o]therwise, some consumers would be inappropriately compensated." Id. at 93-94. But Capps does not know what individual class members paid, and neither does Sturges. See Hawk Decl. I Ex. A (Sturges Depo) at 73, 150, 152 (Sturges does not know what she paid for PAM purchases, does not know if she suffered financial injury, does not know if they were worth what she paid for them).

Capps again proposes calculating damages under the CLRA via a benefit-of-the-bargain analysis, see Capps Decl. ¶¶ 10-14, or a regression analysis, see id. ¶¶ 15-21. But he fails to identify a comparator product in order to calculate a percentage of overpayment. See Capps Decl. ¶ 14 ("With sufficient discovery, I can ascertain whether there are comparable products with which to conduct the benefit of the bargain analysis."). And he admitted in his deposition that he does not know whether such a comparator product exists. Hawk Decl. I Ex. E (Capps Depo) at 153-54 (Q: "do you intend to compare PAM to competitive cooking sprays with hydrocarbon propellants that do not have 100% natural on the label? Is that what you're intending to do?" A: "I suppose I'll have to. . . ." Q: "Are there such competitive products on the market that use hydrocarbon propellants but don't have 100% natural on the label?" A: "I don't know that for sure."). He also asserts that "The difference in the price of the ConAgra cooking spray products from comparable cooking spray products constitutes the damages per unit sold," Capps Decl. ¶ 14, but does not explain why the entire price difference is attributable to the challenged statement.

Capps's regression analysis is as vague and untested as it is with Hunt's. See Ugone Decl. (dkt. 161) at 20-22. Plaintiffs' reply that "Dr. Ugone does not consider Dr. Capps's[s]

41

United States District Court
For the Northern District of California

complete deposition testimony in which he clearly describes the blueprint of the explanatory variables to be used in the regression analysis," without any citation to that testimony, see Reply to PAM Mot. at 11, is clearly inadequate. Moreover, Capps testified that the overpayment percentage he expects to calculate under either the benefit of the bargain or the regression approach must be multiplied by the specific purchase price a class member paid in order to convert it to an actual damages award. Hawk Decl. I Ex. E (Capps Depo) at 89-90 (describing how allocation would work, requiring "some proof of purchase"), 142 ("I don't know how a consumer would be compensated without proof"). Again, Plaintiffs point to no accurate way to determine what class members actually paid. See Red, 2012 WL 8019257, at *11 ("While the amount of [a] premium might be established on a class-wide basis, Plaintiffs cannot get around the fact that individual class members, to recover, would need to show, at a minimum, proof of how many purchases they made of the offending products.")

Plaintiffs have not presented an adequate damages model as to PAM.

### iii.    Swiss Miss

As to Swiss Miss, Plaintiffs also fall short.

Capps proposes to effect restitution under the UCL and FAL "using average retail prices, average wholesale prices, or using a 'benefit of the bargain' approach." SM Mot. at 18. The Court has already concluded that return of the full purchase price is improper under Ries, No. 10-1139, 2013 WL 1287416, at *7 (citing Vioxx, 180 Cal. App. 4th at 131), because it does not account for the value class members received from the Swiss Miss products. The benefit of the bargain approach here is also problematic because Capps identified just one comparable product. On February 4, 2014, at a Safeway Kitchens in San Jose, California, a 10 ounce package of Swiss Miss hot cocoa mix containing an antioxidant claim sold for $3.39, or 33.9 cents per ounce. Capps Decl. (dkt. 190-3) ¶ 15. Capps also identified a Safeway Kitchens hot cocoa mix in a 10 ounce package without an antioxidant claim, which sold for $2.99 or 29.9 cents per ounce. Id. He concludes that the "price difference is tantamount to an overcharge of approximately 11.8 percent," id., and that the entire overcharge is the damages per unit sold, id. ¶ 18. As with Hunt's, the generic

1    comparator product is not appropriate.  See Ugone Decl. ¶¶ 37-38 (Swiss Miss is a market

2    leader that has spent decades building a brand synonymous with cocoa).  As with Hunt's, the

3    entire price difference between Swiss Miss and the generic comparator cannot be attributable

4    to the label statement.  See In re POM Wonderful, 2014 WL 1225184, at *5.

5        Capps again proposes calculating damages under the CLRA via a benefit-of-the-

6    bargain analysis, see Capps Decl. ¶¶ 14-18, or a regression analysis, see id. ¶¶ 19-24.  But his

7    benefit-of-the-bargain analysis requires the use of a comparable product, and as already

8    discussed, Capps did not identify an adequate comparator.  Defendant challenges Capps's

9    regression analysis on the same bases as it did as to the other product groups, see Ugone

10   Decl. ¶ 7 (incomplete description, etc.), and Plaintiffs try to correct some of the deficiencies

11   through a reply declaration, see generally Capps Reply Decl. (dkt. 209-3) ("I have

12   demonstrated using data obtained from the Defendant that several damages models can be

13   constructed in regard to the class defined in Plaintiffs' Motion for Class Certification.").

14   Defendant objects to the reply declaration, arguing that it introduces new evidence, fails to

15   meet evidentiary standards for proper expert testimony, and is not a proper reply.  See

16   generally Obj. to Reply Decl.  Plaintiffs oppose those objections.  See Opp'n to Obj. (dkt.

17   216).  The Court permits the declaration but recognizes its limitations.[41]  Even assuming

18   Capps had sufficiently demonstrated that his proposed regression model was viable, his

19   model requires purchase price information in order to allocate any award.  See Hawk Decl. I

20   Ex. E (Capps Depo) at 89-90 (describing how allocation would work, requiring "some proof

21   of purchase"), 142 ("I don't know how a consumer would be compensated without proof").

22   And, as already discussed, it is highly unlikely that consumers will be able to provide such

23   information.  This is highly problematic.  See Red, 2012 WL 8019257, at *11.

24       Perhaps in light of these problems, Plaintiffs argue for the first time in their reply brief

25   that "[t]here are still other ways to prove class-wide damages."  Reply to SM Mot. at 13.

26

27       [41] Again, Defendant's most persuasive objections to the reply declaration are that while it
     purports to do a preliminary regression, it provides no measure of claimed class damages and does not
28   include the variable Capps previously identified as his "key finding"–a variable associated with the
     presence or absence of the challenged label statements over time.  Id. at 3.

United States District Court
For the Northern District of California

1    They argue that the Swiss Miss products are "legally worthless" because they are illegal to

2    sell or possess, and therefore result in damages equal to the entire purchase price.  Id.  This

3    Order has already concluded that the unlawful product theory fails.  Even if it did not,

4    Plaintiffs face the same obstacle in class members not knowing their purchase prices.

5         Plaintiffs also argued for the first time in their reply brief that the Court could award

6    nominal damages under California Civil Code section 3360, or statutory damages under the

7    CLRA.  Id. at 14.[42]  Neither of these would require a damages model or proof of individual

8    consumers' purchase prices.   However, neither are appropriate.

9         Section 3360 allows for nominal damages "[w]hen a breach of duty has caused no

10   appreciable detriment to the party affected."  Cal. Civ. Code § 3360.  But Plaintiffs' CLRA

11   claim has nothing to do with a breach of duty, see SAC ¶¶ 298-316, and Plaintiffs do not

12   identify one in their reply brief, see generally Reply to SM Mot.  Nor do Plaintiffs point to

13   any CLRA case permitting nominal damages, let alone a CLRA class action.  See id.; cf.

14   Stilson v. Reader's Digest Ass'n, Inc., 28 Cal. App. 3d 270, 274 (1972) ("Although an award

15   of but nominal damages to each of the millions of unnamed plaintiffs would impose a heavy

16   penalty upon defendants, it would hardly serve the interest of any plaintiff.").

17        The CLRA addresses damages, but only to say that any consumer who suffers damage

18   may bring an action to recover, among other things, "Actual damages, but in no case shall the

19   total award of damages in a class action be less than one thousand dollars ($1,000)."  Cal.

20   Civ. Code § 1780(a)(1).  That language sets the minimum for a total award of damages in a

21   class action at $1,000; it does not provide for an automatic award of $1,000 per individual

22   class member.  Compare 17 U.S.C. § 504(c) (providing that copyright owner may elect

23   award of statutory damages for all infringements of $750 to $30,000 per infringement).  Thus

24   in Wilens v. TD Waterhouse Grp., Inc., 120 Cal. App. 4th 746, 754 (2003), the California

25   Court of Appeal explained, "This language does not create an automatic award of statutory

26   damages upon proof of an unlawful act.  Relief under the CLRA is specifically limited to

27

28
_____

[42] The Court allowed Defendant to file, after the motion hearing, a short brief responding to this argument.  See Minutes (dkt. 226).  Defendant did so.  See Supp. Br. (dkt. 227).

United States District Court
For the Northern District of California

1    those who suffer damage, making causation a necessary element of proof." See also

2    Delarosa v. Boiron, Inc., 275 F.R.D. 582, 593 (C.D. Cal. 2011) (same).[43]

3        Accordingly, the Court finds that Plaintiffs have not presented an adequate damages

4    model as to Swiss Miss.

5            **2.    Superiority**

6        Finally, in addition to demonstrating the predominance of common issues, a plaintiff

7    seeking to certify a class under Rule 23(b)(3) must demonstrate "that a class action is

8    superior to other available methods for fairly and efficiently adjudicating the controversy."

9    Pertinent to that determination is: (a) the class members' interests in individually controlling

10   the prosecution or defense of separate actions; (b) the extent and nature of any litigation

11   concerning the controversy already begun by or against class members; (c) the desirability or

12   undesirability of concentrating the litigation of the claims in the particular forum; and (d) the

13   likely difficulties in managing a class action. Id.  Assessing superiority "necessarily involves

14   a comparative evaluation of alternative mechanisms of dispute resolution." See Hanlon, 150

15   F.3d at 1023.

16           **a.    Hunt's**

17       As to Hunt's, Defendant does not specifically address superiority.  Nonetheless, its

18   arguments about ascertainability also apply to manageability.  See In re POM Wonderful

19   LLC, 2014 WL 1225184, at *6 n.8.  Plaintiffs have not proposed an adequate means of

20   identifying each class member, which products each class member purchased, and how many

21   products each class member purchased.  See Hodes, 2009 WL 2424214, at *4 (expressing

22   same concerns); Sethavanish, 2014 WL 580696, at *6 (same); see also Algarin Order at 23

23   ("Courts are reluctant to permit action[s] to proceed where there are formidable . . .

24   difficulties of distributing any ultimate recovery to the class members, because such actions

25   are not likely to benefit anyone but the lawyers who bring them.") (internal quotation marks

26

27       [43] To the extent that Pickman v. Am. Exp. Co., No. 11-5326, 2012 WL 258842, at *2 (N.D. Cal.
     Jan. 27, 2012) (calculating amount in controversy by multiplying "the minimum amount of damages to
28   be sought under the CLRA ($1,000) by the number of alleged violations"), suggests a different analysis,
     the Court would disagree with it.

45

1  omitted).  Given these deficiencies, it is not at all clear that a class action as to Hunt's would

2  be manageable, or superior to individual actions.[44]

### b.   PAM

4  As to PAM, Plaintiff argues that "[g]iven the number and importance of the common

5  questions described above, the adjudication of class claims would not be significantly more

6  burdensome than if the matter were prosecuted individually."  PAM Mot. at 22.  Defendant

7  responds, though, that PAM labels differed during the class period among products and over

8  time, that consumers will not be able to readily determine whether they are class members,

9  that there is no way to test their recollections, and that there is no way to establish what class

10  members paid for their PAM purchases.  Opp'n to PAM Mot. at 24-25.  Despite the

11  undeniably common questions–chiefly, can Defendant label PAM as "all natural" if it

12  contains unnatural propellants–the concerns Defendant raises are substantial and render the

13  case unmanageable.  Class treatment is not superior as to PAM.

### c.   Swiss Miss

15  As to Swiss Miss, Defendant does not specifically address superiority.  Nonetheless,

16  its arguments about ascertainability also apply to manageability.  See In re POM Wonderful

17  LLC, 2014 WL 1225184, at *6 n.8.  As with Hunt's and PAM, it is not at all clear that a class

18  action as to Swiss Miss would be manageable, or superior to individual actions.

## IV.   CONCLUSION

20  For the foregoing reasons, the Court DENIES all three motions.

21  **IT IS SO ORDERED.**

22

23  Dated: June 13, 2014

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

---

[44] Of course, there are significant problems with individual actions as well.  As in Hanlon, individual cases here "would not only burden the judiciary, but would prove uneconomic for potential plaintiffs."  150 F.3d at 1023.  It is hard to imagine many class members actually pursuing individual cases.  "[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative–no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied–to no litigation at all."  Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004).  This case is "unwieldy indeed."

United States District Court
For the Northern District of California